**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**(FORT WORTH DIVISION)**

| | | |
|---|---|---|
| **ROI DEVELOPERS, INC. d/b/a ACCRUVIA** | § | **Case No. 4:22-cv-00073-O** |
| | § | |
| | § | (Formerly in the 96th District Court of Tarrant |
| *Plaintiff* | § | County, Texas |
| | § | Cause No. 096-331099-21 |
| **VS.** | § | |
| | § | |
| **ATHENA BITCOIN, INC. d/b/a ATHENA BITCOIN GLOBAL** | § | |
| | § | |
| | § | |
| *Defendant* | § | |

## APPENDIX TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

This *Appendix to Defendant's Motion for Summary Judgment and Brief in Support* contains the following evidence in support of the Defendant's motion that is attached hereto and fully incorporated herein by reference thereto:

a.  ***Exhibit 1***: The Term Sheet signed and entered by and between ABIT and Accruvia on September 22, 2021 ("Term Sheet" herein) which was marked as *Exhibit 3* to the oral deposition of Eric Gravengaard taken on August 17, 2022 in this case;

b.  ***Exhibit 2***: Certified copy of the translated Non-Disclosure Agreement signed and entered into by Shaun Overton for the benefit of AHES;

c.  ***Exhibit 3***: Oral Deposition of Accruvia's corporate representative, Shaun Overton ("Accruvia Deposition") taken on August 16, 2022 in this case;

d.  ***Exhibit 4***: Oral Deposition of Athena's corporate representative, Eric Gravengaard ("Athena Deposition") taken on August 17, 2022 in this case;

e.  ***Exhibit 5***: Letter with Demand for Payment on behalf of Accruvia to ABIT dated December 14, 2021; and

f.  ***Exhibit 6***: Affidavit of Larry L. Fowler, Jr. dated October 4, 2022.

Respectfully submitted,


____/s/ Larry L. Fowler, Jr._____
LARRY L. FOWLER, JR.
State Bar No. 07321900

**HARRIS ⭐ COOK, L.L.P.**
1309-A West Abram
Arlington, Texas 76013
817/299-2841 – Telephone
817/460-8060 – Facsimile
Email:  Larry@HarrisCookLaw.com
**ATTORNEYS FOR DEFENDANT ATHENA BITCOIN, INC.**


## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2022, a true and correct copy of the above and foregoing document has been served on all counsel of record listed below via email through the PACER system.

Kelly Stewart
K Stewart Law, P.C.
5949 Sherry Lane, Suite 900
Dallas, TX  75225
kelly@kstewartlaw.com
Attorney for Plaintiff


*/s/ Larry L. Fowler, Jr.*
LARRY L. FOWLER, JR.

# ATHENA

### BITCOIN

**Term Sheet**

Dated: September 22, 2021

To: Shaun Overton
ROI Developers, Inc DBA Accruvia

Athena Bitcoin Global ("Purchaser") and Shaun Overton on behalf of himself and ROI Developers, Inc DBA Accruvia (jointly "Seller") arrived at a verbal agreement to enter into a binding Term Sheet this morning subject to regular and ordinary due diligence. h

1. <u>Terms.</u> Subject to signing definitive agreements and due diligence, Purchaser will acquire certain assets on the terms listed on <u>Exhibit A.</u>

2. <u>Other Offers.</u> Understanding that Purchaser will be incurring legal, accounting, and other expenses, you agree not to directly or indirectly solicit, negotiate, or consider any proposal relating to the acquisition of Seller's equity interests or assets, whether directly or indirectly, between the date hereof and October 31, 2021. Purchaser will be entitled to damages and equitable relief, including reasonable attorney's fees, to enforce the terms of this paragraph and paragraph 3, below.

3. <u>Confidentiality.</u> All parties agree that the terms of this letter will be treated confidentially, except that the parties hereto may disclose this letter of intent to their respective legal and accounting advisors or by court order.

4. <u>Binding Nature.</u> The obligation of Purchaser to move forward with the transactions contemplated in this term sheet is contingent upon: (i) completion of due diligence and the acquisition of any and all releases and liability protection to the satisfaction of Purchaser in its sole discretion, (ii) Seller conducting s business in the ordinary course, and (iii) no material change in the value, condition or ownership of Seller. Except as expressly set forth in this Section 5: (a) this term sheet is intended to inform the final documents; b) both parties agree to and sign definitive transaction documents, the terms and conditions of which may e different from the terms set forth herein based on due diligence. The provisions set forth in Sections 2 & , will be binding on and enforceable by each of the parties and any party seeking to enforce such ections(s) is entitled to attorney's fees, costs, and expenses in connection with the enforcement of the ame.

o agreed and approved;

he undersigned agrees to the above terms and conditions.

*[signature page follows]*

Exhibit 1

ATH

Exhibit
3

17th Aug 2022    **3**

**EXHIBIT**

## PURCHASE PRICE AND TERMS

**Purchased Assets and Purchase Price**: Purchaser shall purchase 100% of all intellectual property, service agreements (implied, written, or otherwise), and all other assets of Seller at a price equal to $4,500,000 plus the Seller's capitalized expenses on its balance sheet for Intellectual Property ("Purchase Price"), and employ Shaun Overton with the terms identified herein.

**Payment Terms**: The amount of $4,500,000 of the Purchase Price is to be paid by Purchaser to Shaun Overton with options on equity issued at a strike price of $.10 common shares of Athena Bitcoin Global, yielding options on 45,000,000 shares (based upon a strike price of $.10). The options will vest over four years starting 9 months after execution of final documents with steps every year (9,000,000 options vesting at each vesting point). Options vest pursuant to Shaun Overton continuing employment with Purchaser. Should Shaun Overton pass away or become severely physically incapacitated prior to full vesting through no willful act of Shaun or his beneficiaries, his options will continue to vest.  The remaining Purchase Price (for the Intellectual Property will be paid by Purchaser in a commercially reasonable manner of Purchaser's choosing.)

**Due Diligence:** Purchaser will provide an initial list of due diligence items required within 5 business days of Term Sheet execution. Seller will provide responses to due diligence requests within 15 business days or ask for additional time if needed to be reasonably agreed to by Purchaser.

**Legal Documentation Date**: Draft legal documentation will be provided within 15 business days of Term Sheet execution.

**Targeted Closing Date**: October 22, 2021

**REPRESENTATIONS:**

**Purchaser**: Purchaser has recently raised a round of funding converting into common stock at $.10/share. Executive Compensation of $175,000 - $225,000 annual is in line with a recently promoted senior executive with similar equity position as Seller.

**Seller**: Seller will not change the compensation of, or hire, or terminate, any employee, or change any other material expense required prior to the Closing Date without notifying Purchaser. Upon the Closing Date, and thereafter, the Seller will continue to operate the business utilizing Seller's existing employees and independent contractors.

**EMPLOYMENT AGREEMENT**: Shaun Overton, shall be retained as an Employee affiliated with  Purchaser as of the Closing Date, and be granted a title commensurate with a leadership role on the technology team with a salary between $175,000 and $225,000. Shaun will be afforded all standard benefits be offered by the Purchaser to similarly senior executives. The Purchaser intends to act in good faith to maintain Shaun's employment with the company while he performs the role commensurate with his title.

**MISCELLANEOUS:** (1) Seller agrees to work exclusively with Purchaser for any of Purchaser's current or future clients (2) Seller agrees to be bound by Confidentiality and Non Disclosure Agreement sent forthwith

ATHENA 000004

TERM SHEET
ROI Developers, Inc DBA Accruvia

Sincerely,

PURCHASER ATHENA BITCOIN GLOBAL, INC.

By:  Eric Gravengaard
Title:  CEO
Date: 9/22/2021

SELLER: Shaun Overton and ROI Developers, Inc DBA Accruvia

By:  Shaun Overton
Title:  on behalf of himself and ROI Developers, Inc DBA Accruvia
Date: 9/22/2021



460 W Irving Park Rd
Suite C
Bensenville, IL 60106
800 959 2874
www.burgtranslations.com

March 23, 2022

I, the undersigned, having been duly sworn, depose and say that the following document:

- NDA_Redacted.docx

has been translated from **Spanish** into **English** by BURG Translations, Inc. and, to the best of my knowledge and belief, it is a true and accurate rendering of the original document.

STATE OF ILLINOIS
COUNTY OF COOK
Chicago, Illinois, March 23, 2022

Signed and attested before me on this 23th day of March, 2022 by **Buse Nur Köstekli**

**BURG** TRANSLATIONS, INC.
460 W Irving Park Rd,
Suite C
Bensenville, Illinois 60106
(800) 959-2874

Buse Nur Köstekli
Junior Project Manager

Angelo Passalacqua, Notary Public

Cook County, State of Illinois

ANGELO PASSALACQUA
Official Seal
Notary Public - State of Illinois
My Commission Expires Nov 29, 2024






**Exhibit 2**   6

FILED DATE: 2/7/2022 6:56 PM 2022CH01062

I, *Shaun Overton*, *40* years of age, *1917 Sage Trail.* in the municipality of *Hurst*, State of *Texas, USA* with the Unique Identification Document number: **[REDACTED]**, hereby **DECLARE: I)** That between my person and the company that operates under the name of **"ATHENA HOLDINGS EL SALVADOR, VARIABLE CAPITAL LIMITED COMPANY",** abbreviated as **AHES, S.A. DE C.V.,** there has been an individual work relationship since 09/22/2021, and by virtue of this, I have exercised and will continue to exercise my position as CTO. As a result of this, I have had contact with, handled and received commercial information of a restricted and confidential nature, regarding marketing, technical, financial, accounting and legal matters, among others, from AHES, S.A. DE C.V., as well as from the people who are related to it. **II)** That due to the foregoing, I hereby undertake to maintain total confidentiality in relation to the information that I have received, handled and managed or that in any way has come into my possession throughout the aforementioned employment relationship, including but not limited to the following: a) Financial, accounting, industrial, commercial, customer, marketing, strategic, legal, technical, and other information generated or not generated by the company for the exclusive use of the business, whether in the verbal, digital or physical form; b) Accounts and passwords for access to computerized applications, electronic mail, banking services, databases, operating systems, personal computers, communication equipment, and other electronic devices and services that allow access to tangible or intangible resources of the company; c) Any other document or information that may in any way be part of the intangible assets of AHES, S.A. DE C.V. that is and will be received by me from any of the members, representatives, employees, legal representatives, lawyers and/or executives and even clients of the aforementioned company, under the protection of this instrument, including preliminary documents, notes, reports, studies, correspondence, facsimiles and any other information transmitted by any means; these will be considered by me to be confidential. **III)** That as a consequence of the employment relationship that I have maintained and continue to maintain with AHES, S.A. DE C.V., I expressly consider and acknowledge that all related information is and will be the exclusive property of AHES, S.A. DE C.V., and therefore all the information, including but not limited to any commercial and confidential information

FILED DATE: 3/18/2022 6:55 PM 2022CH01062

which may have been disclosed to me by virtue of the aforementioned employment relationship and of all that is relevant to AHES, S.A. DE C.V. or to its subsidiaries and other entities related to it, will not be used by me for any reason or for any purpose. Therefore I will take all necessary measures to maintain the confidentiality of the information and prevent its loss or disclosure to third parties. Likewise, I declare that I understand that all the information received is characterized as being a "business secret", due to its having commercial value and to having been reserved by AHES, S.A. DE C.V. for exclusive use as restricted information. Therefore, it is understood that ATHENA HOLDINGS EL SALVADOR, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE will have the right to demand from me verbally or in writing at any time that the restricted, confidential or internal information of the company that is in my possession be destroyed or returned, regardless of whether such information was provided before this date. **IV)** Whereas, I expressly assume the responsibility for any loss, theft, destruction and/or misuse of any information owned by AHES, S.A. DE C.V. that is contained within personal computers that are not owned by AHES, S.A. DE C.V., as well as all information that has been extracted or will be extracted in the future by me through magnetic storage devices, compact discs, USB keys, forwarding of said information to personal email, disclosures on social networks, digital platforms, other devices such as cell phones or tablets, or through any other technology. I hereby unequivocally undertake not to take photographs of equipment, materials, supplies, structures, spaces, real estate, or any other distinctive, commercial sign or logos that were owned or merely in the possession of, but ultimately linked to AHES, S.A. DE C.V., nor to disclose in any physical or digital medium any photograph or content related to the operation and economic activity of AHES, S.A. DE C.V.. I also agree not to remove any work tools or personal property owned or held by AHES, S.A. DE C.V. that are part of the development, management and operation of the economic activity of said company, regardless of the object and value in question. Therefore, I hereby assume the risk of being liable for damages caused to ATHENA HOLDINGS EL SALVADOR, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, SA, DE CV, and/or its clients, derived from the breach of any of the obligations and declarations contained in this instrument. **V)** That the statements made through this document and the

obligation to maintain confidentiality implicit in all statements are in force as of this date and will continue to be in force, even if said employment relationship is terminated, without a time limit and regardless of the reason that may cause said termination of the relationship. Finally, I hereby manifest that in the event of breach of the obligations contained in this declaration, I will be civilly and criminally liable before ATHENA HOLDINGS EL SALVADOR, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE or any of its clients who may be affected as a result of my breach; in which case ATHENA HOLDINGS EL SALVADOR, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE may pursue against me all the legal actions to which said breach may give rise, particularly the compensation for the damages caused, being financially liable up to the amount of thirty thousand dollars of the United States of America or legal tender. **VI)** That for the legal effects of the interpretation of this declaration, I expressly submit to the legal system of the Republic of El Salvador and its judicial courts. In witness whereof I sign this document in the city of San Salvador, State of San Salvador, on the _22nd_ day of the month of _September_ of the year two thousand and twenty-one.

[Stamp: JUAN
CARLOS PREZA
SALINAS –
REPUBLIC OF EL
SALVADOR-
NOTARY (initials)]

**Signature:** *[signature]*

In the city of San Salvador, State of San Salvador, at _17_ hours and _04_ minutes on _Wednesday [sic]_ of the month of _September_ of two-thousand and twenty-one. Before me, JUAN CARLOS PREZA SALINAS, Notary, of the municipality of San Salvador, State of San Salvador, appeared ___*[blank]*___, _40_ years of age, _1917 Sage Trail_, from the municipality of _Hurst_, state of _Texas, USA_,   whom I do not know but whom I identified by means of his Unique Identification Document number: **[REDACTED]** , AND DECLARED: That he

FILED DATE: 2/7/2022 6:56 PM 2022CH01062

recognizes as his the signature at the bottom of the previous document, as well as the statements and obligations contained therein, as it was signed in this city, on this same day, month and year. Said document literally STATES: **I)** That between my person and the company that operates under the name of ATHENA HOLDINGS EL SALVADOR, VARIABLE CAPITAL LIMITED COMPANY, abbreviated as AHES, S.A. DE C.V., there has been an individual work relationship since *09/22/2021*. and by virtue of this, I have exercised and will continue to exercise my position as *CTO*. As a result of this, I have had contact with, handled and received commercial information of a restricted and confidential nature, regarding marketing, technical, financial, accounting and legal matters, among others, from AHES, S.A. DE C.V., as well as from the people who are related to it. **II)** That due to the foregoing, I hereby undertake to maintain total confidentiality in relation to the information that I have received, handled and managed or that in any way has come into my possession throughout the aforementioned employment relationship, including but not limited to the following: a) Financial, accounting, industrial, commercial, customer, marketing, strategic, legal, technical, and other information generated or not generated by the company for the exclusive use of the business, whether in the verbal, digital or physical form; b) Accounts and passwords for access to computerized applications, electronic mail, banking services, databases, operating systems, personal computers, communication equipment, and other electronic devices and services that allow access to tangible or intangible resources of the company; c) Any other document or information that may in any way be part of the intangible assets of AHES, S.A. DE C.V. that is and will be received by me from any of the members, representatives, employees, legal representatives, lawyers and/or executives and even clients of the aforementioned company, under the protection of this instrument, including preliminary documents, notes, reports, studies, correspondence, facsimiles and any other information transmitted by any means; these will be considered by me to be confidential. **III)** That as a consequence of the employment relationship that I have maintained and continue to maintain with AHES, S.A. DE C.V., I expressly consider and acknowledge that all related information is and will be the exclusive property of AHES, S.A. DE C.V., and therefore all the information, including but not limited to any commercial and confidential information

FILED DATE: 2/7/2022 6:56 PM 2022CH01062

which may have been disclosed to me by virtue of the aforementioned employment relationship and of all that is relevant to AHES, S.A. DE C.V. or to its subsidiaries and other entities related to it, will not be used by me for any reason or for any purpose. Therefore I will take all necessary measures to maintain the confidentiality of the information and prevent its loss or disclosure to third parties. Likewise, I declare that I understand that all the information received is characterized as being a "business secret", due to its having commercial value and to having been reserved by AHES, S.A. DE C.V. for exclusive use as restricted information Therefore, it is understood that ATHENA HOLDINGS EL SALVADOR, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE will have the right to demand from me verbally or in writing at any time that the restricted, confidential or internal information of the company that is in my possession be destroyed or returned, regardless of whether such information was provided before this date. IV) Whereas, I expressly assume the responsibility for any loss, theft, destruction and/or misuse of any information owned by AHES, S.A. DE C.V. that is contained within personal computers that are not owned by AHES, SA DE C.V., as well as all information that has been extracted or will be extracted in the future by me through magnetic storage devices, compact discs, USB keys, forwarding of said information to personal email, disclosures on social networks, digital platforms, other devices such as cell phones or tablets, or through any other technology. I hereby unequivocally undertake not to take photographs of equipment, materials, supplies, structures, spaces, real estate, or any other distinctive, commercial sign or logos that were owned or merely in the possession of, but ultimately linked to AHES, SA DE C.V., nor to disclose in any physical or digital medium any photograph or content related to the operation and economic activity of AHES, S.A. DE C.V. I also agree not to remove any work tools or personal property owned or held by AHES, S.A. DE C.V. that are part of the development, management and operation of the economic activity of said company, regardless of the object and value in question. Therefore, I hereby assume the risk of being liable for damages caused to ATHENA HOLDINGS EL SALVADOR, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, SA, DE CV and/or its clients, derived from the breach of any of the obligations and declarations contained in this instrument. V) That the statements made through this

FILED DATE: 2/7/2022 6:56 PM 2022CH01062

document and the obligation to maintain confidentiality implicit in all statements are in force as of this date and will continue to be in force, even if said employment relationship is terminated, without a time limit and regardless of the reason that may cause said termination of the relationship. Finally, I hereby manifest that in the event of breach of the obligations contained in this declaration, I will be civilly and criminally liable before ATHENA HOLDINGS EL SALVADOR, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE or any of its clients who may be affected as a result of my breach; in which case ATHENA HOLDINGS EL SALVADOR, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE may pursue against me all the legal actions to which said breach may give rise, particularly the compensation for the damages caused, being financially liable up to the amount of thirty thousand dollars of the United States of America or legal tender. **VI)** That for the legal effects of the interpretation of this declaration, I expressly submit to the legal system of the Republic of El Salvador and its judicial courts.

And I, the undersigned Notary, **HEREBY CERTIFY:** That the signature that appears at the end of the previous document is authentic, as it was signed in his own handwriting and in my presence by the appearing party. This was the declaration of the appearing party, to whom I explained the legal effects of this notarial deed, which consists of two effective pages; and it having been read by me in its entirety, in a single uninterrupted act, he ratified its content and for the record signs with me. **I HEREBY CERTIFY. -**

Signature:   **[Signature]**

[Stamp: JUAN
CARLOS PREZA
SALINAS –
REPUBLIC OF EL
SALVADOR-
NOTARY (initials)]

FILED DATE: 2/7/2022 6:56 PM   2022CH01062

_Shaun Overton_ de _40_ años de edad,
_1717 Sage Trail_ del domicilio de _Hurst_, Departamento de
_Texas, EE.UU._ con Documento Único de Identidad número:
█████████████, por este medio **OTORGO: I)** Que entre
mi persona y la sociedad que gira bajo la denominación de "**ATHENA HOLDINGS EL SALVADOR,
SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE**", abreviadamente "**AHES, S.A. DE C.V.**", ha existido
una relación individual de trabajo desde el día _22/09/2021_
y en virtud de ello, he ejercido y continuaré ejerciendo mi cargo de
_CTO_. Debido a ello, he tenido contacto, manejado y recibido
información comercial de uso restringido y confidencial, de mercadeo, técnica, financiera,
contable y legal, entre otras, de parte de "AHES, S.A. DE C.V.", así como de las personas que se
relacionan con ésta. **II)** Que por lo antes expuesto, a través del presente me obligo a mantener
en total confidencialidad la información que he recibido, manejado y dirigido o que de
cualquier forma ha llegado a mi poder a lo largo de la relación laboral antes mencionada,
incluyendo pero no limitado a lo siguiente: a) Información financiera, contable, industrial,
comercial, de clientela, de mercadeo, estratégica, legal, técnica, y de otra índole generada o
no generada por la sociedad para uso exclusivo del negocio, ya sea en forma verbal, digital o
física; b) De cuentas y contraseñas de acceso a las aplicaciones computarizadas, correo
electrónico, servicios bancarios, bases de datos, sistemas operativos, computadoras personales,
equipos de comunicación, y otros dispositivos y servicios electrónicos que permita ganar acceso
a recursos tangibles o intangibles de la sociedad; c) De cualquier otro documento o información
que de alguna forma sea parte de los activos intangibles de "AHES, S.A. DE C.V." que son y serán
recibidos por mi persona de cualquiera de los miembros, personeros, empleados, representantes
legales, abogados y/o ejecutivos e incluso clientes de la sociedad mencionada, bajo el amparo
de este instrumento, incluyendo documentos preliminares, notas, reportes, estudios,
correspondencia, facsímiles y cualquier otra información transmitida por cualquier medio, será
considerada por mi persona como confidencial. **III)** Que como consecuencia de la relación
laboral que he mantenido y mantengo con "AHES, S.A. DE C.V.", considero y reconozco
expresamente que toda la información relacionada es y será propiedad exclusiva de "AHES, S.A.
DE C.V.", por lo que toda la información, incluyendo pero sin limitarse a la información comercial
y confidencial, que haya sido revelada a mi persona en virtud de la relación laboral antes dicha
y de toda aquella que tenga relevancia para "AHES, S.A. DE C.V." o para sus subsidiarias y demás
entidades relacionadas con ésta, no será utilizada por mi persona por ningún motivo y para
ningún fin, y que por lo tanto tomaré todas las medidas necesarias para mantener la
confidencialidad de la información y evitar su pérdida o revelación a terceros. Asimismo, declaro
que entiendo que toda la información recibida tiene carácter de "secreto empresarial", por
tener un valor comercial y por haberla tenido reservada "AHES, S.A. DE C.V." para uso exclusivo

FILED DATE: 2/7/2022 6:56 PM 2022CH01062

como información restringida. Por lo que queda entendido que "ATHENA HOLDINGS EL SALVADOR, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE" tendrá el derecho de exigirme verbalmente o por escrito en cualquier momento que la información restringida, confidencial o interna de la sociedad que se encuentre en mi poder sea destruida o devuelta, independientemente de que tal información se haya entregado antes de esta fecha. **IV)** Que expresamente asumo bajo mi responsabilidad cualquier pérdida, robo, destrucción y/o mala utilización de toda información propiedad de "AHES, S.A. DE C.V." que esté contenida dentro de ordenadores personales que no sean propiedad de "AHES, S.A. DE C.V.", así como toda información que haya sido extraída o sea extraída en un futuro por mi persona a través de dispositivos de almacenamiento magnéticos, discos compactos, llaves usb, remisión de la misma hacia correo electrónico personal, divulgaciones en redes sociales, plataformas digitales, demás dispositivos tales como celulares, tablets, o a través de cualquier otra tecnología. De forma inequívoca me obligo a no tomar fotografías de equipos, materiales, insumos, estructuras, espacios, inmuebles, ni ningún otro signo distintivo, comercial ni logos que estuvieren en propiedad o mera tenencia, pero en definitiva vinculados a "AHES, S.A. DE C.V.", ni a divulgar en cualquier medio físico o digital ninguna fotografía o contenido relacionado a la operación y actividad económica de "AHES, S.A. DE C.V.". También me obligo a no sustraer ninguna herramienta de trabajo o bienes muebles que estén en propiedad o tenencia por parte de "AHES, S.A. DE C.V., S.A. DE C.V." y que sean parte de el desarrollo, manejo y operación de la actividad económica de dicha sociedad, independientemente del objeto y valor del que se trate. Por lo tanto, asumo el riesgo de responder por los daños y perjuicios causados a "ATHENA HOLDINGS EL SALVADOR, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, S.A. DE C.V.", y/o a sus clientes, derivados del incumplimiento de cualquier de las obligaciones y declaraciones contenidas en el presente instrumento. **V)** Que las declaraciones hechas a través de la presente y la obligación de reserva de confidencialidad imbíbita en tales declaraciones se encuentran vigentes a esta fecha y continuarán estándolo, incluso aun dada por terminada dicha relación laboral, sin límite de tiempo e independientemente del motivo que provocare dicha finalización del vínculo. Finalmente, manifiesto que, en caso de incumplimiento de las obligaciones contenidas en la presente declaración, seré responsable civil y penalmente frente a "ATHENA HOLDINGS EL SALVADOR, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE.", o los clientes de ésta que se vean afectados como consecuencia de mi incumplimiento; en tal virtud "ATHENA HOLDINGS EL SALVADOR, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE", podrá seguir en mi contra todas las acciones legales a que dicho incumplimiento diere lugar, particularmente el resarcimiento de los daños y perjuicios causados, respondiendo económicamente hasta por la cantidad de Treinta Mil Dólares de los Estados Unidos de América o moneda de curso legal. **VI)** Que para los efectos legales de la interpretación de la presente declaración expresamente, me someto al ordenamiento jurídico de la República de El Salvador y a sus tribunales judiciales. En fe de lo cual

FILED DATE: 2/7/2022 6:56 PM   2022CH01062

firmo el presente documento en la ciudad de San Salvador, Departamento de San Salvador, el
día ___22___ del mes de _Septiembre_ del año dos mil veintiuno. -


Firma: _____

En la ciudad de San Salvador, Departamento de San Salvador, a las __8 17__ horas y
___ minutos del día _Wednesday_ del mes de
_Septiembre_ de dos mil veintiuno. Ante mí, JUAN CARLOS PREZA SALINAS, Notario,
domicilio de San Salvador, Departamento de San Salvador, comparece
_____ de __40__ años de edad,
_1917 Jesse Trail_, del domicilio de _Hurst_, Departamento de
_Texas EE. UU._, a quien no conozco pero identifico por medio de su Documento Único de
Identidad número: [redacted], y ME DICE: Que
reconoce como suya la firma que se encuentra al calce del anterior documento, así como las
declaraciones y obligaciones contenidas en él, por haber sido suscrito en esta ciudad, este
mismo día, mes y año, que literalmente **DICE:** """"""**I)** Que entre mi persona y la sociedad que
gira bajo la denominación de **"ATHENA HOLDINGS EL SALVADOR, SOCIEDAD ANÓNIMA DE
CAPITAL VARIABLE"**, abreviadamente **"AHES, S.A. DE C.V."**, ha existido una relación individual de
trabajo desde el día __22 - 09 - 21__ y en virtud de ello, he
ejercido y continuaré ejerciendo mi cargo de __CTO__. Debido a
ello, he tenido contacto, manejado y recibido información comercial de uso restringido y
confidencial, de mercadeo, técnica, financiera, contable y legal, entre otras, de parte de
"AHES, S.A. DE C.V.", así como de las personas que se relacionan con ésta. **II)** Que por lo antes
expuesto, a través del presente me obligo a mantener en total confidencialidad la información
que he recibido, manejado y dirigido o que de cualquier forma ha llegado a mi poder a lo largo
de la relación laboral antes mencionada, incluyendo pero no limitado a lo siguiente: a)
Información financiera, contable, industrial, comercial, de clientela, de mercadeo, estratégica,
legal, técnica, y de otra índole generada o no generada por la sociedad para uso exclusivo del
negocio, ya sea en forma verbal, digital o física; b) De cuentas y contraseñas de acceso a las
aplicaciones computarizadas, correo electrónico, servicios bancarios, bases de datos, sistemas
operativos, computadoras personales, equipos de comunicación, y otros dispositivos y servicios
electrónicos que permita ganar acceso a recursos tangibles o intangibles de la sociedad; c) De
cualquier otro documento o información que de alguna forma sea parte de los activos
intangibles de "AHES, S.A. DE C.V." que son y serán recibidos por mi persona de cualquiera de
los miembros, personeros, empleados, representantes legales, abogados y/o ejecutivos e incluso

FILED DATE: 2/7/2022 6:56 PM   2022CH01062

clientes de la sociedad mencionada, bajo el amparo de este instrumento, incluyendo documentos preliminares, notas, reportes, estudios, correspondencia, facsímiles y cualquier otra información transmitida por cualquier medio, será considerada por mi persona como confidencial. III) Que como consecuencia de la relación laboral que he mantenido y mantengo con "AHES, S.A. DE C.V.", considero y reconozco expresamente que toda la información relacionada es y será propiedad exclusiva de "AHES, S.A. DE C.V.", por lo que toda la información, incluyendo pero sin limitarse a la información comercial y confidencial, que haya sido revelada a mi persona en virtud de la relación laboral antes dicha y de toda aquella que tenga relevancia para "AHES, S.A. DE C.V." o para sus subsidiarias y demás entidades relacionadas con ésta, no será utilizada por mi persona por ningún motivo y para ningún fin, y que por lo tanto tomaré todas las medidas necesarias para mantener la confidencialidad de la información y evitar su pérdida o revelación a terceros. Asimismo, declaro que entiendo que toda la información recibida tiene carácter de "secreto empresarial", por tener un valor comercial y por haberla tenido reservada "AHES, S.A. DE C.V." para uso exclusivo como información restringida. Por lo que queda entendido que "ATHENA HOLDINGS EL SALVADOR, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE" tendrá el derecho de exigirme verbalmente o por escrito en cualquier momento que la información restringida, confidencial o interna de la sociedad que se encuentre en mi poder sea destruida o devuelta, independientemente de que tal información se haya entregado antes de esta fecha. IV) Que expresamente asumo bajo mi responsabilidad cualquier pérdida, robo, destrucción y/o mala utilización de toda información propiedad de "AHES, S.A. DE C.V." que esté contenida dentro de ordenadores personales que no sean propiedad de "AHES, S.A. DE C.V.", así como toda información que haya sido extraída o sea extraída en un futuro por mi persona a través de dispositivos de almacenamiento magnéticos, discos compactos, llaves usb, remisión de la misma hacia correo electrónico personal, divulgaciones en redes sociales, plataformas digitales, demás dispositivos tales como celulares, tablets, o a través de cualquier otra tecnología. De forma inequívoca me obligo a no tomar fotografías de equipos, materiales, insumos, estructuras, espacios, inmuebles, ni ningún otro signo distintivo, comercial ni logos que estuvieren en propiedad o mera tenencia, pero en definitiva vinculados a "AHES, S.A. DE C.V.", ni a divulgar en cualquier medio físico o digital ninguna fotografía o contenido relacionado a la operación y actividad económica de "AHES, S.A. DE C.V.". También me obligo a no sustraer ninguna herramienta de trabajo o bienes muebles que estén en propiedad o tenencia por parte de "AHES, S.A. DE C.V., S.A. DE C.V." y que sean parte de el desarrollo, manejo y operación de la actividad económica de dicha sociedad, independientemente del objeto y valor del que se trate. Por lo tanto, asumo el riesgo de responder por los daños y perjuicios causados a "ATHENA HOLDINGS EL SALVADOR, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, S.A. DE C.V.", y/o a sus clientes, derivados del incumplimiento de cualquier de las obligaciones y declaraciones contenidas en el presente instrumento. V) Que

FILED DATE: 2/7/2022 6:56 PM   2022CH01062

las declaraciones hechas a través de la presente y la obligación de reserva de confidencialidad imbíbita en tales declaraciones se encuentran vigentes a esta fecha y continuarán estándolo, incluso aun dada por terminada dicha relación laboral, sin límite de tiempo e independientemente del motivo que provocare dicha finalización del vínculo. Finalmente, manifiesto que, en caso de incumplimiento de las obligaciones contenidas en la presente declaración, seré responsable civil y penalmente frente a "ATHENA HOLDINGS EL SALVADOR, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE.", o los clientes de ésta que se vean afectados como consecuencia de mi incumplimiento; en tal virtud "ATHENA HOLDINGS EL SALVADOR, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE", podrá seguir en mi contra todas las acciones legales a que dicho incumplimiento diere lugar, particularmente el resarcimiento de los daños y perjuicios causados, respondiendo económicamente hasta por la cantidad de Treinta Mil Dólares de los Estados Unidos de América o moneda de curso legal. **VI)** Que para los efectos legales de la interpretación de la presente declaración expresamente, me someto al ordenamiento jurídico de la República de El Salvador y a sus tribunales judiciales. """""""" Y yo, el suscrito Notario, **DOY FE**: Que la firma que aparece al final del anterior documento es auténtica, por haber sido puesta de su puño y letra y a mi presencia por el compareciente. Así se expresó el compareciente, a quién expliqué los efectos legales de la presente acta notarial, que consta de dos folios útiles; y leída que le fue por mí íntegramente, en un solo acto ininterrumpido, ratifica su contenido y para constancia firma conmigo. **DOY FE**. –

Firma:

**Shaun Overton**
**August 16, 2022**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION


ROI DEVELOPERS, INC.,        §

d/b/a ACCRUVIA,              §

     Plaintiff,            §

        v.                 § Civil Action No.

ATHENA BITCOIN, INC.,        § 4:22-cv-00073-O

     Defendant.            §




Deposition of SHAUN OVERTON


via GPS vTestify Videoconference


Tuesday, August 16, 2022

9:07 a.m.


Reported stenographically by:

Adam D. Miller, Registered Professional Reporter





**GPS LLC**
gpscalendar@gps.llc ~ 214.347.4781

**Exhibit 3**

Shaun Overton
August 16, 2022

**Page 2**

```
1    APPEARANCES:
2    On Behalf of Plaintiff:
3              KELLY STEWART, ESQUIRE
4              kelly@kstewartlaw.com
5         K STEWART LAW, P.C.
6              5949 Sherry Lane, Suite 900
7              Dallas, Texas 75225
8              972.308.6168
9    On Behalf of Defendant:
10             LARRY L. FOWLER, JR., ESQUIRE
11             larry@harriscooklaw.com
12        HARRIS COOK LLP
13             1309A W. Abram Street
14             Arlington, Texas 76013
15             817.299.2847
16   ALSO PRESENT:  ANTONIO VALINTE
17                  PATRICK BLASKOPF, THE TECHNICIAN
18                  - - - - -
19                  INDEX
20   DEPONENT:  SHAUN OVERTON
21   EXAMINATION BY:          PAGE
22   ATTORNEY FOWLER             3
23   ATTORNEY STEWART          123
24   ATTORNEY FOWLER           145
25   ATTORNEY STEWART          149
```

**Page 3**

```
1              SHAUN OVERTON, having first been duly
2         sworn according to law, was examined and
3         testified as follows:
4                   - - - - -
5    BY ATTORNEY FOWLER:
6         Q.   Could you state your name, please,
7    for the record?
8         A.   Shaun Michael Overton.
9         Q.   Mr. Overton, my name is Larry Fowler,
10   and I'm the attorney for Athena Bitcoin, Inc. in
11   this proceeding.  Do you understand that?
12        A.   I do.
13        Q.   We have not met before; correct?
14        A.   Correct.
15        Q.   Okay.  Have you ever had your
16   deposition taken before?
17        A.   Never.
18        Q.   Okay.  Have you personally ever been
19   a party to a lawsuit?
20        A.   Yes.
21        Q.   Okay.  Tell me about that.
22        A.   It was with Forex Capital Markets.
23        Q.   Okay.  And were you a plaintiff or
24   defendant in that suit?
25        A.   Plaintiff.
```

**Page 4**

```
1         Q.   How long ago was that?
2         A.   2006, I think.
3         Q.   And where was that lawsuit pending?
4         A.   Somewhere -- it was in either Dallas
5    County or Tarrant County, Texas.
6         Q.   Okay.  Have you ever been arrested or
7    charged with a felony?
8         A.   No.
9         Q.   All right.  You understand that
10   you're here today as the corporate
11   representative of ROI Developers, Inc., d/b/a
12   Accruvia; correct?
13             ATTORNEY STEWART:  No.  I'm
14        objecting, Mr. Fowler.  He's here on
15        behalf of Shaun Overton.  We didn't get a
16        corporate rep dep.  You asked for
17        Mr. Overton.
18             ATTORNEY FOWLER:  Oh, okay.
19   BY ATTORNEY FOWLER:
20        Q.   All right.  The company ROI
21   Developers, Inc., who owns that company?
22        A.   I do.
23        Q.   100 percent?
24        A.   100 percent.
25        Q.   Okay.  And when was it formed?
```

**Page 5**

```
1         A.   2010.  The Texas entity was formed in
2    2010.
3         Q.   Okay.  Are you the only officer or
4    director of that company also?
5         A.   I'm -- at some point in the past I
6    think I listed my father as the secretary.  But
7    functionally, I've been the only operating
8    officer.
9         Q.   Okay.  Other than you, are there any
10   other employees of that company?
11        A.   Currently, there are zero W-2
12   employees.
13        Q.   Has there in the past been W-2
14   employees?
15        A.   Yes.
16        Q.   When was the last time there was a
17   W-2 employee other than, potentially, yourself?
18        A.   November of 2021.
19        Q.   And who were those W-2 employees?
20        A.   Bailey Jarrell.
21        Q.   Anybody else?
22        A.   Nope.
23        Q.   Okay.  And how long was Mr. Bailey --
24   wait.  Is it Mr. or Miss?
25        A.   Miss.
```



**Shaun Overton**
**August 16, 2022**

Page 6

1    Q.   How long was Miss Jarrell an employee
2  of ROI Developers, Inc.?
3        A.   From February to November of 2021.
4        Q.   All right.  During the year 2021 were
5  there any other W-2 employees of ROI?
6        A.   Just myself.
7        Q.   Okay.  What about prior to 2021;
8  other than yourself has there ever been any
9  other W-2 employees?
10       A.   Yes.
11       Q.   Okay.  How long ago?
12       A.   2012 or -- maybe 2014.  But it's been
13  a while.
14       Q.   All right.  That was well before the
15  issues that bring us here today; correct?
16       A.   Correct.
17       Q.   Okay.  During 2021, did you have ---
18  or did ROI contract with individuals to provide
19  its services?
20       A.   Yes.
21       Q.   Okay.  How many people, roughly, did
22  ROI contract with to assist it in providing
23  services?
24       A.   Around 15.
25       Q.   Does ROI have a physical office?

Page 7

1        A.   Yes, it does.
2        Q.   And where is that located?
3        A.   Hurst, Texas.
4        Q.   Where in Hurst?
5        A.   615 West Harwood Road, Suite B2,
6  Hurst, Texas 76054.
7        Q.   And how long has ROI had that office?
8        A.   One year.
9        Q.   So from approximately August 2021?
10       A.   Correct.
11       Q.   Prior to August 2021 did it have a
12  physical office?
13       A.   Yes.
14       Q.   Where was that?
15       A.   550 Reserve Street, Southlake, Texas
16  76092.
17       Q.   Was that an office building?
18       A.   Yes, it was.
19       Q.   Okay.  And that was in Southlake?
20       A.   Correct.
21       Q.   Okay.  How long had ROI been in that
22  building?
23       A.   I think about two years.
24       Q.   Okay.  The project that brings us
25  here today relates to something called a Bitcoin

Page 8

1  wallet; is that true?
2        A.   Yes, it is.
3        Q.   Okay.  And in your discovery
4  responses, you describe the project as something
5  Chivo, C-H-I-V-O; is that correct?
6        A.   Correct.
7        Q.   And is that how you pronounce it,
8  "Chivo"?
9        A.   "Chivo," yes.
10       Q.   Tell me generally what was the Chivo
11  Wallet project?
12       A.   It's primarily designed to serve the
13  remittance market.  So the 25 percent of
14  El Salvador's GDP is remittances.  Primarily,
15  that money comes from the United States.
16            And when --- and most of those
17  individuals are on the lower spectrum
18  economically, and they have to send money back
19  home to support their relatives and family.  And
20  when they do that, they usually use Western
21  Union, MoneyGram, and other money transfer
22  services.  And those commissions are generally
23  12 and a half percent or more of the amount
24  sent.
25            The government of El Salvador wanted

Page 9

1  to improve the well-being of its citizens.  And
2  by designing the Chivo Wallet ecosystem, it's
3  designed to disintermediate the remittance
4  industry.
5            The way that happens functionally is
6  that a lot of the people sending remittances
7  function in the cash economy and they do not
8  have bank accounts.  And so the only way they
9  can get that money into Bitcoin --- well, back
10  up.
11            Bitcoin is essential because there
12  are no intermediaries.  So there's no middleman
13  to take a cut.  When Western Union sends money
14  from the United States to El Salvador, there's
15  intermediary banks, several intermediary banks;
16  and each one of those banks takes a fee and
17  commission for passing the money along.
18            So by converting the money to
19  Bitcoin, you can completely remove the banks
20  from the equation.  But you still have the
21  physical problem of a guy with a few hundred
22  dollars in cash, needs to transmit its monetary
23  equivalent to El Salvador.
24            And so what he does is he goes to
25  ATMs located within the United States,



**Shaun Overton**
**August 16, 2022**

**Page 10**

1  physically deposits the cash into the ATM. The
2  ATM then converts that to Bitcoin.
3      The government signs terms with
4  Athena to remove the commissions associated with
5  that transaction. There may be like a tiny,
6  tiny commission; but it's functionally close to
7  zero. It's a fraction of a percent.
8      And then that money is converted to
9  Bitcoin, sent to the recipient who has a Chivo
10  Wallet. And that Chivo Wallet has the option
11  but not the requirement that when the Bitcoin
12  deposit is received, you can immediately convert
13  it back into US dollars.
14      The --- one of the primary concerns
15  with people using Bitcoin is its volatility
16  relative to the US dollar. So by the person
17  sending the money in Bitcoin and knowing that
18  Chivo Wallet will automatically convert it, it
19  keeps their market risk extremely limited to
20  approximately a few minutes of price action,
21  which means for most people they won't see any
22  change in the amount of money going from United
23  States to El Salvador.
24      Then the final step in the equation
25  is that that money is received within the Chivo

**Page 11**

1  Wallet app in El Salvador. And the recipient
2  has two potential uses. They can either go to
3  another ATM and withdraw that in cash, which is
4  overwhelmingly what people do. Or they can keep
5  the money in the Chivo Wallet ecosystem and
6  spend it functionally like the credit card,
7  although it --- I guess a debit card would be a
8  better analogy; that they can go make purchases
9  at major stores across El Salvador with money in
10  their Chivo Wallet.
11      Q.  Okay. All right. And so the Chivo
12  Wallet -- I mean, you told me about the people
13  have the ability to transmit money from another
14  country, like the United States, and have the
15  Bitcoins end up in the wallet. But the wallet
16  can be used -- I mean, it's just, it's just used
17  as a Bitcoin wallet; correct? That's what the
18  Chivo Wallet --- it wasn't restricted to
19  receiving funds from, you know, the United
20  States, for example; correct?
21      A.  It's not restricted.
22      Q.  Okay. So the folks in El Salvador,
23  they can go to the ATM there in El Salvador and
24  buy Bitcoins -- I mean, however, whatever they
25  would typically do with regard to a Bitcoin

**Page 12**

1  wallet; correct?
2      A.  I'm sorry. I don't really understand
3  the question.
4      Q.  Okay. With regard to the wallet
5  itself, I think I understood you to say that it
6  could be use like a debit card, essentially?
7      A.  Basically, yes.
8      Q.  Okay. And those funds can be placed
9  into that wallet from anywhere, any source, as
10  far as Bitcoins go; correct?
11      A.  It could come from --- yeah, you don't
12  have to uses an ATM. You could deposit by
13  Bitcoin.
14      Q.  Okay. And as far as where the Chivo
15  Wallet's concerned, was that product -- I guess
16  we'll call the Chivo Wallet a product -- was
17  that product going to be owned by the government
18  of El Salvador?
19      A.  Yes.
20      Q.  Okay. And the information you just
21  told me about Chivo Wallet, all this was
22  explained to you before ROI began its work; is
23  that correct?
24      A.  Yes.
25      Q.  Let me back up just a hair. I

**Page 13**

1  usually ask, and I forgot to ask in this
2  instance, a little bit on your background.
3  Where did you go to high school?
4      A.  Grapevine High School in Grapevine,
5  Texas.
6      Q.  What year did you graduate from
7  Grapevine?
8      A.  1999.
9      Q.  What did you do after you got out of
10  high school?
11      A.  Went to the University of Texas;
12  graduated with a history degree in 2003.
13      Q.  All right. After you got out of UT,
14  then what?
15      A.  I went to Yemen and studied Arabic.
16      Q.  How long were you in Yemen?
17      A.  A little over a year and a half.
18      Q.  Were you employed while you were in
19  Yemen?
20      A.  Yes.
21      Q.  What were you doing?
22      A.  I worked as an English teacher for a
23  language institute owned and operated by the US
24  embassy.
25      Q.  What did you after Yemen?



**GPS LLC**
**gpscalendar@gps.llc ~ 214.347.4781**

Shaun Overton
August 16, 2022

Page 14

1    A.    I worked as an Arabic and English
2    translator in Doha, Qatar.
3        Q.    Who did you work for?
4    A.    Hamad Medical Corporation.
5        Q.    And how long were you in Qatar?
6    A.    Three months.
7        Q.    Okay.  What did you do after that?
8    A.    I returned to the United States and
9    started working at Forex Capital Markets.
10       Q.    Is Four the number four, or is it
11   spelled out?
12   A.    It's F-O-R-E-X.  It's an acronym for
13   "foreign exchange."
14       Q.    All right.  So it's Forex Capital
15   what?
16   A.    Markets.
17       Q.    Okay.  And what did you do for Forex
18   Capital Markets?
19   A.    I was a Forex broker.
20       Q.    And what were you brokering?
21   A.    Currencies, foreign exchange.
22       Q.    And how long were you with Forex?
23   A.    Two years.
24       Q.    So approximately when did you leave
25   Forex?

Page 15

1    A.    November of 2007.
2        Q.    All right.  What did you do after you
3    left Forex?
4    A.    I started this current entity, which
5    was originally named OneStepRemoved.com LLC.
6        Q.    Mechanically, how did you go from the
7    name OneStep -- what was it, OneStep what?
8    A.    Removed.
9        Q.    Okay.  How did you go from the name
10   OneStepRemoved to ROI Developers?
11   A.    There is a series of name changes
12   that I filed with the State of Texas.  It went
13   from OneStepRemoved.com to Engineer ROI to ROI
14   Developers.
15       Q.    Okay.  Has the business been the same
16   under all the different names?
17   A.    You mean like the markets that we
18   serve?
19       Q.    Whatever business OneStepRemoved was
20   in, is that the same business that ROI
21   Developers, Inc. is now in?
22   A.    We serve a different customer base,
23   but it all relates to programming.
24       Q.    Okay.  OneStepRemoved, what was the
25   customer base there?

Page 16

1    A.    Retail foreign exchange traders.
2        Q.    And who's the customer base for ROI
3    Developers, Inc.?
4    A.    Businesses primarily with revenues of
5    5 to 25 million.
6        Q.    And tell me generally what is the
7    programming services that ROI Developers
8    provides to those businesses?
9    A.    We are API integrators.
10       Q.    At some point after you left Forex,
11   did you receive any training in programming?
12   A.    No.
13       Q.    As you sit here today, have you ever
14   received any formal training in programming?
15   A.    I've taken a few courses through
16   Coursera, but that's the extent of it.
17       Q.    All right.  Did I understand you
18   correctly that ROI Developers, Inc. provides
19   programming services to its customers?
20   A.    That's correct.
21       Q.    Okay.  So who actually does the
22   programming?
23   A.    I have a network of contractors that
24   work for me full-time.
25       Q.    The description you gave me earlier

Page 17

1    about the Chivo Wallet, is that the type of
2    project that ROI Developers, Inc. normally works
3    on?
4    A.    No; it's an unusual project.
5        Q.    Okay.  Describe for me what the
6    normal business would be for ROI Developers,
7    Inc.
8    A.    The local business doing 5 to
9    $25 million in revenue, but it could be in any
10   industry.
11       Q.    So what are you doing for them?
12   A.    We're an API integrator.  And that
13   means we take two software platforms that don't
14   talk to each other and we build -- we're like
15   plumbers for software.  So we build the pipe
16   that connects two systems that can't share data.
17       Q.    All right.  And then as I understand
18   it, the Chivo Wallet project, you were creating
19   a Bitcoin wallet for the government of
20   El Salvador; correct?
21   A.    No.
22       Q.    Okay.  What is incorrect about that?
23   A.    We began working on the project with
24   the government of El Salvador because software
25   was provided to the government and they



Shaun Overton
August 16, 2022

Page 18

1 experienced a number of incredibly difficult
2 circumstances where the -- the program was
3 functionally unusable. And so we were brought
4 in to right the ship and fix all the problems.
5      Q.   And so the government of El Salvador
6 had a software program, and you're saying that
7 ROI came in to fix the bugs in this software; is
8 that correct?
9      A.   Correct.
10     Q.   Okay. The software -- what did the
11 software do that was not working properly for El
12 Salvador?
13     A.   It's a very long list.
14     Q.   Well, give me generally what was it
15 supposed to do, this software.
16     A.   It was what I described to you
17 earlier about serving the remittance market.
18     Q.   Okay. But when you became involved
19 in the project, was it already called the Chivo
20 Wallet?
21     A.   Yes, it was.
22     Q.   Okay. All right. So there was a
23 software out there that belong to the government
24 of El Salvador; and part of it, at least,
25 included this Bitcoin wallet called the Chivo

Page 19

1 Wallet. Correct?
2      A.   That was the entirety of it.
3      Q.   Okay. And so you're telling me that
4 you are hired to take -- to work out the kinks
5 in the Chivo Wallet project that already
6 existed; correct?
7      A.   Correct.
8      Q.   Do you recall anything about the
9 government of El Salvador using the Chivo Wallet
10 to give money directly to its citizens?
11     A.   Absolutely.
12     Q.   How -- I mean, tell me what you
13 remember about that.
14     A.   It was rife with fraud. So when the
15 program launched on September 7th, there was a
16 vendor selected that I don't recall the name of.
17 And I know that QA Consultants, another vendor,
18 had warned the government that this software --
19 that this vendor was extremely likely to fail
20 under load.
21          And within the first 150 sign-ups on
22 the platform, the, the vendor for KYC compliance
23 crashed. And government of El Salvador had,
24 especially President Bukele, had staked pretty
25 much his entire career on the successful

Page 20

1 rollout.
2          So the government of El Salvador made
3 to eliminate the KYC, the KYC vendor from the
4 process so that the Chivo Wallet registrations
5 could continue. They wanted to hit their
6 50,000-user initial launch point. But because
7 they turned off KYC, there was literally no
8 supervision whatsoever. Anybody on the platform
9 could sign up and get $30.
10         So we experienced -- I know that
11 Miguel Sabal, who was the direct advisor to
12 President Bukele and who I worked with nearly
13 every day, was coming in my office telling me
14 about users, when they would take the selfie for
15 their personal identification, he was saying
16 people were taking pictures of the wall, of
17 potted plants.
18         So we had this database where people
19 very quickly learned that if they could show an
20 El Salvador IP address, that they could sign up
21 for Chivo Wallet, get $30 completely for free as
22 a gift for registering, and then withdraw that
23 money immediately.
24         And in the final assessment -- we
25 don't -- we never pinned down the exact amount

Page 21

1 of fraud, but we estimated that it was between
2 10 to 20 percent of all of the users registered
3 were fraudulent. And the vast majority of that
4 money had left the Chivo Wallet ecosystem.
5          So throughout my time in the project,
6 fighting fraud was overwhelmingly the
7 government's priority and consumed a lot of our
8 time and resources.
9      Q.   Okay. So based on what you just told
10 me, it was the -- the Chivo Wallet project was
11 designed to be utilized by citizens of
12 El Salvador; correct?
13     A.   It was exclusively limited -- it was
14 supposed to be limited to only citizens of
15 El Salvador.
16     Q.   Okay. So tell me how you became
17 involved in this Chivo Wallet project in
18 El Salvador.
19     A.   I received a call from Brian
20 Bernknopf. He is a colleague and is managing
21 director at QA Consultants. I was flying to
22 visit my team in the Dominican Republic. And
23 while laid over in Miami, I received a call from
24 him, which I didn't hear. He send me a text
25 message which said: Give me a call. I've got



**Shaun Overton**
**August 16, 2022**

Page 22

1  the deal of a lifetime for you.
2          That got my attention, so I called
3  back right away.  And he said that -- he -- him
4  and I had been in communication.  All I knew is
5  that he was working on a Bitcoin project.  And
6  so when he told me that he was working --
7      Q.   Hang on a second.  Let me stop you a
8  second.  Tell me what's this person's name.
9      A.   Brian Bernknopf.
10     Q.   You're going to have to spell that
11 last one?
12     A.   Yeah.  B-E-R-K-N-O-P-F [sic].
13     Q.   What's the last letter?
14     A.   F as in Frank.
15     Q.   B-E-R-K-N-O-P-F?
16     A.   Correct.
17     Q.   And who did he work for?
18     A.   QA Consultants.
19     Q.   Looking through my notes, I see I
20 skipped over one of my normal questions.
21         Where do you currently reside?
22     A.   Hurst, Texas.
23     Q.   How long have you lived in Hurst?
24     A.   Since 2015.
25     Q.   And when you were in Qatar and Yemen,

Page 23

1  what did you use as a permanent address in the
2  US?  Did you have one?
3      A.   My parents' home in Colleyville,
4  Texas.
5      Q.   Okay.  All right.  So you told me a
6  moment ago you're at a layover in Miami on the
7  way down to see your team in the Dominican
8  Republic.  Who or what is your team in the
9  Dominican Republic?
10     A.   At the time it was Carlos Lopez,
11 Franklin Grassais, Williams Mendez, and Gustavo
12 Rodriguez.
13     Q.   All right.  And so was this -- you
14 told me earlier that there is a group of
15 programmers that you keep busy all the time on a
16 contract basis.  Is this part of that group?
17     A.   Yes, it is.
18     Q.   Okay.  And they were all based in the
19 Dominican?
20     A.   Yes.
21     Q.   Okay.  And tell me what timeframe
22 we're talking about here where you're in the
23 Miami airport on the way down to the Dominican
24 Republic?
25     A.   September 9th.

Page 24

1      Q.   What year?
2      A.   2021.
3      Q.   So in September of '21 were all of
4  the programmers that you were using on a regular
5  basis located in the Dominican?
6      A.   No.
7      Q.   What other -- where were the other
8  programmers that you were using on a regular
9  basis?
10     A.   Poland, South Africa, Greece,
11 Argentina.  Those were the main ones.
12     Q.   So was that bulk of the programmers
13 that ROI used in September of '21; were they in
14 those countries you just told me about?
15     A.   Correct.
16     Q.   Okay.  In September of 2021, was ROI
17 contracting with any programmers that were
18 located in Texas on a regular basis?
19     A.   No.
20     Q.   In September of 2021, was ROI
21 contracting with anybody for anything on a
22 regular basis in the State of Texas?
23     A.   Yes.
24     Q.   What?
25     A.   The primary relationships would be

Page 25

1  Evexias -- E-V-E-X-I-A-S -- Health Solutions and
2  Silver Creek Materials.
3      Q.   Now, were those customers --
4      A.   Yes.
5      Q.   -- of ROI?
6          I'm sorry?
7      A.   Yes.
8      Q.   All right.  So these were two
9  customers that ROI had.  And was it providing
10 programming services to these two entities?
11     A.   Correct.
12     Q.   The programming that was being done,
13 was that being done by somebody here in Texas or
14 was that being done by part of this group of
15 programmers you told me about a minute ago?
16     A.   Managed in Texas; done -- the
17 programming was done in the various countries
18 that I listed.
19     Q.   All right.  So no programming in
20 Texas; all by -- in these other countries you
21 told me about; correct?
22     A.   Correct.
23     Q.   So for the health solutions company,
24 what was ROI doing for it?
25     A.   We built a completely custom platform



**GPS LLC**
gpscalendar@gps.llc ~ 214.347.4781

24

Shaun Overton
August 16, 2022

Page 26

1  that's used for education and ordering
2  prescriptions.
3          (Discussion held off the record.)
4          (Recess.)
5  BY ATTORNEY FOWLER:
6      Q.    Then the other company you told me
7  about that ROI was providing services to, Silver
8  something -- what was it?
9      A.    Silver Creek Materials.
10     Q.    Is that a material-handling company?
11     A.    They're a sand mine.
12     Q.    Yeah.  Where are they located?
13     A.    Fort Worth.
14     Q.    Over on the west side?
15     A.    Correct.
16     Q.    Yeah.  And generally, what was the
17  project for them?
18     A.    It was a couple of things.  It was a
19  mobile app that sits in a front loader so that
20  operators could see incoming orders that they
21  needed to service.  We did some accounting
22  integration work to connect the point-of-sale
23  system into QuickBooks.  And that was, that was
24  the work.
25     Q.    Okay.  So on -- for those two

Page 27

1  companies around September of '21, are you
2  personally doing any of the programming or is it
3  done by these programmers you were telling me
4  about?
5      A.    I -- overwhelmingly done by the
6  programmers.  I did nominal bits of coding here
7  and there.
8      Q.    Okay.  And you never had any formal
9  training on coding; is that right?
10     A.    Correct.
11     Q.    So with regard to ROI, is the vast
12  majority of the programming done by those
13  programmers that are located around the world?
14     A.    Correct.
15     Q.    So when would be an instance when you
16  personally would attempt to do some type of
17  coding?
18     A.    It would be what I would call
19  "knickknack work"; just something -- low-hanging
20  fruit, just to free the developers up to do
21  something that they could be working on,
22  something more productive.
23     Q.    Okay.  So with regard to ROI,
24  predominantly, what's your role?  I known you
25  own it; you're the -- and the only officer.  But

Page 28

1  physically, what is it you primarily do for the
2  company?
3      A.    Project manager.
4      Q.    Okay.
5      A.    And sales.
6      Q.    And by project manager, is that
7  primarily coordinating with the programmers?
8      A.    And the customers; yes.
9      Q.    So would you say working as a project
10  manager takes up what, what, 80 percent,
11  90 percent of your time, or a hundred percent?
12     A.    It's my full-time job.
13     Q.    So other than as a program -- being
14  the program manager for ROI, any other functions
15  that you perform for ROI on a regular basis?
16     A.    Sales, project management, a little
17  bit of accounting.  But that's it.
18     Q.    When you say a little bit of
19  accounting, have you got an outside source that
20  does most of your accounting?
21     A.    Correct.
22     Q.    Okay.  Who's that outside source?
23     A.    It is -- I forget the name of his
24  business, but his name is Joe Abesamis.
25     Q.    Where's he located?

Page 29

1      A.    In Southern California.
2      Q.    When you're dealing with him, do you
3  actually transmit the information
4  electronically?
5      A.    Yes.
6      Q.    How did you hook one with an
7  accountant in Southern California?
8      A.    He used to live in Frisco.
9      Q.    Oh.  All right.  So with regard to
10  accounting, is your role, then, primarily to
11  transmit data to the accountant?
12     A.    Correct.
13     Q.    And sales, that's out soliciting new
14  business; correct?
15     A.    Correct.
16     Q.    And then project manager, that's
17  primarily coordinating between your programmers
18  and the customers; is that correct?
19     A.    Yes.
20     Q.    All right.  Let's go back to Miami.
21  Tell me about this phone call while you're there
22  in the airport.
23     A.    So he said:  My customer's project is
24  on fire.  It was written in Django --
25  D-J-A-N-G-O -- which is a framework that we



Shaun Overton
August 16, 2022

**Page 30**

1  specialize in.  And he said the government needs
2  as many talented Django developers as it can
3  possibly get ahold of right now.  How many
4  people can you round up?
5             And so ---
6        Q.   Hang on a second.  He said "his
7  customer"; is that right?
8        A.   Correct.
9        Q.   Okay.  And do you know what he meant
10  by who the customer was?
11        A.   The government of El Salvador.
12        Q.   Okay.  So he's calling you, telling
13  you what his customer, El Salvador, the software
14  it has, which was written in Django, is on fire?
15        A.   Correct.
16        Q.   Okay.  And he's asking you if you can
17  round up people that are familiar with Django;
18  is that correct?
19        A.   Correct.
20        Q.   So what happens next?
21        A.   I have a signed contract with the
22  government of El Salvador 24 hours later.
23 ---- Q.   Did you go to El Salvador?
24        A.   Eventually.  But I signed the
25  agreement in the Dominican Republic and had to

**Page 31**

1  cancel the trip with my team.
2        Q.   Hang on.  So what date are we talking
3  about here?
4        A.   September -- I believe it is
5  September 10th, is the date that I signed the
6  contract.
7        Q.   All right.  So September 10th, '21,
8  you signed a contract with the government of
9  El Salvador; correct?
10        A.   I should correct that.  So I --- the
11  government signed a contract with
12  QA Consultants.  And then QA Consultants
13  subcontracted me to do the work because we
14  didn't want to have to lose time with legal
15  contracts, negotiations, that kind of thing.
16             So I was a subcontractor to
17  QA Consultants, who was the primary to the
18  government of El Salvador.
19        Q.   Okay.  And so approximately when did
20  you sign your contract with QA Consultants?
21        A.   September 10th, I believe.
22        Q.   Okay.  All right.  And what was --
23  the gentleman -- I wrote his name down here a
24  second ago.  What was the first name of the guy
25  that called you? because we're just going to go

**Page 32**

1  by his first name.
2        A.   Brian.
3        Q.   So what was Brian's connection to
4  QA Consultants?
5        A.   He's the managing director.
6        Q.   And where is the QA Consultants?
7        A.   They have offices in Dallas and in
8  Toronto, Canada.
9        Q.   Do you know where Brian offices?
10        A.   Dallas.
11        Q.   All right.  So Brian tells you that
12  QA Consultants has an agreement with the
13  government of El Salvador, and they hire you to
14  help them provide services to the government of
15  El Salvador; correct?
16        A.   Correct.
17        Q.   Okay.  And is this on the Chivo
18  project, or is it something different?
19        A.   Only for the Chivo project.
20        Q.   Okay.  All right.  So you're in the
21  Dominican when you signed the contract with QA
22  Consultants; is that right?
23        A.   That's right.
24        Q.   Okay.  All right.  What's next in
25  this progression?

**Page 33**

1        A.   It begins.  The most stressful
2  project of my life.  The -- we first have to
3  decide where they're going to put us.  And the
4  very first day was dedicated to establishing our
5  work environment.  The project was very
6  difficult to spin up because there was no
7  documentation.
8        Q.   And by "documentation," do you mean
9  documentation related to the programming that
10  had already been done?
11        A.   Correct.
12        Q.   Okay.
13        A.   Literally zero documentation.
14        Q.   All right.  Let me interrupt you for
15  just a second.
16             The programming that had been done
17  that you were coming in to assist with, who
18  performed that programming; do you know?
19        A.   Athena Bitcoin, Inc.
20        Q.   Okay.  All right.  So your testimony
21  is that prior to September '21, there was
22  programming in existence for this Chivo project
23  in El Salvador; correct?
24        A.   All right.  I can't speak to where
25  the code lived.  But, yes, it was for the



**Shaun Overton**
**August 16, 2022**

Page 34

1  project in El Salvador.
2  Q.  Yeah.  And that's my question.  Okay.
3  So how did you find out who created
4  that programming?
5  A.  The -- Lorenzo Rey, who was
6  functionally the government's CTO, informed me
7  that Athena Bitcoin, Inc. had developed the
8  software and sold it -- licensed a copy to the
9  government of El Salvador.
10  Q.  When did this conversation occur?
11  A.  About noon Eastern on September 10th,
12  when we had our orientation call.
13  Q.  All right.  So Mr. Rey, did he
14  actually say "Athena Bitcoin, Inc." or did he
15  say "Athena Bitcoin"?
16  A.  "Athena Bitcoin."
17  Q.  All right.  So he -- during your
18  orientation meeting he says Athena Bitcoin has
19  created this software that you're going to be
20  working on; correct?
21  A.  Correct.
22  Q.  Okay.  All right.  And then you're
23  telling me that the first order of business is
24  find out where you're going to be working -- I
25  mean, logistically where you're going to be

Page 35

1  staying, that kind of stuff?
2  A.  No, no, no.  It had nothing to do
3  with physical, real-world logistics.  It had to
4  do with programming logistics.
5  Q.  Okay.  I'm sorry.  I misunderstood.
6  Thank you for correcting that.
7  So on the program, it is collecting
8  sufficient information to allow you to begin
9  work?
10  A.  Correct.  Like with any project,
11  there's an orientation period where you have to
12  learn the high-level diagram of how all this
13  stuff glues together.  And to help us with that,
14  the government provided us with a document that
15  mapped out the entire Chivo ecosystem.
16  Q.  All right.  So what happens next?
17  A.  So we had to decide where in the code
18  we're going to work.  The first day was consumed
19  with really, really basic setup:  configuring
20  Docker, getting the project fully Dockerized,
21  getting the process of -- like literally writing
22  documentation so as we onboarded other
23  developers, we wouldn't have the same time
24  hurdle.
25  And then on Saturday evening -- I'm

Page 36

1  pretty sure it was Saturday -- we had a
2  conference call between my team, Lorenzo Rey,
3  and Eric Gravengaard.
4  Q.  Are any of those folks associated
5  with any of the Athena entities?
6  A.  Eric Gravengaard is.
7  Q.  Okay.  And would that have -- this
8  discussion, would that have been on or about
9  October 4th or was it before that?
10  A.  Well before.  This is September 10th,
11  I think.
12  Q.  Okay.  So -- and this is a conference
13  call?
14  A.  Yes.  I think it was on Microsoft
15  Teams.
16  Q.  And where were you physically
17  located?
18  A.  The Dominican Republic, in Santiago.
19  I'm sorry -- yeah, Santiago.
20  Q.  All right.  And what's the purpose of
21  this phone conference?
22  A.  To figure out what is the best use of
23  us as a resource.  And Eric -- well, first of
24  all, we identified that because the project had
25  no documentation and no unit test coverage, that

Page 37

1  it would be irresponsible and dangerous to risk
2  making any changes to the source code without
3  having unit tests as a safety mechanism.
4  So what we decided in the call was
5  that the best way for us to get started and
6  start adding value was to do what I would
7  consider essential and best-practice work that
8  had not been done to that point, which was to
9  start adding unit test coverage over the most
10  critical functionalities of the, of the
11  software.
12  Q.  Okay.  So -- all right.  Software,
13  this -- the -- this -- the Chivo Wallet project,
14  that's stored on computers, correct --
15  A.  Yes.
16  Q.  -- servers?
17  I mean, where -- how is it stored?
18  A.  It was in a code repository called
19  Bitbucket.  And also there's copies that live on
20  the developers' machines.
21  Q.  All right.  And the software belonged
22  to El Salvador; correct?
23  A.  Legally, it was the property of
24  Athena.  And I'm not sure which entity that --
25  but I believe it's Inc. -- and that they sold a



Shaun Overton
August 16, 2022

**Page 38**

1  licensed copy to the government of El Salvador
2  and retained intellectual property over the
3  software, so that any changes and improvements
4  they made at the request of the government would
5  remain the property of Athena Bitcoin, Inc.
6      Q.    As far as which entity owned the
7  software -- scratch that.
8          All right.  You understand there are
9  two entities with similar names -- have similar
10 names:  Athena Bitcoin, Inc. and Athena Global.
11 You understand that; correct?
12     A.    I understand that and that there are
13 other international entities as well.
14     Q.    All right.  But with regard to which
15 entity actually licensed the software and owned
16 the software to the government of El Salvador,
17 that would be easy enough for us to look and
18 see; correct?
19     A.    You have the contracts.  I don't have
20 access to those.
21     Q.    And -- but as far as which Athena
22 entity, as we sit here, do you actually -- have
23 you ever actually seen that contract?
24     A.    I have not.
25     Q.    So as we sit here you don't have,

**Page 39**

1  personally have any knowledge as to which entity
2  licensed the software to El Salvador; correct?
3      A.    I believe I -- I believe I know.  But
4  I don't know for certain.
5      Q.    Okay.  What do you -- who do you
6  believe licensed the software to El Salvador?
7      A.    Athena Bitcoin, Inc.
8      Q.    Okay.  As opposed to Athena Global,
9  Athena Bitcoin Global?
10     A.    Correct.
11     Q.    What makes you think the software was
12 licensed to El Salvador by Athena Bitcoin, Inc.?
13     A.    Athena Bitcoin, Inc. is the operating
14 entity of Athena Bitcoin Global.  Athena
15 Bitcoin, Inc. houses, if not every single
16 employee, almost every single employee in the
17 company.
18          The -- within Athena and its
19 functioning systems -- so, for example, a few
20 weeks later, as the letter of intent was signed
21 with Athena Bitcoin, Inc., we are onboarded and
22 asked to bring Accruvia's team into -- inside of
23 Athena.
24          And by "Athena," I mean Athena
25 Bitcoin, Inc.

**Page 40**

1          And as I was doing that, Eric
2  Gravengaard gave me access to Microsoft Teams
3  and Microsoft Admins so that I could create all
4  of my employees and contractors, give them email
5  addresses and Microsoft Teams accounts and so
6  on.
7          And within that system I created them
8  under the entity of Athena Bitcoin, Inc.  And
9  everybody on Microsoft Teams was labeled as
10 being with Athena Bitcoin, Inc., including Eric
11 Gravengaard and all of the other executives with
12 whom I interacted.
13     Q.    Okay.  All right.  During this
14 initial phone call you were telling me about in
15 September of '21, was there any, any discussion
16 about -- well, scratch that.
17          During this initial discussion, what
18 was it for?
19     A.    Figuring out how to best utilize the
20 team.
21     Q.    All right.  So what happened next in
22 this progression?
23     A.    We start writing unit tests over the
24 next couple of days, improving the
25 documentation, and fixing some severe issues

**Page 41**

1  with Docker.
2      Q.    All right.  And when you're doing all
3  this, you're doing all this for QA Consultants;
4  is that right?
5      A.    Nominally.  I mean, functionally, QA
6  Consultants just sold our services, marked it
7  up; and aside from collecting the money, that
8  was the extent of their interaction with our
9  services.
10     Q.    Okay.  Well, you're getting paid by
11 QA Consultants.  They're getting paid by the
12 government of El Salvador, correct --
13     A.    Correct.
14     Q.    -- at this point in time?
15          All right.  So what happens next
16 after this conference call.  Scratch that.
17          All right.  If Athena Bitcoin ---
18 whichever entity -- owned the software and
19 licensed it to El Salvador, how is QA
20 Consultants involved in all this?
21     A.    They're responsible for QA, which
22 stands for "quality assurance."  It was -- the
23 government was kind of -- they do two things.
24 They do unit tests, which I described, and they
25 do load tests.



Shaun Overton
August 16, 2022

Page 42

1    So the government was extremely
2 concerned that with a county of 6 million people
3 and they wanted to roll this out as fast at
4 possible, they were worried about scalability.
5    So the government hired QA
6 Consultants with the intent, with the intent to
7 use them for load testing. However, because of
8 stalling from Athena, they were never actually
9 able to run those load tests.
10    So QA Consultants was extraordinarily
11 frustrated by the lack of cooperation with
12 Athena, that they --
13    Q.   Hang on a second.  This information,
14 this is all coming to you from Brian and QA
15 Consultants; correct?
16    A.   And their employees.
17    Q.   Okay.
18         ATTORNEY STEWART:  I don't think he
19    was done with his answer.
20         ATTORNEY FOWLER:  Well, if you need
21    to expand on his answer later, you can.
22    He answered my question, which was what
23    was next.
24         ATTORNEY STEWART:  But he was still
25    talking when you interrupted him.  So

Page 43

1    that's all I want to point out.  If he's
2    done, that's great.  Otherwise, please,
3    I'd appreciate you letting him finish.
4    That would be great.
5 BY ATTORNEY FOWLER:
6    Q.   Okay.  All right.  So QA Consultants
7 is hired by the government of El Salvador;
8 correct?
9    A.   Correct.
10    Q.   For -- tell the again what "QA"
11 stands for?
12    A.   "Quality assurance."
13    Q.   Okay.  So what happens after that
14 initial phone conference in September of '21?
15    A.   Then we start focusing on
16 documentation, Docker, improving the developer
17 onboarding process, and then overwhelmingly
18 writing unit tests.
19    Q.   All right.  So what brings us here
20 today is a claim that, that ROI's owed money by
21 Athena.  How did we go from you being paid by QA
22 Consultants to you being paid by Athena?
23    A.   On -- so around ten days after I
24 signed the agreement -- so this would be -- it
25 was a Saturday.  And I knew that my contract was

Page 44

1 expiring on that upcoming Friday.  I made the --
2    Q.   All right.  Let me interrupt you for
3 a second.  So how long was your initial
4 contract?
5    A.   Two weeks, renewable -- two weeks
6 with the extension to renew.
7    Q.   Okay.  All right.  So you know your
8 contract's coming up for renewal or expiration?
9    A.   Correct.
10    Q.   So what is it about that that leads
11 us to Athena?
12    A.   I wanted to make sure I did
13 everything in my power to extend that contract.
14 So I made the decision on a Saturday to fly to
15 El Salvador to meet with Lorenzo in person to
16 give myself the best opportunity to continue
17 servicing that business.
18         On Monday morning, Lorenzo asked me
19 to meet him first thing in the government's
20 offices in the Megacentro.  And there I got to
21 meet all of the senior players in government
22 that were managing the project.  And that was
23 just a very brief meeting.
24         But then Lorenzo pulled me aside and
25 offered me the opportunity to -- initially he

Page 45

1 offered me the opportunity to remove Athena
2 Bitcoin, Inc. from the project entirely --
3    Q.   Hang on.  Let me, let me interrupt
4 you.
5         When you say he offered you the
6 opportunity to remove Athena Bitcoin, Inc., did
7 he say remove Athena Bitcoin, Inc. or did he say
8 remove Athena Bitcoin?
9    A.   He said remove Athena.
10    Q.   Okay.  Remove Athena.  Thank you.
11         All right.  So you're having a
12 conversation with him, and he is discussing with
13 you the ability to remove Athena; correct?
14    A.   Correct.
15    Q.   All right.  So tell me about that
16 discussion.
17    A.   He was irate and -- with the quality
18 of the code that was provided.  He said -- I
19 don't remember the exact term that he used.  But
20 he basically felt like they were sold a bill of
21 goods, that -- they were just severely
22 disappointed.
23         And so he offered me to run the --
24 ROI Developers to run the entire Django
25 component of the project.  And then I asked



**Shaun Overton**
**August 16, 2022**

Page 46

1 would it be possible to run the entire project.
2 And he said yes.
3        So I immediately -- I left and
4 started huddling with Brian about how do we --
5 like they wanted an estimate or a bid like
6 almost immediately. And so Brian and I were
7 huddling for how do we scramble to put a project
8 together that's probably going to be an
9 eight-figure bid in the span of like 48 hours.
10       Q.   Okay. Let me -- is this huddling
11 occurring in El Salvador?
12       A.   I'm located in El Salvador; Brian's
13 located in Dallas.
14       Q.   So you're huddling either via
15 telephone or Zoom or something like that?
16       A.   Correct. Yes.
17       Q.   Okay. Keep going.
18       A.   And so somehow Eric Gravengaard -- I
19 should start back.
20       Before I had the meeting with
21 Lorenzo, I worked in Athena's offices for an
22 hour that morning. And my intent was to meet
23 with Eric because I also saw Athena as a good
24 candidate for doing future business with.
25       So I was trying to get face time with

Page 47

1 Eric, but he completely ignored me that morning.
2 I think he literally said hello, and that was
3 it. And then I went straight from there to go
4 meet with Lorenzo.
5       Literally, like within hours, Eric
6 all of a sudden got back to me and said he wants
7 to meet.
8       Q.   Let me interrupt you. What date are
9 we talking about? Is this in September, or are
10 we now in October?
11       A.   No; we're still in September.
12       Q.   Okay.
13       A.   This is like -- we're less than a
14 week into the project at this point.
15       Q.   All right. All right. Keep going.
16       A.   So at this point, the tables have
17 fundamentally turned, where for weeks I had been
18 trying to have -- build a relationship with Eric
19 Gravengaard, but then the government of
20 El Salvador offered me the opportunity to
21 essentially take over that entire line of
22 business.
23       So I went from wanting to build a
24 relationship with Eric to not wanting to build a
25 relationship with Eric. But word of the meeting

Page 48

1 somehow got back to Eric, that the government
2 had offered me the opportunity.
3       And so he was --
4       Q.   Let me stop you for just a second.
5       All right. What makes you believe
6 word of the meeting got -- was -- that Eric
7 learned of this meeting?
8       A.   Well, there was only two people in
9 room, me and Lorenzo. And within hours Eric had
10 started aggressively trying to contact me. And
11 by the next day, they -- him and the -- what I
12 understood to be the entire board of Athena --
13 Eddie Weinhaus, Matias Goldenhorn, one of their
14 attorneys -- I forget his name -- and Eric
15 Gravengaard sat, sat in front of me, felt like
16 an interrogation, and said: We know the
17 government offered you an opportunity to take
18 over the project.
19       So that's how I know.
20       Q.   Where did this take place?
21       A.   Athena's offices in whatever Athena
22 entity it was. Athena in San Salvador,
23 El Salvador.
24       Q.   All right. So an Athena entity had
25 an office in San Salvador; is that correct?

Page 49

1       A.   Correct.
2       Q.   When you went to this office, was
3 there any signage up that said "Athena"?
4       A.   Yes.
5       Q.   Okay. Was there anything that said
6 "Athena Bitcoin Global"?
7       A.   No.
8       Q.   Was there anything that said "Athena
9 Bitcoin"?
10       A.   Yes.
11       Q.   Was there anything that you saw that
12 said "Athena Bitcoin, Inc.," or did it just say
13 "Athena Bitcoin"?
14       A.   "Athena Bitcoin, Inc."
15       Q.   What is it that you saw said "Athena
16 Bitcoin, Inc."?
17       A.   Microsoft Teams.
18       Q.   So the meeting was partially in
19 person and partially over Microsoft Teams; is
20 that right?
21       A.   You asked me -- specifically at the
22 time of the meeting, what is the signage?
23       Q.   Yes.
24       A.   All it says is "Athena Bitcoin."
25       Q.   Okay. That was my question. When



**Shaun Overton**
**August 16, 2022**

Page 50

1  you go to this office in San Salvador, what was
2  the signage that you saw?
3      A.    "Athena Bitcoin."
4      Q.    And as I understand it, the signage
5  that you saw said "Athena Bitcoin"; is that
6  correct?
7      A.    Correct.
8      Q.    At that office did you see anything
9  that said "Athena Bitcoin, Inc."?
10     A.    No.
11     Q.    All right.  So this meeting that
12  you're having, was it everybody in person or was
13  it part in person, part remotely?
14     A.    Entirely in person.
15     Q.    Okay.  All right.  So what's the
16  result of that meeting?
17     A.    Eric offered -- Eric said:  I know
18  about your offer from the government of
19  El Salvador.  And if you do that, you'll, you'll
20  do really well for six months.  But then you're
21  going to to ask yourself what next.  You don't
22  have the infrastructure to grow the business and
23  expand and capitalize on the opportunity
24  afterwards.  Or you can, you can join our team.
25  We'd like you to be the CTO.  And we'll take you

Page 51

1  around the world.  We will give you -- yeah --
2  we'll give you the opportunity to do what you're
3  doing already but not have to do the chief
4  everything officer role; you can just focus on
5  the CTO role.
6            And so he made it a binary choice.  I
7  either had to do the government of El Salvador
8  or I had to do Athena Bitcoin -- and I
9  understood it to be Inc.
10           And then I said:  I need time to
11  think about it.
12     Q.    Okay.  I'm going to interrupt you
13  right there.  All right.  In -- do you recall --
14  all right.
15           Is this discussion occurring or
16  October 4th?
17     A.    No.
18     Q.    Okay.  In your discovery responses
19  you say [as read]:  Overton and Eric Gravengaard
20  discussed in El Salvador on October 4th, 2021,
21  the software development services at issue that
22  Accruvia was performing and the cost for said
23  services.
24           Is that a different meeting?
25     A.    Completely different.

Page 52

1      Q.    Okay.  So the discussion that you
2  just told me about between you and Eric, at any
3  point does Eric say:  Hey, I want you to come --
4  you know, this is on behalf of Athena Bitcoin,
5  Inc. or Athena Bitcoin Global, or is it just
6  Athena in general?
7      A.    Athena in general.
8      Q.    Okay.  All right.  So there's a
9  discussion -- you're saying that Eric and you
10  discussed you coming to work with Athena.  And
11  you're saying, Hey, I need to think about it.
12           Correct?
13     A.    Correct.
14     Q.    All right.  So what happens next?
15     A.    So that meeting occurred on a, on a
16  Tuesday morning, so about 24 hours after my
17  meeting with the government.
18           And then that evening Eric and I met
19  by the pool of the Hotel Barcelo, and he told me
20  the entire background about how Athena came to
21  be involved in the project.
22     Q.    Okay.  I'm going to -- if I'm
23  fast-forwarding, tell me here.  But at some
24  point there becomes discussions relating to the
25  service that's the subject of this lawsuit;

Page 53

1  correct?
2      A.    Correct.
3      Q.    When did those -- you provide -- when
4  did, when did it become discussed that ROI was
5  going to provide these services that brings us
6  here today?
7      A.    Around September 20th.
8      Q.    Okay.  All right.  So tell me how it
9  is that there were discussions relating to ROI
10  providing the services that are the subject of
11  the lawsuit.
12     A.    There was a term sheet signed
13  between ROI Developers and Athena Bitcoin, Inc.
14  that was essentially a letter of intent that had
15  a component of outlining a potential employment
16  agreement between myself and Athena Bitcoin,
17  Inc.  And there was a separate component with
18  Athena Bitcoin, Inc. acquiring ROI Developers
19  and its staff.
20           That evening, after the discussion by
21  the pool, Eric -- I sent Eric an email outlining
22  my exact understanding of what we were agreeing
23  to.  And I also outlined the fact that I was
24  giving up a four and a half million dollar
25  opportunity, that that was my expected profit



**Shaun Overton**
**August 16, 2022**

Page 54

1  from what I was bidding on in -- from the
2  government of El Salvador.
3           And so we signed a term sheet that
4  Athena Bitcoin, Inc. was going to acquire ROI
5  Developers and that I, Shaun Overton, would
6  become the CTO of that entity.
7       Q.   Okay.  And in that term sheet
8  there's -- is there anything in this about ROI
9  providing services related to the Chivo project?
10      A.   Is it okay if I look at the term
11 sheet?
12      Q.   Sure.  Well, tell you what.  Before
13 you look at it, do you recall there being any
14 discussions about you providing services on the
15 Chivo project prior to your signing the term
16 sheet?
17      A.   Yeah.  That's the entire -- what else
18 are the developers going to work on?
19      Q.   Well, I don't know.  You told me that
20 there was discussions going on where you were --
21 where ROI was going to do stuff all over the
22 world.  Correct?
23      A.   Yeah; in the Chivo Wallet context.
24 Like at no point was there any doubt whatsoever
25 about what the Accruvia programmers would be

Page 55

1  working on.  They would be working on Athena's
2  internal projects.
3       Q.   Okay.  Project or projects?  Would
4  they be working on the Chivo project or multiple
5  projects?
6       A.   Initially, the Chivo Wallet project.
7  And then Eric heavily implied to me that "going
8  around the world" meant servicing whatever
9  software requirements that Athena Bitcoin, Inc.
10 decided to pursue.
11      Q.   Okay.
12      A.   And he specifically mentioned, like,
13 some pretty crazy places, like Congo, West
14 Africa.  He literally meant around the world.
15           ATTORNEY FOWLER:  Okay.  All right.
16      Just a...
17           Kelly, I didn't, I didn't download
18      the term sheet.  Do you have it there to
19      pull up?  I've got a copy of it.  It's
20      your Bates number -- or it's our Bates
21      number 4.
22           ATTORNEY STEWART:  Let me share it.
23      Just a second.
24           Yes.  I'm sorry.  I've got it pulled
25      up.  I'm just trying to find the share

Page 56

1  button.
2           ATTORNEY FOWLER:  It's okay.  I'm
3      going to ask him a question in a second.
4      But I just want to make sure you've got it
5      so he and I can talk about it.
6           ATTORNEY STEWART:  Okay.  Well, I've
7      also got a hard copy in front of him.  Do
8      you want me to share it?
9           ATTORNEY FOWLER:  No, I've got it
10     here in front of me.  I'm okay.  But let
11     me ask a couple questions and he and I can
12     talk about it, if that's okay.
13 BY ATTORNEY FOWLER:
14      Q.   So -- all right.  So my question is:
15 You're saying that there were discussions
16 between you and Eric that related to the Chivo
17 project, and you think those discussions were --
18 would have been included in the term sheet?
19      A.   Yes.
20      Q.   And the -- you providing services on
21 the Chivo project, that's what brings us here
22 today; correct?
23      A.   Correct.
24      Q.   All right.  All right.  So you and
25 Eric are talking; he's talking about a lot of

Page 57

1  things that you've told me, about including ROI
2  providing services on the Chivo project; and
3  then you guys sign a term sheet.  Is that
4  correct?
5       A.   That's correct.
6       Q.   All right.  And then I'm going to ask
7  Kelly to show you the document that's been
8  Bates marked Athena 003 and 004 and 005.  And
9  I'd ask you:  Is that the term sheet that you're
10 talking about?
11      A.   Yes.
12      Q.   Okay.  And it's dated -- if I see
13 that correctly, it's dated September 22nd, 2021;
14 is that right?
15      A.   Yes, it is.
16      Q.   Okay.  So at this point,
17 September 22nd, 2021, have you provided any
18 services to any of the Athena entities that you
19 expected to get paid for by any of the Athena
20 entities?
21      A.   No.
22      Q.   Okay.  So prior to this execution of
23 the term sheet, everything you'd done --
24 everything that ROI had done was for QA
25 Consultants; right?



Shaun Overton
August 16, 2022

**Page 58**

1    A.    Correct.

2    Q.    Okay.  So then -- so tell me what

3  happens next in this progression related to you

4  providing services to Athena that brings us here

5  today.

6    A.    The -- so, like, what this term sheet

7  accomplished for Athena was that it severed the

8  government's option to remove it from the

9  project.  And so the only way for Eric to

10  protect that source of business was to

11  internalize the Accruvia development team within

12  its, within its company.

13        And the very first day as -- the

14  very first day the two-week contract with QA

15  Consultants expired, all of the developers that

16  were working on the project no longer serviced

17  QA Consultants; they serviced Athena Bitcoin,

18  Inc.

19    Q.    Wow.  Are there any documents that

20  show that?

21    A.    It would be in the records of Athena

22  for the Microsoft Teams that I onboarded

23  everybody, showing that everybody at Athena --

24  or at Accruvia, at ROI Developers was onboarded

25  in Athena Bitcoin, Inc.'s Microsoft software,

**Page 59**

1  Solutions.

2    Q.    All right.  This Microsoft software,

3  Solutions, what is that?  What's that software

4  utilized for?

5    A.    Email and chat.

6    Q.    Okay.  So you're saying the fact that

7  accounts were set up for email and chat on a

8  Microsoft software that was utilized by Athena

9  Bitcoin, Inc. is, in your mind, something

10  showing that Athena -- that ROI was providing

11  its services to Athena Bitcoin, Inc.; is that

12  correct?

13    A.    Yes, it is.

14    Q.    All right.  So approximately when was

15  this -- when was the accounts on the Microsoft

16  software, when were these set up?

17    A.    Would have been September 22nd or

18  September 23rd.

19    Q.    So as of September 22nd or

20  September 23rd, are you saying that the --

21  whatever Athena entity was going to be paying

22  the developers, your developers directly?

23    A.    No.  We didn't discuss the specific

24  terms of how I would bill or the way payments

25  would flow.  October 4th.

**Page 60**

1    Q.    Until October 4th.  So prior to

2  October 4th there was never any discussion about

3  how much you were going to be paid or how you

4  were going to be paid or who was going to pay

5  you; correct?

6    A.    Correct.

7    Q.    So what -- did any of that change on

8  October 4th?

9    A.    I mean, we ironed out the details.

10  But the same fundamental setup remained in

11  place.

12    Q.    When you say "we ironed out the

13  details," who's "we"?

14    A.    Myself and Eric Gravengaard.

15    Q.    And where did this conversation take

16  place?

17    A.    In the stairwell on -- in the office

18  building of Athena's offices in San Salvador,

19  El Salvador.

20    Q.    Okay.  So tell me what you recall

21  about the discussion.

22    A.    I said:  Eric, I need to pay my team,

23  and I need to know what you think an appropriate

24  markup is.

25        The reason that I said that is I knew

**Page 61**

1  how cash-poor Athena -- as all of the Athena

2  entities were.  I didn't know the full extent of

3  their cash problems until probably a week later.

4  But I knew that I was taking a financial risk by

5  paying my team and waiting to get paid from

6  Athena Bitcoin, Inc.

7        And so I felt like probably a 10 or

8  20 percent markup would be appropriate for a

9  short-term, short-term loan.  And -- but I asked

10  Eric to propose the terms.  And he said:  I

11  don't know.  A percent, a percent and a half?

12        I wasn't super-happy with it.  But --

13  and it -- under no circumstance would I ever

14  work on a percent margin.  But because of the

15  pending acquisition and a four and a half

16  million dollar payday on the line, I wasn't

17  going to throw a fit over making a few extra

18  thousand dollars.

19    Q.    So you're saying on October 4th you

20  and Eric discussed that Athena was going to pay

21  ROI based on a markup of the -- what it paid its

22  programmers; is that correct?

23    A.    Yes, it is.  And Bailey Jarrell's

24  included in there.  She worked in marketing.

25  But yes.



**Shaun Overton**
**August 16, 2022**

Page 62

1    Q.    On October 4, 2021, when you were
2  having this discussion with Eric, was there any
3  discussion -- scratch that -- did Eric say
4  specifically what entity you would be
5  contracting with?
6    A.    No.
7    Q.    Okay.  And as of October 4th, 2021,
8  you weren't aware of which Athena entity Eric
9  was acting on behalf of; correct?
10   A.    We never explicitly outlined it;
11 correct.
12   Q.    So then, as of October 4th, you
13 believed you were going to get paid a markup of
14 what ROI was paying its developers.  But as far
15 as who was contractually obligated to pay you,
16 you didn't know yet; correct?
17   A.    I believed it was Athena Bitcoin,
18 Inc., from the term sheet where Eric's signature
19 is.
20   Q.    So you believed that you were
21 contracting with the same party that signed the
22 term sheet that we looked at a moment ago;
23 correct?
24   A.    With Athena Bitcoin, Inc.; yes.
25   Q.    That's not my question.  My question

Page 63

1  is: Did you believe that in the stairwell, your
2  conversation between you and Eric, that you were
3  contracting with the same entity that you signed
4  the term sheet with?
5    A.    I don't think I had a strong opinion
6  on it at the time.  I was more focused on just
7  getting paid.
8    Q.    All right.  So then as of October
9  4th, 2021 -- which is the day you say you made
10 the deal to provide the services -- you didn't
11 know who you were contracting with; correct?
12   A.    I didn't -- I disagree with how you
13 phrased the question.
14   Q.    What is it is about the question you
15 disagree with?
16   A.    We formed the agreement on
17 September 22nd.
18   Q.    And is that when you signed the term
19 sheet?
20   A.    Yes, it is.
21   Q.    Okay.  Well, if that is, in fact,
22 correct, then the -- isn't it true that the
23 party that you were contracting with to provide
24 these services that we've been talking about was
25 the same party that signed the term sheet?

Page 64

1    A.    The reason I believe that's wrong is
2  that the one that paid my bill, the very first
3  bill, was Athena Bitcoin, Inc.
4    Q.    Okay.  I'm not -- what I'm asking you
5  right now is: As of October 4th, okay, as of
6  October 4th, 2021, you hadn't received any
7  payment from anybody on -- from Athena; correct?
8    A.    Correct.
9    Q.    Okay.  As of October 4th, 2021, did
10 you believe your agreement was with the same
11 person or entity that you entered into the term
12 sheet with?
13   A.    Yes.
14   Q.    And that's who you believe you were
15 going to provide services to, and that's what
16 you believed was going to pay you; correct?
17   A.    I said earlier that I wasn't focused
18 on it because, to me, all I cared about was the
19 cash outlay.  So I had put no thought into which
20 entity was paying me.
21   Q.    Okay.  So then, as of October --
22 well, I guess back to my question:  As of
23 October 4th, you had signed a term sheet;
24 correct?
25   A.    Yes, that's true.

Page 65

1    Q.    Okay.  And you told me a moment ago
2  that that was the same entity you were
3  contracting with to provide the services for the
4  Chivo project.  Do you remember telling me that?
5    A.    I do.
6    Q.    Okay.  So then, at least as of
7  October 4th, isn't it true that you believed the
8  entity that you were providing services to and
9  that you were going to get paid by was the same
10 entity that you entered into the term sheet
11 with?
12   A.    No.  The blunt truth is that I did
13 not have any concern whatsoever.  I had put no
14 thought into which entity was going to pay me.
15 My only motivation and concern was getting paid
16 in a timely manner.
17   Q.    Okay.  So then, if the folks at
18 Athena Bitcoin Global, Inc. say that as of
19 October 4th, 2021, it was the belief of Athena
20 Bitcoin Global that it entered into this
21 agreement with ROI where ROI was going to
22 provide the services for the Chivo project, you
23 wouldn't be able to contradict that testimony,
24 would you?
25       ATTORNEY STEWART:  Object to form.



**Shaun Overton**
**August 16, 2022**

Page 66

1    THE WITNESS:  I don't have -- like I
2    said, I didn't put any thought into which
3    entity would pay me.
4    BY ATTORNEY FOWLER:
5    Q.   Okay.  All right.  And as of
6    October 4th, 2021, tell me what type of services
7    you thought ROI was going to be providing --
8    excuse me.  Poor question.
9        As of October 4th, 2021, you did
10   understand that ROI was going to be providing
11   services related to the Chivo project; correct?
12   A.   Absolutely.
13   Q.   But as far as which entity you might
14   have been provided them to, you're telling us
15   now that you didn't really give it much thought;
16   correct?
17   A.   Correct.
18   Q.   All right.  As of October 4th, 2021,
19   were there any services that that ROI was going
20   to be delivering to any of the Athena entities
21   for the Chivo project that were going to relate
22   to the State of Texas?
23   A.   Say that again.
24   Q.   The services ROI was going to
25   provide, okay, as of October 4th -- whoever it

Page 67

1    was providing them to -- was there anything
2    about ROI providing those services that related
3    to the State of Texas?
4    A.   Absolutely.
5    Q.   What?
6    A.   Bailey Jarrell was a resident of
7    Paradise, Texas and performed the entirety of
8    her work and services in the State of Texas.
9    Q.   Okay.  All right.
10   A.   And also I performed a portion of my
11   work within the State of Texas.  And I'm trying
12   to think if there's anything else that I can
13   recall.
14   Q.   All right.  Well, with regard to the
15   actual project, the Chivo project, that software
16   that's being created -- or that had been created
17   and that you are working the kinks out of --
18   that was all going to be utilized by the
19   government of El Salvador; correct?
20   A.   Yes.  But it was the property of
21   Athena.  Eric and I had a long discussion the
22   night that we were by the pool --
23   ATTORNEY FOWLER:  I'm going to object
24   as nonresponsive.
25   BY ATTORNEY FOWLER:

Page 68

1    Q.   That's not my question at the present
2    time.  My question to you was:  At the time you
3    entered into this agreement, all the software
4    wad going to be utilized by the government of
5    El Salvador; correct?
6    A.   Primarily.
7    Q.   Well, who else was it going to be
8    utilized by other than the government of
9    El Salvador?
10   A.   Athena.  That was the promise, is
11   that we signed the term sheet that Athena was
12   going to -- it owns the software and it was
13   going to sell the software to other governments
14   around the world.
15   Q.   Okay.  Well, as of October 4th, it
16   wasn't your understanding that the software was
17   going to be sold to the United States
18   government; correct?
19   A.   Yeah, I had no expectation it would
20   be sold to the United States government.
21   Q.   And you had no expectation it was
22   going to be sold to any governmental entities in
23   the State of Texas; correct?
24   A.   Correct.
25   Q.   So as of October 4th, 2021, on or

Page 69

1    before that date, did you have any discussions
2    with anyone that you believe was acting on
3    behalf of any of the Athena entities that Bailey
4    Jarrell was going to be performing any of the
5    programming?
6    A.   Bailey being a programmer?  No.
7    Q.   Okay.  What services was Bailey going
8    to be providing?
9    A.   Marketing.
10   Q.   Okay.  Marketing to who?
11   A.   She worked -- she was my marketing
12   director.  And so she was linked up with -- I
13   forget her name -- Georgina or Georgia.  She's
14   the CMO, the fractional CMO for Athena.
15   Q.   Well, you told me a moment ago that
16   the agreement you reached with Athena was that
17   you were going to mark up the rate that you had
18   to pay your programmers to work on the Chivo
19   project; correct?
20   A.   Correct.
21   Q.   So -- Bailey's not a programmer.  So
22   why was Bailey involved in the project?
23   A.   The term sheet was for -- and the
24   agreement that Eric and I came to and
25   specifically in the email that I sent him the



Shaun Overton
August 16, 2022

Page 70

1  night before, was that all of the Accruvia's
2  contractors and employees would have a role.
3  And so Eric agreed.
4           And I specifically asked him on
5  October 4th about Bailey Jarrell -- hand on --
6  not on October 4th -- on September 21st, the
7  night that we were by the pool, about her
8  continuing to have a role.  And he agreed.
9           And when we discussed the markup, it
10  was primarily for the programmers.  But Bailey
11  is obviously listed on the invoice that was
12  paid.  And part of the discussion was reminding
13  him that, that Bailey was included as well.
14      Q.   So what services did Bailey provide
15  related to the Chivo project?
16      A.   She didn't work on the Chivo project
17  at all.  She worked directly for Georgia -- I
18  think that's her name -- Georgia or Georgina --
19  at -- exclusively at her direction.
20      Q.   All right.  Who did Georgina work
21  for?
22      A.   Athena Bitcoin, Inc.
23      Q.   All right.  Do you know specifically
24  it was Athena Bitcoin, Inc., or could it have
25  been Athena Bitcoin Global?

Page 71

1      A.   I don't have direct knowledge.
2      Q.   All right.  But Bailey Jarrell did
3  not work on the Chivo project; correct?
4      A.   Define -- it depends on how you
5  define "the Chivo project."  And the reason I --
6  there was this conference coming up in
7  El Salvador where Athena Bitcoin was a sponsor.
8  And Bailey was working very closely with the CMO
9  to support the marketing efforts within
10  El Salvador.
11           So how, how closely you want to tie
12  that to Chivo Wallet, it's up to you.  But it
13  was directly connected to El Salvador.
14           ATTORNEY STEWART:  Hey, Larry, I need
15       to take a bathroom break when you get a
16       chance.
17           ATTORNEY FOWLER:  Oh, you know what.
18       I'm so sorry.  I meant to say that at the
19       beginning.
20           This isn't an endurance contest.  If
21       you ever need a break, all you've got to
22       say is "I need a break."
23           So let's -- is five minutes enough,
24       Kelly?
25           ATTORNEY STEWART:  Yeah.  Thanks.

Page 72

1           (Recess.)
2  BY ATTORNEY FOWLER:
3      Q.   All right.  So Bailey Jarrell did
4  provide software development services; correct?
5      A.   Correct.
6      Q.   Okay.  And Bailey Jarrell did not
7  program; correct?
8      A.   Correct.
9      Q.   So with regard -- and you're saying
10  Bailey Jarrell provided marketing services; is
11  that correct?
12      A.   Yes, it is.
13      Q.   Okay.  All right.  And you indicated
14  Bailey Jarrell lives in Texas; correct?
15      A.   Correct.
16      Q.   Okay.  Do you know where Bailey
17  Jarrell was located when Bailey was providing
18  whatever services it was that she provided?
19      A.   I believe she was in Paradise, Texas,
20  from her home.
21      Q.   What do you base that belief on?
22      A.   She works from home for the vast
23  majority of her employment with me.
24      Q.   Okay.  Did she ever work in
25  El Salvador?

Page 73

1      A.   No.
2      Q.   Okay.  But just to make sure I
3  understand, with regard to all of these folks,
4  Bailey and the programmers, they were not being
5  paid directly by the Athena entities; correct?
6      A.   They were paid by me, by -- yes,
7  by ROI Developers.
8      Q.   Okay.  And tell me again, prior to
9  October 4th, 2021, tell me about any specific
10  conversation you can recollect with anybody who
11  you believe was acting on behalf of an Athena
12  entity where it was discussed that Bailey
13  Jarrell lived in Texas?
14      A.   I don't recall a specific
15  conversation about Bailey's residence.
16      Q.   Okay.  So then, as of October 4th,
17  2021, as far as you know, Athena -- there was no
18  one at Athena that knew that Bailey Jarrell
19  lived in Texas; correct?
20           ATTORNEY STEWART:  Objection; form.
21           THE WITNESS:  Disagree.  I -- her,
22       her CMO and supervisor absolutely knew she
23       lived in Texas --
24  BY ATTORNEY FOWLER:
25      Q.   Okay.



**Shaun Overton**
**August 16, 2022**

Page 74

1     A.  -- on the basis of the prior
2  conversation.
3     Q.  Well, hang on a second.  All right.
4  But as of -- all right.  Prior to October 4th,
5  2021, had Bailey Jarrell ever done any work on
6  this Chivo project?
7     A.  I've already outlined how her
8  work had been -- on that date, I don't know at
9  what point her -- the CMO started directing her
10 to work on the El Salvador conference.  So I
11 don't know for that specific date.
12    Q.  Okay.  Well, prior to -- all right.
13 Ask it this way:  As we sit here today, tell me
14 what information you're aware of that makes you
15 believe someone at any of the Athena entities
16 knew that Bailey Jarrell lived in Texas.  And
17 this is prior to October 4th, 2021.
18    A.  Because she was directly assigned to
19 the CMO.  And the CMO directed the entirety of
20 her work.  I did not manage Bailey in any form
21 whatsoever.  The CMO was completely responsible
22 for what she was working on.
23    Q.  And what -- when you're saying "CMO,"
24 what does that stand for?
25    A.  Chief marketing offer.

Page 75

1     Q.  Okay.  Well -- okay.  Prior to
2  October 4th, 2021, had ROI provided any services
3  that it thought was going to be paid for by one
4  of the Bitcoin entities?
5     A.  Yeah, absolutely.
6     Q.  Okay.  All right.  Then I'm a little
7  bit off on my dates.  I know that when you first
8  started work on the Chivo project, it was
9  because of the phone call from Brian and you
10 worked with his company; right?
11    A.  Through September -- whatever the
12 date that we signed the term sheet was.
13    Q.  Oh, okay.  Okay.  That's what I'm
14 looking for.  So --
15    A.  Yeah.  There's a gap from the 23rd
16 through October 4th that you're overlooking.
17    Q.  Okay.  In your response to discovery
18 you indicated that you reached the agreement
19 with Athena for these programming services on
20 October 4th.  And that was the conversation you
21 had in the stairwell; is that right?
22    A.  No.
23    Q.  Okay.  I know Kelly has your
24 discovery answers there.  Would you please look
25 at interrogatory number 2 in your original

Page 76

1  answer.
2        ATTORNEY STEWART:  Larry, I'm sorry.
3     I only printed the original -- you want
4     the original one or the supplemental one?
5        ATTORNEY FOWLER:  No, it doesn't
6     matter.  It's in the original answer.
7        ATTORNEY STEWART:  Okay.  Then I need
8     to print the supplemental if you're going
9     to ask him about that.
10       ATTORNEY FOWLER:  Okay.  Right now,
11    just the original interrogatory number 2.
12       THE WITNESS:  Yeah; October 4th is
13    where we outlined the exact payment terms,
14    that you're going to mark up -- I'm going
15    to mark up the invoice by a percent and a
16    half.
17       But that was the entirety of that
18    discussion.  That was literally the only
19    thing we talked about, is how much my
20    markup was going to be.
21       The actual initiation of the services
22    started September 22nd or 23rd.
23 BY ATTORNEY FOWLER:
24    Q.  Okay.  And pursuant to the term
25 sheet?

Page 77

1     A.  No.
2     Q.  What do you mean "no"?
3     A.  Well, we have -- like Accruvia or ROI
4  Developers is located within the Athena umbrella
5  and everything that I'm working on is for Athena
6  Bitcoin, Inc. that -- the term sheet is just for
7  acquiring the company and making me the CTO.
8  But my understanding is that the, the -- that I
9  would be hired for Athena Bitcoin, Inc. and that
10 my contractors would be hired by Athena Bitcoin,
11 Inc. because that's what absolutely everybody in
12 the Athena umbrella operates under, is Athena
13 Bitcoin, Inc.
14    Q.  Well, let me ask:  I mean, a minute
15 ago you told me that you were providing these
16 services pursuant to the term sheet.  Are you
17 changing your testimony now?
18    A.  I am.
19    Q.  I guess after we had the opportunity
20 to take a break.  And during that break, did you
21 have the opportunity to converse with your
22 attorney?
23    A.  Yes.
24    Q.  Okay.  All right.  Prior to
25 October 4th, did you ever have a discussion --



**Shaun Overton**
**August 16, 2022**

Page 78

1  when did you discuss that you were going to
2  provide service -- prior to October 4th, when
3  did you ever discuss with anybody at any Athena
4  entity that you were -- that ROI was going to
5  provide some form of services that were good to
6  be paid for by this Athena entity?
7      A.   I'm still confused how that would be
8  even remotely in question; because Athena was
9  directing me and the, the contractors that came
10  with me.  So --
11          ATTORNEY FOWLER:  Objection;
12  nonresponsive.
13  BY ATTORNEY FOWLER:
14      Q.   My question is:  Prior to
15  October 4th, 2021, tell me any conversation you
16  ever had with anybody at Athena where you agreed
17  that ROI was going to provide services and
18  Athena was going to pay for those services.
19      A.   I'm confused why you're upset.
20          ATTORNEY STEWART:  Just answer the
21  question.
22          THE WITNESS:  But -- like, they're
23  directing my programmers to work on code.
24  Like, they're telling me what they want my
25  team to work on.  What's the question

Page 79

1  here?
2  BY ATTORNEY FOWLER:
3      Q.   The question is:  Tell me when you
4  ever discussed prior to October 4th, 2021, with
5  anyone at Athena that you were going to be paid
6  by Athena for any work you did.
7      A.   As I've testified, we discussed the
8  actual payment terms on October 4th, and prior
9  to that we had not discussed any payment terms.
10      Q.   I'm not asking how much you're going
11  to get paid.  My question is:  Prior to
12  October 4th, 2021, did you ever discuss with
13  anybody at Athena that you -- that ROI was going
14  to provide services to Athena and Athena was
15  going to pay for those services?
16      A.   I really don't understand why you
17  think I'm being difficult.  Like, they're
18  telling me to --
19      Q.   That's not my -- excuse me.  Whether
20  I think you've being difficult or not isn't the
21  issue.
22          My question is really basic:  Prior
23  to October 4th, 2021, did you ever discuss with
24  anybody at Athena that ROI was going to provide
25  services to Athena and Athena was going to pay

Page 80

1  ROI?
2      A.   I don't -- I, I really don't
3  understand -- like -- as I keep saying, we
4  didn't have the specific terms of what the
5  billing rate was going to be.
6          But for me, that was implicit, when
7  you're asking me to provide a service and you
8  know I charge for it.  Like -- so the payment
9  terms were on October 4th.  The rest of it is
10  them telling us what they want us to work on.
11          Like, I don't understand what else
12  you're looking for.
13      Q.   Well, you're saying that prior to
14  October 4th, folks at Athena were directing
15  programmers on work they desired to be done;
16  correct?
17      A.   Yes, absolutely.
18      Q.   Okay.  Well, that was going on while
19  you were getting paid by QU Consultants also;
20  correct?
21      A.   No.
22      Q.   Okay.  So was there -- prior to
23  October 4th, 2021, was there ever an agreement
24  on how much Athena was going to pay ROI for the
25  services that you say were being requested?

Page 81

1      A.   No, no payment terms were set prior
2  to October 4th.
3      Q.   All right.  Was there ever a
4  discussion where anybody at Athena explicitly
5  told you that Athena was going to pay ROI for
6  services, prior to October 4th, 2021?
7      A.   I don't recall anything specific
8  about the -- I don't recall having a specific
9  discussion because, as I keep saying, they're
10  directing me; so that to me was understood.
11      Q.   So what you're saying -- your
12  testimony is that prior to October 4th, 2021,
13  you never had a discussion with anybody at
14  Athena, at any of the Athena entities, that ROI
15  was going to get paid for services; is that
16  right?
17      A.   That seems preposterous to me.  I
18  don't recall a specific discussion.  But in no
19  way would I ever just start programming for
20  somebody without the expectation of getting
21  paid.
22      Q.   Well, as we sit here, can you tell me
23  about any conversations you recall with anybody
24  at Athena, prior to October 4th, 2021, related
25  to ROI being paid for services by an Athena



**Shaun Overton**
**August 16, 2022**

---

**Page 82**

1   entity?
2        A.   I don't recall a specific discussion.
3        Q.   Okay.  So the only specific
4   discussion you recall occurred on October 4th,
5   2021 between you and Eric in El Salvador;
6   correct?
7        A.   Yes.  Correct.
8        Q.   And at the time you were having those
9   conversations -- scratch that.
10       Are part of the services that are at
11  issue in the lawsuit services that occurred
12  prior to October 4th, 2021?
13       A.   Yes, absolutely.
14       Q.   All right.  When I asked you earlier
15  what it was about this contract that related to
16  State of Texas, you told me Bailey Jarrell lived
17  in Texas and you also did part of the work in
18  Texas; correct?
19       A.   Correct.
20       Q.   All right.  Is there anything else
21  about the work that ROI did pursuant to this
22  agreement that relates to the State of Texas?
23       A.   Yeah.  The whole point of the Chivo
24  Wallet ecosystem was the very beginning of our
25  discussion today, of the important -- the whole

---

**Page 83**

1   purpose of the product is that you can go up to
2   a physical ATM and put money in it and send it
3   to El Salvador.  Without the physical ATMs in
4   Texas, it doesn't make any sense.
5        Q.   Well -- okay.  And that's any ATM
6   anywhere in the world, correct --
7        A.   Incorrect.
8        Q.   -- that sends Bitcoin?
9        A.   Incorrect.
10       Q.   Okay.  Well, which -- what does it
11  take for the ATM to function to be able to send
12  the Bitcoin to the Chivo Wallet?
13       A.   A typical markup when you interact
14  with a Bitcoin ATM is anywhere from 10 to
15  20 percent.  But the entire purpose of the
16  project is to remit money at a cheaper rate than
17  the average 12 and a half percent that Western
18  Union and MoneyGram charge.
19       So a fundamental portion of the Chivo
20  Wallet ecosystem is the agreement between Athena
21  Bitcoin, Inc. and the government of El Salvador
22  that Athena is not going to charge any kind of
23  substantial commission for providing its
24  services.  That's the only way that sending a
25  remittance gets rid of Western Union and

---

**Page 84**

1   MoneyGram.
2        So without the ATMs -- they have to
3   use the ATMs in Texas to do the whole point of
4   the project.
5        Q.   Are you saying that you -- your
6   testimony is that it had to use Athena Bitcoin
7   ATMs in Texas to function?
8        A.   It had to use Athena Bitcoin ATMs,
9   including in Texas, to function; yes.
10       Q.   So no other ATM in the State of Texas
11  except Athena Bitcoin ATMs would function with
12  the software; is that what you're telling me?
13       A.   Without charging a commission; yes.
14  The whole point is commissions.  Everything
15  we're talking about is remittances and getting
16  rid of the commissions, because that means 400
17  to -- 300 million to a billion dollars a year
18  for one of the poorest countries in the world.
19  Like the whole point is to get rid of the
20  commission system.
21       Q.   Well, in your discussions with the
22  government of El Salvador, was the State of
23  Texas mentioned?
24       A.   Yes; because of the consulates.
25       Q.   Okay.  Well, and -- okay.  All right.

---

**Page 85**

1   What was it that was mentioned about the
2   consulates?
3        A.   As Lorenzo was explaining the
4   ecosystem to me, he said we have ATMs across the
5   United States.  Some of them that are in
6   El Salvador community places, like Salvadoreño
7   restaurants.  But he also mentioned that we have
8   ATMs in the consulates across the United States,
9   including Dallas, and that -- I might be missing
10  something, but that's the gist of it.
11       Q.   Okay.  The ATMs at the consulates, is
12  it your testimony that those ATMs belong to a --
13  to one of the defendants in the lawsuit?
14       A.   I believe they are, yes.
15       Q.   But your understanding was that
16  the -- when you were talking to the
17  representative from El Salvador, they were
18  talking about ATMs at their consulates; correct?
19       A.   That is -- including at the
20  consulates.  But, yes.  Like the -- my
21  understanding from Lorenzo was that they have
22  contracted for access to all of the Athena ATMs
23  across the United States and that the
24  government, as part of the contract, asked them
25  to place ATMs within the consulates.

---



**Shaun Overton**
**August 16, 2022**

Page 86

1   Q.   But you don't have any personal
2   knowledge on who owns or operates those ATMs at
3   the consulates; correct?
4   A.   I think it's in the SEC S1 disclosure
5   from earlier this year that Athena Bitcoin, Inc.
6   is the operating entity within the United
7   States.
8   Q.   Well, the conversation you had with
9   the individual in El Salvador related to ATMs at
10   their consulates; correct?
11   A.   Yes, that's correct.
12   Q.   And that was all over the country;
13   correct?
14   A.   Correct.
15   Q.   Okay.  But no one from Athena -- any
16   of the Athena entities has told you that the
17   ATMs in the consulates are their property, have
18   they?
19   A.   Eric did.
20   Q.   Who?  Say it again.
21   A.   Eric Gravengaard did.
22   Q.   Eric said that the ATMs in the
23   consulates were Athena property?
24   A.   Correct.
25   Q.   Did you ever have any conversations

Page 87

1   with anyone at Athena related to the utilization
2   of the software related to Athena ATMs in the
3   State of Texas?
4   A.   Not specifically about the State of
5   Texas, but ATMs came up all the time.
6   Q.   Okay.  But the -- to make sure I
7   understand -- but the software that you were
8   working on related to the Chivo Wallet, none of
9   that software was directly placed on the ATMs;
10   correct --
11   A.   Incorrect.
12   Q.   -- in the United States?
13   A.   Not correct.
14   Q.   What's not correct about it?
15   A.   It's an API.  So Athena -- Chivo
16   Wallet is not really -- it's better thought of
17   as a collection of external services that are
18   all glued together; and when glued together,
19   They form Chivo Wallet.  So you have all of
20   these supporting roles that don't make sense to
21   program yourself.
22       For example, when you log in, you
23   have to do two-factor authentication; you have
24   to use a cellphone.  It doesn't any make sense
25   to program your own way of sending SMS messages.

Page 88

1   You use an external platform to send those
2   messages for you.
3       And in the same way, when we interact
4   with the ATMs, we have to talk directly to the
5   ATMS.  Otherwise, there's no way you're ever
6   going to, like, know where this money came from.
7       And when we deployed the code, we had
8   had a checklist of all the different groups of
9   servers that needed to get copies of the
10   software.  Primarily, those servers were Chivo
11   Wallet.  But the ATM deployment was a specific
12   deployment that we would do every single night.
13   So it had to talk to the ATMs; otherwise,
14   there's no point.
15   Q.   Well, it talked to them.  It had to
16   be compatible; correct?
17   A.   No.  It had to talk to them directly.
18   Like, we had to know if the ATMs were working or
19   not because people are trying to use Athena ATMs
20   so that they don't have to pay the commissions.
21   Like, we have to know if an ATM's not working.
22   Q.   Okay.  But your testimony is that the
23   only ATMs that could talk to the Chivo project
24   wallets were ATMs owned by Athena?
25   A.   My testimony is that you could use

Page 89

1   the ATMs owned by Athena to skip the
2   commissions, which is the entire point of
3   building Chivo Wallet.
4       Yes, you can use another Bitcoin ATM.
5   But you would pay a 10 to 20 percent commission,
6   which is a very dumb economic decision.  You
7   should use the free one.
8   Q.   All right.  But if you don't live
9   around an ATM that happens to give the -- to
10   belong to an Athena entity, you can use another
11   ATM; correct?
12   A.   Yes.  You'll pay a higher commission.
13   But, yes, you can use any Bitcoin -- not the
14   ATM.  Anything Bitcoin will talk to it.
15   Q.   All right.  And when you're talking
16   about all of this deploying the software, is
17   this the same thing you were doing when you
18   first began the work for QA Consultants?
19   A.   No.  We never deployed software as
20   part of QA Consultants.
21       ATTORNEY FOWLER:  Okay.  Kelly, would
22   you show him on the exhibits in the
23   documents, it's your document number --
24   begins with Bates number 11.
25       ATTORNEY STEWART:  Okay.  He's got it



**Shaun Overton**
**August 16, 2022**

**Page 90**

1  in front of him.
2  BY ATTORNEY FOWLER:
3      Q.   Okay.  Mr. Overton, if you would
4  slide down to Bates number 12.
5      A.   Okay.
6      Q.   Do you see that page?  What is this
7  document?
8      A.   It's my invoice to Athena Bitcoin for
9  the programming work and the marketing work done
10  in October of 2021.
11      Q.   All right.  Is there anything,
12  anywhere on here where it says that you're
13  billing for marketing work?
14      A.   I don't see anything about marketing
15  work; no.
16      Q.   And then the work that you did here
17  on this page, where it says $16,666.67, do you
18  see that entry?
19      A.   I do.
20      Q.   Okay.  Where was that work performed?
21      A.   Texas and El Salvador.
22      Q.   Is there any way for us to know how
23  much was El Salvador, how much was Texas?
24      A.   Yeah; you paid for my flights.
25      Q.   Okay.  But do we know -- is there a

**Page 91**

1  way for us to know -- out of the $16,666.67 that
2  you were billing Athena for, is there any way of
3  knowing how much of that work of that $16,000
4  was done in El Salvador?
5      A.   Absolutely.
6      Q.   How?
7      A.   The flights.  So Athena booked my
8  flights.  It should have all the records of
9  where I was physically present on every single
10  day throughout the duration of my relationship
11  with them.
12      Q.   Okay.  Well, how would I know how
13  many hours you spent working in El Salvador
14  versus how many hours you spent working in
15  Texas?
16      A.   I would, I would take the total of
17  the days I worked in Texas, and that's the
18  portion that I worked in Texas.  And then I'd
19  take the days that I worked the El Salvador, and
20  that's the total in El Salvador.
21      Q.   Okay.  What document -- do you have
22  documents that show when you billed for work in
23  Texas versus when you billed for work in
24  El Salvador?
25      A.   No, I do not.

**Page 92**

1      Q.   All right.  So how would I, in
2  looking at this total, $16,666.67, how would I
3  know how much of that work was done in
4  El Salvador versus how much of that work was
5  done in Texas?
6      A.   From looking at the invoice?
7      Q.   Well, right now my question is:  From
8  looking at the invoice, is there any way to
9  know --
10      A.   From looking at the invoice, no,
11  there is no way to know just from looking at the
12  invoice.
13      Q.   Are there documents in existence that
14  I could look at that would tell me how much of
15  that billing occurred in El Salvador versus how
16  much of that billing occurred in Texas?
17      A.   Yes; the flight records.
18      Q.   Well, the flight records tell us what
19  town you were -- or, excuse me -- what country
20  you were in; correct?
21      A.   Well, yes, they do.
22      Q.   All right.  So are you telling me
23  that for the entire time you're in El Salvador,
24  you billed for every day you're there?
25      A.   This was just a flat fee.

**Page 93**

1      Q.   Okay.  What was the fee?
2      A.   The $200,000 salary that I expect --
3  yeah, I think it's $200,000 salary that I
4  expected from Athena Bitcoin, Inc., I just
5  divided that by 12, and that was my rate.
6      Q.   Okay.  So that's $16,666.67, it's not
7  for programming; right?
8      A.   It's for -- well, I mean, partially
9  for programming.  Very little for programming.
10  It's primarily for project management, like the
11  CTO role was my functional role.  It's what I
12  was labeled as in the MS Teams environment.
13      Q.   Is there a -- all right.  Two
14  questions.  First question:  Is there a document
15  anywhere that I could look at that should show
16  that how were -- how you calculated the
17  $16,666.67?
18      A.   No.
19      Q.   At any point in time did you ever
20  discuss with anyone at Athena that you were
21  going to be billing based on the $200,000 salary
22  and then divide by 12?
23      A.   No.
24      Q.   Did you ever discuss with anyone at
25  Athena that these invoices would include a



**Page 94**

1  charge for you related to a salary?
2      A.   I -- this is all getting, this is all
3  getting mixed up because of the, I guess, the
4  chaos.  What was your question again?
5      Q.   My question was:  Did you ever
6  discuss with anyone at any Athena entity that
7  you were going to be charging for and billing
8  for you, for your services, based on a salary?
9      A.   Actually, yes.  When we, when -- in
10  the -- on October 4th, when I was talking to
11  Eric, I had to ask him about my rate.  And I
12  said:  Since we haven't actually pinned down my
13  salary, is it okay if I split the difference?
14      Q.   Okay.  All right.  You got there
15  the -- okay.  You have there in front of you the
16  term sheet we were talking about; correct?
17      A.   I do.
18      Q.   Okay.  And what you're referencing,
19  it sounds like, is there on -- under Employment
20  Agreement on page 4.  Look at the paragraph and
21  let me ask you:  Is that what you're
22  referencing?
23      A.   Under the Purchaser section.
24      Q.   Well, where it say Employment
25  Agreement, second paragraph from the bottom on

**Page 95**

1  page 4.
2      A.   Yes, that is where those numbers come
3  from.
4      Q.   Okay.  So the charges for your time
5  on all of those invoices are based on a salary
6  pursuant to the employment agreement that's
7  being discussed in the term sheet; correct?
8      A.   That's where those numbers come from.
9      Q.   So is it true that you were billing
10  Athena pursuant to the salary that's discussed
11  in the term sheet?
12      A.   For my particular salary, yes, that's
13  where that number comes from.
14      Q.   Okay.  What about Bailey Jarrell?
15  Was her time marked up the same as the
16  programmers?
17      A.   Correct.
18      Q.   Okay.  Okay.  Were there -- is there
19  anything else that you can contend or you
20  believe was -- scratch that.
21           Can you tell me anything else about
22  your arrangement with Athena that related to the
23  State of Texas?
24      A.   So we have Bailey doing the marketing
25  work here.  We have me partially working here

**Page 96**

1  and partially El Salvador.  ATMs are the
2  critical components of the software working in
3  general.
4           And your question was about my work
5  in the State of Texas?
6      Q.   Any -- right now my question is:
7  Other that what you've told me, which is about
8  you and Bailey and the connection to the ATMs.
9           Is there anything else about your
10  agreements with Athena that you contend relate
11  to the State of Texas?
12      A.   At the moment I can't think of
13  anything else.
14      Q.   Okay.  Now, with regard to your
15  charges, okay, you just told us that your
16  charges are simply an annual salary and that's
17  what you're billing; correct?
18      A.   Correct.
19      Q.   And so for your services, it didn't
20  matter where you were; you were still going to
21  charge what you contend your salary was.
22  Correct?
23      A.   Correct.
24           ATTORNEY FOWLER:  All right.  I'm
25       going to have to share this one; see if I

**Page 97**

1  can figure out how to do it.
2           (Discussion held off the record.)
3  BY ATTORNEY FOWLER:
4      Q.   Would you take a moment and look at
5  that document, page 34 of 38.
6      A.   Yes.
7      Q.   Okay.  Do you recognize that
8  document?
9      A.   I do.
10      Q.   And do you recognize the exhibits
11  that were attached to it?
12      A.   Yeah.  They're my invoices.
13      Q.   Okay.  And am I correct that this
14  letter that's dated December 14th, 2021 from
15  Christopher McNeill to Zachary Soto was a letter
16  sent by an attorney representing ROI?
17      A.   I do.
18      Q.   Did you retain Mr. McNeill to send
19  this letter?
20      A.   I did.
21      Q.   Did you review the letter before it
22  was sent?
23      A.   Yes.
24      Q.   Okay.  All right.  I'd ask you to
25  take a minute and reread that letter.  And then



Shaun Overton
August 16, 2022

Page 98

1   I'm going to ask you if you agree with
2   everything that's in the letter.
3           A.   I already read it, and I don't.
4           Q.   Okay.  What is it that's in the
5   letter that you don't agree with?
6           A.   Athena Bitcoin Global.
7           Q.   Where are you referring to?
8           A.   [As read]:  This law firm represents
9   ROI Developers, Inc, d/b/a Accruvia, which has
10  retained us to assist in its collection of the
11  outstanding amounts owed to it by Athena Bitcoin
12  Global, Athena.
13          Q.   So you're telling us today you don't
14  agree with that statement?
15          A.   It should have been Athena Bitcoin,
16  Inc.
17          Q.   Well, you looked at this before your
18  lawyer sent it; right?
19          A.   Briefly; yes.
20          Q.   Well, you conferred with him before
21  he sent it; correct?
22          A.   I did, yes.
23          Q.   And on the exhibits, there's nothing
24  that says "Athena Global," is there -- "Athena
25  Bitcoin Global"?

Page 99

1           A.   On the exhibits it does not say
2   "Global," no.  It say "Athena Bitcoin."
3           Q.   Okay.  So your lawyer, when he sent
4   this letter, he didn't get the term Athena
5   Bitcoin Global off of your invoices; right?
6           A.   I don't know where he got that term.
7   But, correct, he did not get it from the
8   invoice.
9           Q.   Well, he would have had to have
10  gotten it from you, wouldn't he?
11              ATTORNEY STEWART:  Objection; form.
12              THE WITNESS:  At no point did I
13          direct Mr. McNeill to specifically say --
14          address it to Athena Bitcoin Global.
15  BY ATTORNEY FOWLER:
16          Q.   Okay.  But when you looked at the
17  letter, you didn't suggest it be changed before
18  it was sent; correct?
19          A.   Correct.
20          Q.   On the invoices that are on here, we
21  now know the numbers that are on here for you
22  are not for programming; the numbers that are on
23  there for Bailey Jarrell are not for
24  programming.
25              Are there any other entries on these

Page 100

1   invoices that were actually not for programming?
2           A.   Not that I can recall, no.
3           Q.   And out of all the folks that are
4   listed on your invoice, the only two that
5   potentially provided any services in the State
6   of Texas are yourself and Bailey Jarrell;
7   correct?
8           A.   Correct.
9           Q.   At any point prior to October 4th,
10  2021, did you discuss with anybody at any Athena
11  entity that any of the services that you would
12  be providing were going to be performed in the
13  State of Texas?
14          A.   Yes.  Bailey Jarrell was part of the
15  discussion.  Like, we specifically talked about
16  when -- before I entered into any relationship
17  with Athena, part of the terms were that all
18  employees -- including Bailey, who is not a
19  programmer -- she would come with me.  We
20  explicitly discussed that.
21          Q.   Okay.  What about you?  Was there
22  ever any discussion that any of the services you
23  would be providing would be potentially done in
24  the State of Texas?
25          A.   Absolutely.

Page 101

1           Q.   Who did you discuss it with?
2           A.   Eric Gravengaard.
3           Q.   When?
4           A.   The -- on September -- the night of
5   September 21st or 22nd -- September 21st.
6           Q.   Tell me what you recall saying
7   related to you performing service in the State
8   of Texas.
9           A.   That I would not be in El Salvador
10  the entire time; that I have a wife and three
11  children whom are very important to me; and that
12  I could not be away constantly and that I would
13  need to work remotely.
14          Q.   Okay.  And then with regard to Bailey
15  Jarrell, the conversation was -- you're telling
16  me that you told them, Hey -- well, scratch
17  that.  I'm not going to put words in your mouth.
18              What do you recall specifically
19  saying about Bailey related to the State of
20  Texas?
21          A.   I valued my relationship with Bailey;
22  that she's a W2 employees; I do not want her to
23  lose her job just because I'm signing this --
24  I'm coming to an agreement with you; so she has
25  to come with us and she continues to work for



**Shaun Overton**
**August 16, 2022**

**Page 102**

1  Athena.
2           And so -- and I -- it was tangential.
3  At no point was Texas the focus.  But I did
4  mention she was located in Texas and comes to
5  the office once a week.
6       Q.   Okay.  Did you say that you did not
7  want to lose her -- or you didn't want her to
8  lose her job because you were signing the term
9  sheet, or did you say you didn't want her to
10 lose her job because you were entering into an
11 agreement?
12      A.   Because I'm entering into an
13 agreement.
14      Q.   So a moment ago when you started to
15 say because you were entering into that -- the
16 term sheet, that was just a misstatement on your
17 part.  Is that what you're telling me?
18      A.   I was overly specific.
19      Q.   Well, was part of the discussion
20 related to Bailey Jarrell and related to you
21 didn't want her to lose her job because ROI was
22 entering into the term sheet?
23      A.   On September -- yes.  In September,
24 yeah; that is true.
25      Q.   Well, after that conversation in

**Page 103**

1  September, did you ever have any other
2  conversations with anybody at Athena where you
3  said "Hey, I don't want her to lose her job"
4  related to anything?
5       A.   I'm trying to remember when the
6  conversation I had with -- yes; because in the
7  middle of October I basically didn't supervise
8  Bailey at all because I was so consumed with
9  putting out the dumpster fire of the software
10 that she -- I finally got a chance to catch with
11 her and let her know what was going on.
12          And then she -- and then at some
13 point I talked to, I think, Georgia.  And she
14 mentioned that -- I mentioned how important it
15 was that Bailey have a career path for her.  And
16 she reassured me that she's doing great and the
17 remote work arrangement was working out well.
18      Q.   Okay.  And when do you think this
19 was?
20      A.   I'm not super-specific on the dates.
21 But it would have been somewhere around the
22 middle of October.
23      Q.   Did you ever meet with anyone from
24 Athena in the State of Texas?
25      A.   No.  Well, I think I ran into --

**Page 104**

1  well, no, I did not.
2       Q.   In connection with the Chivo Wallet
3  project, other than potentially Bailey Jarrell,
4  are you aware of anybody else -- other than
5  yourself -- that potentially provided any type
6  of services related to the Chivo Wallet project
7  in the State of Texas?
8       A.   I can't recall anything additional at
9  this time.
10      Q.   How many A- -- well, scratch that.
11          Do you have any understanding how
12 many ATMs Athena Bitcoin, Inc. owns in the State
13 of Texas?
14      A.   I think it's somewhere around ten.
15      Q.   You're not testifying today that it
16 was your expectation that the only persons in
17 Texas that would take advantage of the Chivo
18 Wallet in El Salvador were going to use those
19 ten ATMs only, are you?
20      A.   For remittances, I would expect that
21 90, 95 percent of them occur on an ATM owned by
22 Athena or operated by ATM.
23      Q.   So out of all the ATMs in the State
24 of Texas that might have been -- could have been
25 used to send money to El Salvador, you're

**Page 105**

1  saying -- your testimony is that at least
2  90 percent of those transactions would have used
3  those ten ATMs?
4       A.   Correct.
5       Q.   But as far as the Chivo Wallet
6  itself, you had to be a resident of El Salvador
7  in order to utilize it; correct?
8       A.   Incorrect.
9       Q.   What's incorrect about that?
10      A.   You have to be a citizen of
11 El Salvador to use Chivo Wallet.  But, but that
12 means that you can live -- you can in be an
13 El Salvador citizen and live in the United
14 States.
15      Q.   Okay.  Thank you.  Do you have to, do
16 you have to be physically in El Salvador in
17 order to prove up that, Hey, I'm a citizen and
18 entitled to use it?
19      A.   With DUI -- D-U-I -- which is kind of
20 like the Social Security equivalent in
21 El Salvador.  If you have the DUI, you can sign
22 up for Chivo Wallet.  And I believe that anybody
23 could send money into Chivo Wallet
24 commission-free.
25          So I don't think you -- I don't know

Shaun Overton
August 16, 2022

**Page 106**

1  this for certain; but I'm pretty sure that if
2  you sent money into a Chivo Wallet on an
3  Athena-operated ATM, it wouldn't pay commission.
4      Q.  It wouldn't what?
5      A.  If you're -- like, the Athena ATM
6  knows that you're sending money into a Chivo
7  Wallet address.
8      Q.  Okay.
9      A.  I believe, but I'm not certain, when
10  you send money into a Chivo Wallet, regardless
11  of who you are -- like you personally could put
12  money in the ATM and send it into Chivo Wallet.
13  And I believe that the software knows that you
14  are sending the money into Chivo Wallet and
15  therefore not charging you the commission.
16  That's the economic incentive for using this
17  very limited number of ATMs and going out of
18  your way to do it, because you can save 12,
19  12 percent on the remittance.
20      Q.  So -- all right.  The discussion
21  between you and Athena was that there was a
22  markup on the programmers.  I get it.
23      But internally, how are you -- how do
24  you account for your salary versus the
25  programmers?

**Page 107**

1      A.  Some of the salary -- because a lot
2  of the programmers were on fixed salaries.  So,
3  like, you notice the numbers repeating, like
4  10,016, 10,016, 10,000.  That's because those
5  three developers were making $10,000.  Two of
6  them I incurred additional commissions for
7  sending the $10,000.  Mariano is on a salary.
8  Lance is on salary.  Everybody is salary here.
9      Q.  Well, I mean, they're contract
10  employees, right -- or contract workers;
11  correct.
12      A.  Yes, they are.
13      Q.  Okay.  And so you paid them a flat --
14  ROI paid them a flat rate per month for what?
15      A.  For working at least -- I forget what
16  the -- working at least 25 hours a week.  But on
17  the Chivo Wallet project they were averaging,
18  probably 12, 14 -- I know I was averaging 14
19  hours a day.
20      Q.  Okay.  So let's just take Lance
21  Moore, who's on here.  The amount's a thousand
22  dollars.  And this invoice is dated
23  November 4th, 2021.
24      So and that's -- and that's paid --
25  it's the next to last page that we were looking

**Page 108**

1  at a minute ago.  It's one of the exhibits
2  attached to the letter from your lawyer?
3          ATTORNEY STEWART:  Hold on, Larry.
4      We're trying to find it.
5          THE WITNESS:  Is it Bates number 12?
6  BY ATTORNEY FOWLER:
7      Q.  No.  No, this isn't a Bates.  What
8  I'm looking at is on that letter from your
9  lawyer, the next-to-last page, which is 37, it's
10  an invoice dated November 4th, 2021.  Do you see
11  that?
12      A.  Yeah, I do.  With Lance Moore for a
13  thousand dollars?
14      Q.  Yes.  So tell me how the thousand
15  dollars was arrived at.
16          ATTORNEY STEWART:  I think -- hold on
17      a second, Larry.  We've just -- I think
18      it's Accruvia 11.  We're just making sure.
19      It's harder to see on the screen.  He can
20      see it.  Just want to make sure that it's
21      the same document.
22          ATTORNEY FOWLER:  Okay.
23          ATTORNEY STEWART:  I'm sorry.  It's
24      November 4th, 2021 invoice.  Yeah, I think
25      we're looking at the same document.  We've

**Page 109**

1  got it on the screen so, so...
2  BY ATTORNEY FOWLER:
3      Q.  Okay.
4      A.  The invoice was -- covered at a
5  period of three days, from November 1st to the
6  3rd.  That developer was on a $10,000 a month
7  salary.  And so I divided 3 by 30.  And the
8  10 percent.  10 percent on 10,000 is $1,000.
9      Q.  Okay.  So...
10      All right.  And then scroll up to the
11  page right above that, which is dated -- it's
12  also -- it's dated November 3rd?
13      A.  Yes.
14      Q.  And Lance Moore is the first entry;
15  right?
16      A.  Correct.
17      Q.  And that -- is that a 6 or an 8?
18      A.  It's a 6.
19      Q.  So that $6,513, how did you arrive at
20  that number?
21      A.  Lance went on vacation for close to
22  two weeks.  So I pro-rated the amount.
23      Q.  For what period of time?
24      A.  I pro-rated it for the days that he
25  worked in October of 2021.



**Shaun Overton**
**August 16, 2022**

Page 110

1    Q.   So how do you know how many days he
2  worked in October of 2021?
3        A.   He told me he was taking a vacation
4  and his plans like a month or two in advance.
5        Q.   Let's pick one that's easier to
6  figure out.  All right.  Williams Mendez.  Do
7  you see that, $10,016?
8        A.   Yes, I do.
9        Q.   How did you come up with that number?
10       A.   That's his flat monthly rate.
11       Q.   So what did you look at to know he
12 worked the whole month?
13       A.   Well, one, he was physically present
14 in El Salvador.  So I saw him in the office
15 every day for a period of three weeks.  And I
16 literally mean every day.  Occasionally he got a
17 day off.  But we were working six and seven days
18 a week.
19       Q.   So -- okay.  So during the month of
20 October, were you in El Salvador the entire
21 month?
22       A.   No.  I returned to Texas, I think
23 once in early October, for, like, 48 hours.  I
24 mean, I barely saw my wife.  And then towards ---
25 I think it was November 1st I flew home.  I

Page 111

1  don't remember the exact dates.
2        Q.   Okay.  All right.  And so these
3  invoices that are attached to the letter, the
4  first -- it's dated November 3rd, 2021.  So that
5  would have been for October 2021; correct?
6        A.   Yeah.  There's two invoices.  And one
7  of them has the specific note that says:
8  Invoice for labor, October 1st to 31st.
9        Q.   Where are you looking?
10       A.   Invoice IB1050.
11       Q.   Okay.  Where does it say that?
12       A.   Very bottom left corner.
13       Q.   Ah.  Thank you.  Okay.  Invoice for
14 labor, October 1 through 31; right?
15       A.   Correct.
16       Q.   Okay.  Then if we scroll down to the
17 next page, okay, in the bottom left it says
18 invoice for labor, November 1 through 3, 2021;
19 right?
20       A.   Correct.
21       Q.   The bill -- this invoice we created
22 on November 4th; right?
23       A.   Correct.
24       Q.   Okay.  Then the one behind it, what
25 period of time is that one for?  It's dated

Page 112

1  October 4th.
2        A.   The one that's October 1st to 31st
3  for about $75,000?
4        Q.   No.  The one right behind it, the
5  very last one on that letter.  It says --
6        A.   Oh.  Yeah.  It's not a coincidence
7  that it's dated October 4th because that was the
8  date where Eric agreed what he was going to pay
9  me for all the labor that he had hired us for.
10            This is the bill that Athena Bitcoin,
11 Inc. paid.
12       Q.   Okay.  All right.  So this is the
13 labor that was performed after the term sheet
14 was signed but before your conversation in the
15 stairwell on October 4th; right?
16       A.   Correct.
17       Q.   Okay.  And you're on here for 3,336.
18 Tell me how again how you calculated that.
19       A.   It's pro-rated.
20       Q.   And so you split the two numbers that
21 we looked at in the term sheet; you came up with
22 a yearly salary of 200; and then you pro-rated
23 it for however many days; is that right?
24       A.   Yes.
25       Q.   Now, at the very bottom it says

Page 113

1  [as read]:  Programming hours, program hour,
2  overhead expenses, 1.5 percent.
3        A.   Yes.
4        Q.   How did you calculate that?
5        A.   Within one and a half percent of all
6  of the numbers on the line items above that.
7        Q.   So including your --
8        A.   Oh, sorry.  Overhead -- is that --
9  yeah, I believe that's what it is.
10       Q.   Okay.  So does that include a markup
11 for your salary?
12       A.   I expect so.
13       Q.   Okay.
14       A.   Well, actually, I don't -- I'm not
15 sure.  I don't know whether I included it or
16 not.
17       Q.   And how come Bailey Jarrell's not
18 listed on here?
19       A.   She did not perform any work for
20 Athena Bitcoin, Inc. during that time period.
21       Q.   Well, has she performed work for ROI?
22       A.   She was on vacation.  And I don't
23 remember the exact dates, but she wasn't working
24 at that time because she had planned time off.
25 And I don't remember exactly when she started ---



Page 114

1   well, it would be reflected on the invoice to
2   mark when she started working.
3       Q.   So the programmers during, during
4   September and October, all these folks that are
5   listed on here, are they only working on the
6   Chivo Wallet project?
7       A.   For which invoice?
8       Q.   Let's just use -- let's use the
9   very first one up there, the November 3rd one,
10  where it says invoice for labor, October 1
11  through 31.
12      A.   The only -- let me check the names.
13          ATTORNEY STEWART:   The $75,000 one?
14          THE WITNESS:   Yeah.   The only one
15      that was not exclusively on Chivo Wallet
16      was Gustavo Rodriguez.   He helped with a
17      small crisis on a Sunday, and so I pulled
18      him in because he was the one I could
19      round up.
20          But other than that, everybody
21      else -- I was just looking real quickly,
22      but I believe everybody else was fully
23      dedicated to Chivo Wallet.
24  BY ATTORNEY FOWLER:
25      Q.   So on Gustavo, the $335, how did you

Page 115

1   come up with that?
2       A.   That was just billed for the time
3   because he was fractionally working on it.
4       Q.   So is that like a day?   What is it?
5       A.   I don't recall.
6       Q.   Okay.   All right.   Who performed
7   these calculations that are reflected on this
8   invoice that we're looking at?
9       A.   I did.
10      Q.   Did you make any notes when you were
11  doing it?
12      A.   Not that I remember.
13      Q.   All right.   So then the next invoice,
14  which was the three days in November, how did
15  you know how much to calculate on there?   I
16  mean, is there anything you looked at, or you
17  just know everybody was working on the project?
18      A.   I know everybody was working
19  exclusively on the project.   They were working
20  crazy hours.
21      Q.   And during those days in November,
22  you were in El Salvador; correct?
23      A.   No.   I was in El Salvador, I
24  think, November 1st.   But the 2nd and 3rd was in
25  Texas.   Eric encouraged me to fly home because I

Page 116

1   was at my wits' end.
2       Q.   So then let's just look at
3   October/November.   During October, how many days
4   do you think you were in El Salvador versus
5   Texas?
6       A.   I don't know the exact number.   I
7   believe I was home for -- I don't recall.   It
8   could have been as little as three or four days
9   and maybe up to a week at a time.
10      Q.   What about November?
11      A.   I was in El Salvador on the 1st; flew
12  home really, really late at night; and was in
13  Texas on the 2nd and 3rd.
14      Q.   Then did you go back to El Salvador?
15      A.   I did on November 15th, but it had
16  nothing to do with Athena.
17      Q.   I'm sorry.   Say that again.
18      A.   I went back to El Salvador around
19  November 15th for a Bitcoin conference in the
20  country.   But that did not have anything to do
21  with Athena.
22      Q.   Okay.   All right.   Okay.   But this
23  last invoice is just for November 1 through 3;
24  right?
25      A.   That's correct.

Page 117

1       Q.   Okay.   And November 1 through 3, you
2   said you were in Texas; right?
3       A.   I was in Texas on the 2nd and 3rd.
4       Q.   Okay.   Did you ever have any
5   conversations with anyone at Athena about,
6   physically, how you were going to be paid -- not
7   how much, but how the funds were going to be
8   delivered?
9       A.   Yes.   Eric told me to send my invoice
10  to Noreen Pepino and she would send me an
11  electronic transfer payment.   And I was more
12  worried about the timeframe.   He assured me that
13  I would get paid within 24 hours.
14      Q.   These documents we're looking at, the
15  invoices, are you the one that physically
16  created them?
17      A.   I am, yes.
18      Q.   All right.   Is the first one that you
19  created the one that's marked Paid, dated
20  October 4th, 2021?
21      A.   Yes, that is the first invoice I
22  created.
23      Q.   Do you know when you were paid?
24      A.   I don't recall.   But I know it's in
25  one of your exhibits.



Page 118

1    Q.   Okay.  So that's the first one that
2  you were paid.  And then the next one that you
3  would have been paid -- excuse me, the next one
4  you would have created would have been the
5  invoice B1050 for the October 1 through 31; is
6  that right?
7    A.   That sounds correct.  Yeah, that
8  invoice goes through -- covers the month of
9  October.
10   Q.   All right.  Well, the very first
11 invoice you created where it says Bill To, it
12 just has an address; correct?  It doesn't say
13 Athena anything; right?
14   A.   Yeah.  It says "Athena Bitcoin."
15 That doesn't specify which Athena.
16   Q.   Wait a minute.  The very first
17 invoice, the one dated October 4th --
18   A.   Yes.
19   Q.   -- where does it say "Athena
20 Bitcoin"?
21   A.   It does not.
22   Q.   Okay.  Now, the next invoice, which
23 is for October 1 through 31, it's addressed to
24 Athena Bitcoin; right?
25   A.   Correct.

Page 119

1    Q.   Okay.  Did you physically -- I mean,
2  do you recall looking at anything or deciding on
3  how -- what to put there on this invoice, on the
4  Bill To, as opposed to the first invoice that
5  you did where it doesn't have anything?
6    A.   Yeah.  I think I realized after the
7  fact that I didn't list the entity on the
8  invoice, and so I added it in for the October
9  invoice.
10   Q.   Okay.  As we sit here, do you
11 physically remember doing that?
12   A.   I do not.
13   Q.   What about the address, 1332 North
14 Halsted Street, Chicago, Illinois; where did you
15 get that address?
16   A.   I googled "address of Athena Bitcoin,
17 Inc."  And that's the address that comes up in
18 Google's search results.
19   Q.   So you think you got that address
20 from a Google search; is that right?
21   A.   Correct.
22   Q.   Bailey Jarrell, the marketing she was
23 doing, tell me again what was -- who was she
24 marketing to?
25   A.   I don't know.

Page 120

1    Q.   What was she marketing -- scratch
2  that.  What was, what was she marketing?
3    A.   Like I testified earlier, she was
4  reporting directly to the CMO, who directed her
5  activities.  I was not directly involved in
6  supervising her in any meaningful way.
7    Q.   But you were paying her salary;
8  correct?
9    A.   Correct.
10   Q.   So as far as what Bailey Jarrell was
11 doing in the months of October and
12 November 2021, you don't know; is that fair?
13   A.   The only thing that I know is that
14 her efforts in the timeframe were focused on the
15 conference.  But what Athena hopes to accomplish
16 out of the conference or its motivations for
17 sponsoring or the business outcome they were
18 seeking, I don't know.
19   Q.   Okay.  So as we sit here today, you
20 can't testify that in either September, October,
21 or November 2021, Bailey Jarrell was working on
22 the Chivo Wallet project?
23   A.   I -- like I testified earlier, it
24 depends on where you draw the line on Chivo
25 Wallet.  Like at no point -- I don't remember --

Page 121

1  I don't know because all her efforts were
2  focused on the conference.
3         And so whether the conferences was
4  Chivo Wallet-focused or not I don't know because
5  I did nothing for the conference prep.  All I
6  know is she was working on that.  So I can't --
7  I don't have knowledge of that.
8    Q.   So to make sure you and I are on the
9  same page, as far as what she was doing for
10 Athena in September, October, and November 2021,
11 you don't know what it was; is that correct?
12   A.   No.  She was working on the
13 conference.  She was doing whatever marketing
14 Athena was focused on.  She was getting the
15 company ready to -- for its exhibition at the
16 Bitcoin conference in San Salvador, El Salvador
17 around November 15th.  That was the exclusive
18 focus of her efforts.
19         (Discussion held off the record.)
20 BY ATTORNEY FOWLER:
21   Q.   All right.  So September, October,
22 November 2021, Bailey Jarrell is working on
23 Athena making a presentation at the Bitcoin
24 conferences; is that right?
25   A.   And their group.  But, yeah, it's all



**Page 122**

1  related to the conference; yes.
2      Q.    Since she -- she was an employee,
3  right, W-2 employee?
4      A.    That's correct.
5      Q.    So ROI -- so -- okay.  So ROI was
6  letting Athena use Bailey Jarrell to prepare for
7  that conferences, and you all marked up her
8  salary 1.5 percent; is that right?
9      A.    Yes.
10      Q.    And the Bitcoin conference, it was in
11  El Salvador; is that right?
12      A.    Correct.
13          ATTORNEY FOWLER:  Okay.  Kelly, let's
14      take a break for five minutes.  Is that
15      okay?
16          ATTORNEY STEWART:  Yeah, no problem.
17          (Recess.)
18  BY ATTORNEY FOWLER:
19      Q.    On the invoices you sent to that
20  North Halsted Street, Chicago, Illinois address,
21  did you tell me that you looked that address up
22  yourself and then put it on the invoices?
23      A.    That's correct.
24      Q.    And you did that using Google?
25      A.    Yes, I did.

**Page 123**

1      Q.    Do you remember what search terms you
2  used?
3      A.    I have no idea.  Well, I mean, I
4  would assume it was "Athena Bitcoin, Inc.'s
5  address."  But I can't, I can't recall
6  specifically.  I know I used it, but I can't
7  imagine it would be anything different.
8      Q.    As you sit here, you don't recall
9  what search terms you used; is that correct?
10      A.    Yeah, I don't know the terms; that's
11  correct.
12          ATTORNEY FOWLER:  Okay.  Kelly, I'll
13      pass the witness and...
14          ATTORNEY STEWART:  I have a few
15      follow-up questions.
16  BY ATTORNEY STEWART:
17      Q.    Mr. Overton, you were asked by
18  Mr. Fowler about lawsuits you've been involved
19  with.  And my question is:  Did you forget and
20  leave one out?
21      A.    Yes, I did.
22      Q.    What did you leave out?
23      A.    A lawsuit in Illinois where Athena
24  Bitcoin Global sued myself, my wife, and ROI
25  Developers, Inc.

**Page 124**

1      Q.    And so other than that lawsuit and
2  the lawsuit you told Mr. Fowler about, are there
3  any other lawsuits in which you've been
4  involved?
5      A.    No.
6      Q.    Now, you were asked by Mr. Fowler
7  about whether you had changed your testimony
8  about whether your work that you've sued
9  under -- that Accruvia sued under in this case
10  was related to the term sheet.  Do you recall
11  that testimony?
12      A.    I do.
13          ATTORNEY STEWART:  And, Larry, he's
14      got in front of him the three invoices
15      that you've had up on the screen.  And
16      those are Accruvia 11, 12, and 13.
17          And he's also got in front of him the
18      term sheet, which is Athena 3, 4, and 5.
19  BY ATTORNEY STEWART:
20      Q.    And if you'll take a look,
21  Mr. Overton, at the work -- let's just look at
22  Accruvia 13, which is the $11,000 invoice that's
23  marked Paid.  And was that work actually paid
24  for by an Athena entity?
25      A.    Yes, it was.

**Page 125**

1      Q.    And this is work, I believe you
2  testified, that was done before October 4th,
3  2021?
4      A.    Correct.  The dates covered were
5  September 22nd or '3rd through the end of
6  September.
7      Q.    Okay.  And does any of this work
8  relate to the terms in the term sheet which you
9  had -- we've been talking about?
10      A.    No.
11          ATTORNEY FOWLER:  Object to form.
12          THE WITNESS:  No, it does not.
13  BY ATTORNEY STEWART:
14      Q.    Now, you did, though, say that you
15  pulled, right, your salary figure from the term
16  sheet?
17      A.    Yes, I did.
18      Q.    Is that your testimony?
19      A.    It is my testimony.
20      Q.    And now that you've looked at the
21  term sheet, do you see anything in the term
22  sheet that would provide for this additional --
23  any of the work on either that invoice, that
24  $11,000 invoice that's paid or the other two
25  invoices, the $75,000 and the $8,000 one there



**Page 126**

1  that are not paid?
2      A.   No.
3          ATTORNEY FOWLER:  Object to form.
4          THE WITNESS:  No.  That term sheet
5  was the start of my relationship with the
6  Athena entities.  It did not cover the
7  specific work because this was intended to
8  eventually commence into the terms
9  outlined.
10         But in no way did it cover the
11  in-between time other than the salary
12  number I pulled for myself.
13         ATTORNEY FOWLER:  Objection;
14  nonresponsive.
15  BY ATTORNEY STEWART:
16     Q.   Then, Mr. Overton, why did you tell
17  Mr. Fowler that you believed your work that
18  you've invoiced and -- when I say you, I mean
19  Accruvia here -- the work that Accruvia invoiced
20  was with the entity that is -- that signed or
21  entered into the term sheet?
22     A.   Because in the -- because that term
23  sheet was the start of my relationship with the
24  Athena entities.  And there's no way I would
25  have wound up working for Athena Bitcoin, Inc.

**Page 127**

1  if that term sheet hadn't existed.
2          But that term sheet doesn't cover the
3  in-between time.  That's a future state.
4      Q.   And, in fact, on the third page of
5  the term sheet -- which is Athena 5 -- which is
6  the -- what's the name of the entity that's
7  signed this on behalf of Athena?
8      A.   Athena Bitcoin Global, Inc.
9      Q.   Now, I want to ask you a couple of
10  follow-up questions about the software, the
11  Chivo Wallet software -- can I call that?  Is it
12  software?
13     A.   Yeah, software.  Chivo Wallet.
14     Q.   -- that Mr. Fowler talked to you
15  about, is it just used in El Salvador?
16     A.   No, absolutely not.
17     Q.   Where is it used?
18     A.   It's used globally wherever anybody
19  has access to -- like if you can -- if you're
20  sending money to Chivo Wallet, I believe you can
21  do that anywhere in the world.
22         It's used -- it's specifically
23  designed for use in the United States and
24  including in Texas.
25         ATTORNEY FOWLER:  Objection;

**Page 128**

1  nonresponsive, speculation.
2  BY ATTORNEY STEWART:
3      Q.   And how do you know it's used in --
4  is it -- how is it is used in the United States?
5      A.   The way Lor- -- well, both Lorenzo
6  Rey and Eric Gravengaard outlined to me the
7  rationale behind the project.  And it's 100
8  percent focused on remittances and avoiding
9  commissions from Western Union and similar
10  services.
11         I know that Sara Hannah, who's the
12  president's advisor, Eric told me about a
13  conversation between her and Western Union where
14  Western Union started negotiating on the
15  remittance rates to El Salvador because they
16  were feeling the financial pressure of people
17  using the Chivo Wallet system.
18         ATTORNEY FOWLER:  Objection;
19  nonresponsive, leading, speculation.
20  BY ATTORNEY STEWART:
21     Q.   Was the Chivo Wallet software, that
22  work that either was billed and paid for by an
23  Athena entity and the work that was billed and
24  not paid for by an Athena entity that you've
25  sued over, was that related to the Chivo Wallet

**Page 129**

1  software?
2      A.   Yeah, absolutely.
3      Q.   Can you divorce the Chivo Wallet
4  software from Bitcoin ATMs in the United States?
5      A.   Absolutely not.
6      Q.   And that would include Bitcoin ATMs
7  in Texas; right?
8      A.   Absolutely.
9      Q.   And that would include Bitcoin ATMs
10  in Texas that are owned by an Athena entity?
11     A.   Correct.
12         ATTORNEY FOWLER:  Objection; leading.
13  BY ATTORNEY STEWART:
14     Q.   Who would own the Texas Bitcoin ATMs
15  in which Chivo Wallet would be used?
16     A.   Athena Bitcoin.
17         ATTORNEY FOWLER:  Objection;
18  speculation.
19  BY ATTORNEY STEWART:
20     Q.   And how do you know that?
21     A.   Because Athena Bitcoin, Inc.'s entire
22  business line is operating -- well, not their
23  entire business line.
24         Prior to starting Chivo Wallet, the
25  entire business of Athena Bitcoin, Inc. is



Shaun Overton
August 16, 2022

**Page 130**

1  owning and operating Bitcoin ATMs across the
2  United States and including Texas.
3      Q.   With respect to the work that is
4  showing up in the three invoices we've talked
5  about, Accruvia 11, 12, and 13, how did -- let's
6  just use the first one, Franklin Grassais, which
7  is the top entry on the $11,000 paid invoice
8  dated October 4th.  Who would have told him what
9  work to do?
10     A.   That was coming from Eric Gravengaard
11  or myself, with Eric serving as, like, the
12  director.  So him and Edward Iskra, who was the
13  project manager, would direct me what my
14  priorities were.  Sometimes they would directly
15  interject to my contract staff to tell them what
16  to do.  Or they would give me a goal and an
17  objective, and then I would direct my staff to
18  accomplish the objective.
19     Q.   I believe you told Mr. Fowler that
20  you don't recall any conversations before
21  October 4th, 2021, with anyone at Athena as far
22  as:  Here's the work that we want you to do.
23          Do you recall that testimony?
24     A.   I do.
25     Q.   And so why would that be?  Why were

**Page 131**

1  these people doing work?
2      A.   Athena was directing us specifically
3  what to do.  And that's why I was pushing back
4  so hard; because it's so obvious that if
5  somebody's telling me what work to do, there's
6  an obvious expectation that I expect to get paid
7  for it.
8      Q.   And the work that Accruvia did for
9  Athena, it's your understanding, is it not, that
10  it was used for Chivo Wallet?
11          ATTORNEY FOWLER:  Objection; form,
12     leading.
13          THE WITNESS:  The exclusive work that
14     they did was for Chivo Wallet.
15  BY ATTORNEY STEWART:
16     Q.   Let me fix my question.
17          For what purpose was the work that's
18  shown in the three invoices we discussed, what
19  purpose was that?
20     A.   It was exclusively for Chivo
21  Wallet --- well, sorry.  It was for Chivo Wallet,
22  except for Bailey Jarrell's services, who was
23  doing marketing.
24          But especially on the paid invoice,
25  that was -- I need to double-check, but -- I'm

**Page 132**

1  pretty sure that invoice was exclusively for my
2  services, and everything that's not me is
3  programming work.
4      Q.   Programming work for whom and what?
5      A.   For Athena Bitcoin, Inc., for Chivo
6  Wallet.
7      Q.   Now, did --- you've talked to
8  Mr. Fowler a little bit about, you know, how
9  this whole relationship came into being.  And
10  you mentioned some fraud issues.  Do you recall
11  who?
12     A.   I do.
13     Q.   What was the fraud?  The fraud wasn't
14  Athena committing fraud; right?
15     A.   That's correct; it wasn't Athena.
16     Q.   What was the fraud?
17     A.   The fraud was the fact that, in order
18  to -- if you know someone's DUI and their name,
19  you basically able to open up -- because the
20  third-party KYC vendor -- know your customer --
21  crashed and was not servicing.
22          So people figured this out very
23  quickly that you could -- because DUI's are
24  public information, including the name.  So all
25  you got to do is find the list; and then you can

**Page 133**

1  sign up, get the 30 bucks, withdraw it in
2  Bitcoin, and now it's not traceable.
3          And so when I mentioned that 10 to
4  20 percent number, by the time I left the
5  project we were at 4 million registered users.
6  So you have at least 10 percent of 4 million.
7  So 400,000 people that each got 30 bucks, you're
8  talking about $12 million.
9          And for context, like for the
10  American government, that would be chump change.
11  But the government of the El Salvador, at the
12  time they were negotiating with the IMF for a
13  bailout for a billion dollars.  And so when
14  you're losing anywhere from 12 to 24 million
15  dollars, just throwing it away on bogus
16  registrations, they did not have that kind of
17  money to just throw away to fraud.
18          So when they would come to us and beg
19  us to run these scripts to mark these people as
20  fraudulent as fast as possible, it's because
21  they were bleeding money that they didn't have.
22     Q.   Who do you mean by "they"?
23     A.   "They" would be the government of
24  El Salvador.
25     Q.   Did Athena ever make any complaints



Shaun Overton
August 16, 2022

Page 134

1  about your work?
2          ATTORNEY FOWLER:  Object to form.
3          THE WITNESS:  One time.  Eric, about
4  two weeks after I started working with
5  Athena, he said that he wasn't happy
6  because we weren't meeting the objectives.
7  And we had probably an hour-and-a-half to
8  two-hour long discussion about the way
9  everything was working.
10          And the outcome with that was that I
11  told him:  When everything's a priority,
12  nothing is a priority.  And so what's not
13  happening is the communication that -- I
14  can only handle so many fires at once.
15          And what he settled on was the top
16  five.  So him and Edward could pick five
17  things a day for us to work on.  And also
18  coming out of -- because my big complaint
19  was that there's no QA department at all,
20  internally, with Athena.  And we weren't
21  following best practices because
22  everything was so bad with having code
23  reviews and being very careful with what
24  we released.
25          So once Eric and I had that

Page 135

1  discussion, we implemented the top five,
2  and we got -- and I implemented a formal
3  QA.
4          And from there on out, we are
5  humming.  Like we were making substantial
6  progress on the app and triaging the worst
7  of the fraud and the worst of the
8  spaghetti code that Athena originally
9  developed.
10  BY ATTORNEY STEWART:
11      Q.   Did -- in your mind, was that
12  complaint resolved?
13      A.   It was --
14          ATTORNEY FOWLER:  Objection; form,
15  leading.
16          THE WITNESS:  It was resolved.
17  BY ATTORNEY STEWART:
18      Q.   Any other complaints that you can
19  recall?
20      A.   No.
21      Q.   What's the current status of the
22  subcontractors and the employee, Bailey Jarrell,
23  that you -- what's their current employment
24  status; do you know?
25      A.   Bailey Jarrell is currently an

Page 136

1  employee of Athena Bitcoin, Inc.  And I know
2  that because I asked her who, who pays her.  And
3  she told me Athena Bitcoin, Inc.
4          The -- Franklin Grassias no longer
5  works for me.  Williams Mendez no longer works
6  for me.
7          ATTORNEY FOWLER:  Objection;
8      nonresponsive.
9  BY ATTORNEY STEWART:
10      Q.   Keep going.  It's responsive.
11      A.   Burak was terminated in the middle of
12  October.  Panos still works for me.  Mariano has
13  another position.  Mario has another position.
14  Gustavo has another position.  I think that --
15      Q.   Well, do any of them work for Athena?
16      A.   Bailey Jarrell.
17      Q.   Okay.
18      A.   And I should mention that Athena at
19  the end of the work approached every single
20  developer listed on the invoices and offered
21  them a 25 percent raise and, I think, $50,000
22  and some kind of stock compensation.
23          ATTORNEY FOWLER:  Objection;
24      nonresponsive, speculation.
25  BY ATTORNEY STEWART:

Page 137

1      Q.   Do you know -- well, how do you know
2  that?
3      A.   Because every single developer came
4  to me and said:  Hey, Athena's trying to poach
5  us.
6      Q.   And what did they tell you?
7      A.   They said they weren't interested
8  because the work environment was so toxic that
9  they didn't want to have anything to do with
10  Athena.
11      Q.   So what did they tell you -- the
12  poaching, you used that term -- what did they
13  tell you specifically?
14      A.   Eric somehow obtained their personal
15  contact information and said that Athena and ROI
16  Developers are no longer working together and
17  that Eric had made them those specific terms.
18          So they were coming to me at their
19  own volition and saying:  Hey, this happened.  I
20  want you to know about it.
21      Q.   What did they tell you with respect
22  to terms that Athena offered?
23      A.   They told me that -- they mentioned
24  the salary numbers.  So they told me a
25  25 percent raise.  So they were going to offer



Shaun Overton
August 16, 2022

Page 138

1 everybody on my invoices a 25 percent raise.
2 And Panos specifically, and Lance, both
3 mentioned the stock compensation.
4    Q.    Was there anybody else to your
5 knowledge that resided in Texas that worked on
6 Chivo Wallet?
7    A.    Andrew Chalk.
8    Q.    Who was Andrew Chalk?
9    A.    He was a developer hired by Athena
10 Bitcoin, Inc. and partial -- like I would
11 play -- my team played a role in managing him,
12 and Eric Gravengaard played a role in managing
13 him.
14    Q.    Did Accruvia -- was he employed or
15 subcontracted by Accruvia?
16    A.    No, he was not.
17    Q.    And was he working on the Chivo
18 Wallet?
19    A.    Exclusively.
20    Q.    Who was his supervisor?
21    A.    Myself and Eric.
22    Q.    Who authorized his hiring?
23    A.    Ultimately Eddie Weinhaus -- oh, no.
24 Ultimately it was Eric Gravengaard.  He had to
25 sign off on it.

Page 139

1    Q.    And again, I think I'm repeating
2 myself, but was he working for or subcontracted
3 with Accruvia?
4    A.    No.  We've never paid Andrew Chalk.
5    Q.    Did -- were there any complaints
6 about his work?
7    A.    Yes.
8    Q.    What were those?
9    A.    He -- the very first day that he
10 joined Athena Bitcoin, Inc., after he got the
11 environment set up -- so when I say the first
12 day, I mean the first day where he is actually
13 writing code that we would use -- and I directed
14 him to work on unit tests, because unit tests,
15 you're not going to break anything.  It's a
16 really good learning opportunity for you to get
17 exposed to the code, but if you mess up, there's
18 no consequences.
19        But at the time the government was
20 hemorrhaging into a completely separate way,
21 through arbitrage.  Arbitrage is where you know
22 what the real market price is but you're able to
23 buy it at a fake price.  And the way that wallet
24 software was designed was the price only updated
25 once per minute; but globally, the price of

Page 140

1 Bitcoin changes in fractions of a second.
2        And what -- as soon as -- so as we
3 progressed and got the software stable, the
4 government was able to increase the number of
5 users it was putting on the platform.  And
6 around that time it was in the millions of --
7 the user base was in the millions.  AWS was
8 completely misconfigured to where it couldn't
9 handle the load; the databases were
10 misconfigured.
11        But as we got the databases
12 configured correctly and AWS correctly, the
13 software able to calculate the balance -- which
14 is also a critical feature of the ATMs, that
15 people could check their Chivo balance at an
16 Athena Bitcoin ATM -- the -- people knew what
17 the price of Bitcoin was, but they could see
18 that the price was too low or too high.
19        And so we had pretty much the entire
20 country turn into day traders where they would
21 watch the real Bitcoin price was what the Chivo
22 incorrect Bitcoin price was, and they could buy
23 and sell risk-free and sell within five seconds
24 later and make half a percent or a percent on
25 their money.

Page 141

1        There was one specific incidence
2 where we saw a guy start with $2,000 and he had
3 like $400,000.
4        And so as because the Chivo Wallet
5 ecosystem did not offset market risk, that means
6 that all of those guys' profits came from the
7 government of El Salvador.  And again, they're
8 negotiating for a IMF bailout because they're on
9 the verge of bankruptcy.
10        So you can imagine the kind of
11 pressure the government was feeling.  And that
12 snowballed right down to us.  Miguel Sabal came
13 into my office and directed me and said:  I need
14 this fixed today.
15    Q.    Who's he with?
16    A.    Miguel Sabal is the direct, is the
17 direct advisor to President Bukele.
18    Q.    And what -- you said AWS.  What's
19 AWS?
20    A.    Amazon Web Services.  It's the
21 infrastructure that sends the code out.
22    Q.    And I think my question was -- I was
23 talking to you about --
24        ATTORNEY FOWLER:  Kelly, I'm going to
25 object to -- that his response is



**Page 142**

1   nonresponsive.
2   THE WITNESS:  All right.  Andy -- so
3   this is the pressure I was under.  And I
4   advised -- or this is the pressure that
5   everybody was under, including Athena as a
6   whole.
7   And Miguel told me, like, this needs
8   to be fixed right now, tonight.  And I
9   advised him that that's a horrible idea
10  because we don't have time for QA.  And he
11  said skip it.  And then Eric felt that
12  pressure and overruled me.
13  So instead of, instead of having Andy
14  work on unit tests where he couldn't break
15  anything, Eric directed him to modify the
16  control that controlled how the
17  Bitcoin/dollar exchange rate worked.
18  And long story short is he screwed it
19  up; because the code was a giant mess,
20  full of the copy-and-paste no unit tests.
21  And so Andrew mistakenly allowed for the
22  exchange of 1 dollar to 1 Bitcoin.  And
23  the impact of 1 dollar at the time was
24  actually worth 60,000 Bitcoin.
25  And so we found -- by the time that

**Page 143**

1   that mistake was caught -- Miguel
2   frantically texted Edward Iskra saying:
3   What is going on?  There's way too many
4   Bitcoin going through the system.
5   We found that line of code.  It
6   resulted in -- we saw -- by the time we
7   released the code and we stopped it about
8   an hour later, there were about 3600
9   transactions that we estimated were about
10  $50 in value each.  And so instead of
11  trading $180,000, that -- Andrew's code
12  trade 180,000 Bitcoin with a market value
13  in excess of $10 billion, which made the
14  government insolvent immediately.
15  And we had to pull in the Accruvia
16  team, Jeremy Brenner, Eric Gravengaard.
17  We did an all-night marathon session
18  writing code to unwind that whole event so
19  that -- and we had to take the server
20  completely off-line -- like we killed the
21  entire system, just turned it off --
22  didn't get it back on until about 7:30 in
23  the morning.
24  And that was Andy's very first day
25  working on the project.

**Page 144**

1   As he continued working -- I don't --
2   and I don't blame him for that mistake.  I
3   think that was a poor management decision.
4   But it did become clear on the next two
5   weeks or so that he was having trouble
6   adapting to the platform.  And because I
7   identified a need for senior developers to
8   work on the project, I didn't think we
9   were going to spin him up in time to
10  accomplish the business results that we
11  needed.
12  I was getting ready to let him go.
13  But before I could do that, Eric
14  Gravengaard told me we needed to fire Andy
15  Chalk.  And so he was terminated.  I think
16  his total time with Athena was maybe three
17  weeks.
18  BY ATTORNEY STEWART:
19  Q.   And the work -- the problem that you
20  just described, would that have happened had
21  Andy done what you instructed him to?
22  A.   It would not have happened.
23  Q.   Who instructed him to do the code
24  work?
25  A.   Eric Gravengaard.

**Page 145**

1   Q.   And did that ultimately get resolved?
2   You said an all-nighter.  Did that resolve it?
3   A.   It did.  I think the government
4   probably lost a quarter million dollars on it.
5   The government had some safety mechanism that,
6   through sheer luck, prevented the disaster.  It
7   didn't allow Bitcoin withdrawals from 10:00 p.m.
8   until around 6:00 or 7:00 in the morning.
9   And because we did nightly releases,
10  the transaction -- we did releases at 10:00 p.m.
11  So when we caught it around 11:00, 11:30, nobody
12  could actually take the on-chain Bitcoin out of
13  the system; they could only transfer it within
14  Chivo.  The only money that was able to leak was
15  using Bitcoin Lightning.  And so I just
16  ballparked it at around a quarter of a million
17  dollars.
18  ATTORNEY STEWART:  Okay.  Pass the
19  witness.
20  BY ATTORNEY FOWLER:
21  Q.   Okay.  Can you spell the name of this
22  Andrew person.  What's his last name?
23  A.   Chalk, C-H-A-L-K.
24  Q.   Okay.  And did I hear you testify
25  that you were going to let him go?



Shaun Overton
August 16, 2022

Page 146

1    A.    Yes.
2    Q.    So you had the authority to fire him;
3  is that correct?
4    A.    I would need to run it by Eric; but
5  yes, I had planned to advocate heavily for
6  terminating him.
7    Q.    Well, there's a difference between
8  advocating him and letting him go.  And your
9  testimony was you were working to let him go;
10  correct?
11    A.    Correct.  I did not have authority to
12  make the final decision so let him go.
13        [Crosstalk.]
14    Q.    Then why did you testify you were
15  going to let him go?
16    A.    Because I was going to make the
17  recommendation.
18    Q.    You understand there's a difference
19  between a making a recommendation and actually
20  letting him go; correct?
21    A.    I do.
22    Q.    When Mr. Chalk was doing this
23  programming, where was he located?
24    A.    El Salvador.
25    Q.    So to your knowledge, did Mr. Chalk

Page 147

1  do anything in the State of Texas that related
2  to this -- the Chivo project?
3    A.    He reviewed the source code prior to
4  getting on the flight.  We provided him with
5  some orientation work before.  Like we provided
6  him with some orientation work of Docker and
7  things that he needed to familiarize himself
8  with before he got on the plane.
9    Q.    Okay.  But as far as actual work,
10  none of that had occurred in the State of Texas;
11  correct?
12    A.    Well, doing preparation is work.
13  It's very important.  You have to know the
14  framework.
15        But in terms of writing code, no, he
16  did not write code in the State of Texas.
17    Q.    In the invoices we were looking at a
18  minute ago -- we'll look at, oh, the one that's
19  got the $75,000, where the bill on there for
20  your time is $16,666.67.  Do you see that?
21    A.    Yes, I do.
22    Q.    Would there have been any way for
23  anyone at Athena, when they received this
24  invoice, to know that your charge was for a
25  salary and not for programming hours?

Page 148

1    A.    Yeah.  Eric supervised me directly.
2    Q.    That's not my question.  My question
3  is:  When this invoice was received by Athena,
4  would there have been any way from looking at
5  this invoice to know that your charge for your
6  time was as a salary and not for programming?
7        ATTORNEY STEWART:  Objection; form.
8        THE WITNESS:  On the invoice, no,
9      there's nothing that differentiates
10      between -- I --
11  BY ATTORNEY FOWLER:
12    Q.    Was there ever -- did you -- was
13  there ever any separate documentation sent by
14  you at any time to Athena indicating that
15  charges for your time were as a salary and not
16  for programming?
17    A.    I never sent, I never sent any
18  documentation explicitly outlining the number.
19    Q.    Likewise, with regard to Bailey
20  Jarrell, the entries or here for her charge,
21  $5,871.05, when that document was received at
22  Athena, is there any way from looking at that
23  document and telling that the charge for her was
24  for marketing and not for programming?
25        ATTORNEY FOWLER:  Objection; form.

Page 149

1        THE WITNESS:  No.
2        ATTORNEY FOWLER:  Pass the witness.
3        ATTORNEY STEWART:  No further
4      questions.
5        I think the court reporter had some
6      spelling issues, though.
7        Oh, I take it back.  I do have one
8      question.
9  BY ATTORNEY STEWART:
10    Q.    Even though, Mr. Overton, you said
11  you would have had to have run it by
12  Mr. Gravengaard to fire Andy Chalk, would you
13  have been the one to actually fire him?
14    A.    Yes.
15        ATTORNEY STEWART:  I have no further
16      questions.
17        ATTORNEY FOWLER:  No further
18      questions.
19        (Deposition concluded at 12:41 p.m.)
20
21
22
23
24
25



Shaun Overton
August 16, 2022

**Page 150**

```
1              CHANGES AND SIGNATURE
2    WITNESS NAME: SHAUN OVERTON
3    DATE: August 16, 2022
4    PAGE LINE      CHANGE           REASON
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 151**

```
1
2            I, SHAUN OVERTON, have read the
3    foregoing deposition and hereby affix my
4    signature that same is true and correct,
5    except as noted above.
6
7
8    THE STATE OF        )
9    COUNTY OF           )
10
11          Before me,                    , on
12   this day personally appeared SHAUN OVERTON,
13   known to me (or proved to me under oath or
14   through              (description of
15   identity card or other document)) to be the
16   person whose name is subscribed to the
17   foregoing instrument and acknowledged to me
18   that they executed the same for the purposes
19   and consideration therein expressed.
20
21          Given under my hand and seal of office
22   this day of              ,         .
23
24                       NOTARY PUBLIC IN AND FOR
                         THE STATE OF
25                       COMMISSION EXPIRES:
```

**Page 152**

```
1              UNITED STATES DISTRICT COURT
2               NORTHERN DISTRICT OF TEXAS
3                   FORT WORTH DIVISION
4
5    ROI DEVELOPERS, INC.,      §
6    d/b/a ACCRUVIA,            §
7        Plaintiff,            §
8        v.                    § Civil Action No.
9    ATHENA BITCOIN, INC.,      § 4:22-cv-00073-O
10   Defendant.                §
11
12                    - - - - -
13
14           REPORTER'S CERTIFICATION
15         DEPOSITION OF SHAUN OVERTON
16                        August 16, 2022
17
18           I, Adam D. Miller, Certified Shorthand
19   Reporter in and for the State of Texas,
20   hereby certify to the following:
21           That the witness, SHAUN OVERTON, was
22   duly sworn by the officer and that the
23   transcript of the oral deposition is a true
24   record of the testimony given by the
25   witness; that the deposition transcript was
```

**Page 153**

```
1    submitted on August 23, 2022 to the witness
2    or to the attorney for the witness for
3    examination, signature and return to me by
4    September 22, 2022; that the amount of time
5    used by each party at the deposition is as
6    follows:
7
8        BY MR. FOWLER:   2 HOURS, 43 MINUTES
9        BY MR. STEWART:  0 HOURS, 23 MINUTES
10
11       that pursuant to information given to
12   the deposition officer at the time said
13   testimony was taken, the following includes
14   counsel for all parties of record:
15
16       KELLY STEWART on behalf of plaintiff
17       LARRY L. FOWLER, JR. on behalf of
18   defendant
19
20       that $         is the deposition
21   officer's charges to the Plaintiff for
22   preparing the original deposition transcript
23   and any copies of exhibits;
24       I further certify that I am neither
25   counsel for, related to, nor employed by any
```



**GPS LLC**
gpscalendar@gps.llc ~ 214.347.4781

**Shaun Overton**
**August 16, 2022**

Page 154

1  of the parties or attorneys in the action in
2  which this proceeding was taken, and further
3  that I am financially or otherwise
4  interested in the outcome of the action.
5      Certified to by me this 23rd day of
6  August, 2022.
7                    Adam D. Miller, CSR
                    Texas CSR No. PCR-12075
8                    Expiration Date:  09/30/24
                    Firm Registration No. 11446
9                    GOUCHER PARKER SPIVEY LLC
                    9243 Dove Meadow
10                   Dallas, Texas 75243
                    214.347.4781
11                   www.gps.llc
12
13
14
15
16
17
18
19
20
21
22
23
24
25



**GPS LLC**
**gpscalendar@gps.llc ~ 214.347.4781**

**Athena Bitcoin, Inc. (Eric Gravengaard)**
**August 17, 2022**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| ROI DEVELOPERS, INC., | § | |
| d/b/a ACCRUVIA, | § | |
|  Plaintiff, | § | |
| | § | Civil Action No. |
| VS. | § | 4:22-cv-00073-O |
| | § | |
| ATHENA BITCOIN, INC., | § | |
|  Defendant | § | |

— — —

ORAL VIDEOCONFERENCE DEPOSITION OF

ERIC GRAVENGAARD (PERSONAL JURISDICTION)

ON BEHALF OF ATHENA BITCOIN, INC.

Wednesday, August 17, 2022

— — —


Oral videoconference deposition of ERIC

GRAVENGAARD (PERSONAL JURISDICTION), conducted

virtually, from 9:11 a.m. to 12:51 p.m., on the

above date, before Ronald R. Cope, Registered

Professional Reporter, and Certified Realtime

Reporter.



**GPS LLC**
**gpscalendar@gps.llc ~ 214.347.4781**

**Exhibit 4**

Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

**Page 2**

```
 1  A P P E A R A N C E S:
 2  REMOTE APPEARANCES:
 3
 4      ON BEHALF OF THE PLAINTIFF:
        KELLY STEWART
 5      K STEWART LAW
        5949 Sherry Lane
 6      Suite 900
        Dallas, Texas 75225
 7      972.308.6168
 8
        ON BEHALF OF THE DEFENDANT:
 9      LARRY FOWLER
        HARRIS COOK LLP
10      1309 W. Abram Street
        Arlington, Texas 76013
11      817.275.8765
12
     ALSO PRESENT:
13      Shaun Overton
        Antonio Valiente
14      Michael Schena, GPS Tech
15
16              - - -
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1        I N D E X   (Continued)
      NUMBER         DESCRIPTION           PAGE
 2
 3
      Exhibit 12   E-mail                    93
 4
      Exhibit 13   Text from bill.com        94
 5
 6    Exhibit 14   Report from Citizen's     96
                   National Bank,
 7                 ATHENA 000020 - ATHENA
                   000019
 8
      Exhibit 15   E-mail                    97
 9
      Exhibit 16   E-mail                    98
10
      Exhibit 17   Defendant's Supplemental  99
11                 Responses to Plaintiff's
                   First Set of Personal
12                 Jurisdiction Discovery
13    Exhibit 18   Defendant's Responses to 115
                   Plaintiff's First Set of
14                 Merits Discovery
15    Exhibit 19   Chivo Core document      143
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1              I N D E X
 2  APPEARANCES                              2
    PROCEEDINGS                             5
 3
    ERIC GRAVENGAARD (PERSONAL JURISDICTION)
 4
 5      EXAMINATION BY MR. STEWART           5
    CERTIFICATE                            149
 6
 7
 8                    EXHIBITS
    NUMBER         DESCRIPTION           PAGE
 9
    Exhibit 1    Notice of Deposition       6
10               (Personal Jurisdiction)
11    Exhibit 2    Form S-1 filed on        20
                   February 10, 2022, by Athena
12                 Bitcoin Global
13    Exhibit 3    Term Sheet               29
14    Exhibit 4    Texas Franchise Tax Public 36
                   Information Reports
15
    Exhibit 5    Document from Delaware     41
16               Division of Corporations
17    Exhibit 6    Document printed from the 42
                   Illinois Secretary of State
18
    Exhibit 7    ATM Locations, Texas       61
19
    Exhibit 8    Invoice                    73
20
    Exhibit 9A   Invoice                    76
21
    Exhibit 9B   Invoice                    79
22
    Exhibit 10   E-mail                     90
23
    Exhibit 11   E-mail                     92
24
25
```

**Page 5**

```
 1              PROCEEDINGS
 2         (August 17, 2022 at 9:11 a.m.)
 3      ERIC GRAVENGAARD (PERSONAL JURISDICTION),
 4  having been first duly sworn, testified as
 5  follows:
 6              EXAMINATION
 7  BY MR. STEWART:
 8      Q.   Good morning, Mr. Gravengaard.  My
 9  name is Kelly Stewart and I represent the
10  plaintiff in this case, ROI Developers, otherwise
11  known as Accruvia.
12           Can you state your full name for the
13  record, please.
14      A.   Eric Gravengaard.
15      Q.   And where do you live,
16  Mr. Gravengaard?
17      A.   I live in the state of Illinois.
18      Q.   What's your business address?
19      A.   The headquarters of Athena Bitcoin
20  Global is 1332 North Halsted.  That's in Chicago,
21  Illinois.
22      Q.   Okay.  And, Mr. Gravengaard, are you
23  here on behalf of Athena Bitcoin, Inc., to answer
24  questions relating to this lawsuit?
25      A.   I'm not familiar with the company
```



**Athena Bitcoin, Inc. (Eric Gravengaard)**
**August 17, 2022**

**Page 6**

1  that you just referred to.  You referred to Athena
2  Bitcom, Inc., and I'm unfamiliar with that
3  company.
4      Q.    Okay.  Well, I mispronounced it.
5  I'm sorry.
6            Athena Bitcoin, Inc., is that the
7  company on which you're here on behalf of today?
8      A.    I -- I'm here on behalf of myself
9  and Athena Bitcoin Global.
10     Q.    All right.  Well, let me -- I am
11 going to -- let's see.  Let me share a document
12 with you.  And you should be able -- it should
13 have come up as what's titled "Notice of
14 Deposition (Personal Jurisdiction)" that I've
15 marked as Exhibit 1.
16           Do you see that, Mr. Gravengaard?
17     A.    I see a document on my screen, yes.
18     Q.    Have you seen -- and you can scroll
19 through it.  I can't scroll through it for you.  I
20 don't think I can.
21           But you can scroll through it, and
22 my first question for you is:  Have you seen this
23 document before?
24     A.    I have seen this document.
25     Q.    Okay.  And this is a notice of

**Page 7**

1  deposition to the defendant here, Athena Bitcoin,
2  Inc.
3            Do you understand that?
4      A.    Okay.
5      Q.    Are you here to testify on behalf of
6  Athena Bitcoin, Inc.?
7      A.    I guess I am.
8      Q.    All right.  And you have seen
9  Exhibit 1, correct?
10     A.    Is that the document you're showing
11 me?
12     Q.    Yes, sir.
13     A.    Then I have seen it.
14     Q.    All right.  Before we go any
15 further, Mr. Gravengaard, have you been deposed
16 before?
17     A.    By you?  No, I have not.
18     Q.    Have you been deposed before by
19 anyone?
20     A.    Yes, I have.
21     Q.    How many depositions have you given?
22     A.    I believe just one.
23     Q.    What -- what were the circumstances,
24 or what was that case generally?
25     A.    It was an employment matter.

**Page 8**

1      Q.    Was that for an Athena entity?
2      A.    No, it was not.
3      Q.    Okay.  Before you started working
4  with or for Athena?
5      A.    I believe it was.
6      Q.    Mr. Gravengaard, you're doing a good
7  job of answering questions.  If you can avoid the
8  uh-uhs and uh-huhs and say yes or no, the court
9  reporter will get a clean and a clear record, if
10 that's okay.
11           Also, Mr. Gravengaard, if you don't
12 understand one of my questions, I would appreciate
13 you telling me.  Is that acceptable?
14     A.    I understand your question, yes.
15     Q.    All right.  And if you need to take
16 a break, you let me know or your attorney know,
17 and we will take a break.  Is that okay?
18     A.    Yes, sir.
19     Q.    All right.  I'm still looking at
20 Exhibit Number 1, and if you will scroll to what's
21 starting on page 4 with a list of topics and going
22 to page 5.
23           Have you seen that list of topics
24 before?
25     A.    Yes.

**Page 9**

1      Q.    Mr. Gravengaard, did you do anything
2  to prepare for this deposition?
3      A.    I put on a nice shirt, and I have
4  logged into your GPS vTestify system.
5      Q.    Did you do anything else to prepare
6  for the deposition?
7      A.    Yes.
8      Q.    What was that?
9      A.    Combed my hair, took a shower.
10     Q.    Did you do anything else?
11     A.    I'm unfamiliar with what your
12 question is.
13     Q.    Do you understand the term
14 "preparation," what that means in general?
15     A.    Maybe you could elaborate on what
16 you mean by "prepare" and --
17     Q.    Well --
18     A.    -- then I could be more specific in
19 my answer.
20     Q.    Well, I think you were very specific
21 on some of the things you said, Mr. Gravengaard,
22 but let me ask it this way:  Did you review any
23 documents to prepare for your deposition today?
24     A.    I did not review any documents.
25     Q.    Did you talk to anyone other than



Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

**Page 10**

1  Athena's counsel to prepare for your deposition
2  today?
3      A.      No, sir.
4      Q.      Did you review the topics that are
5  on page 4 and 5 of Deposition Exhibit 1 to prepare
6  for your deposition today?
7      A.      I have previously reviewed this list
8  of topics with counsel.
9      Q.      Did you do anything specifically to
10 prepare for your deposition as it relates to these
11 topics?
12     A.      No, sir.
13     Q.      Did you meet with your lawyer to
14 prepare for the deposition?
15     A.      Yes, sir.
16     Q.      And when I say "your lawyer," did
17 you meet with Mr. Fowler?
18     A.      I have met with Mr. Fowler.
19     Q.      Or talked to Mr. Fowler.
20     A.      I'm sorry.  I have spoken with
21 Mr. Fowler.
22     Q.      To prepare for your deposition; is
23 that right?
24     A.      Yes, sir.
25     Q.      How many times did you meet or talk

**Page 11**

1  with Mr. Fowler to prepare for your deposition?
2      A.      I couldn't say.
3      Q.      You couldn't say.  More than once?
4      A.      I believe that we were connected
5  more than once.
6      Q.      Did you meet with any other lawyers,
7  meet or talk with any other lawyers to prepare for
8  your deposition?
9      A.      I have met with the other counselors
10 who advise Athena Bitcoin and Athena Bitcoin
11 Global.
12     Q.      Who were they, or who was that?
13     A.      Including Antonia Valiente, who I
14 believe is on this call.
15     Q.      Anybody --- any other lawyers did you
16 meet with or talk to to prepare for the
17 deposition?
18     A.      No.
19     Q.      When you met with or talked to
20 either Mr. Fowler or Mr. Valiente, was there
21 anybody else in attendance or --- with those
22 meetings or listening to or participating in those
23 calls?
24     A.      No.
25     Q.      Where did you attend school?

**Page 12**

1              Let's start with high school.  Where
2  did you go to high school?
3      A.      I attended the Greenwich High School
4  of Connecticut.
5      Q.      And where --- did you attend college?
6      A.      I did.
7      Q.      Where did you go to college?
8      A.      I attended the Massachusetts
9  Institute of Technology in Massachusetts.
10     Q.      When did you graduate?
11     A.      I have a degree that says 1996.
12     Q.      What was your degree in?
13     A.      Mechanical engineering.
14     Q.      Other than the 1996 degree in
15 mechanical engineering from MIT, do you have any
16 other college degrees?
17     A.      I have only one undergraduate
18 college degree.
19     Q.      Okay.  Do you have any
20 post-undergrad college degrees?
21     A.      I'm sorry.  Are you asking if I have
22 a graduate degree?
23     Q.      Yes.
24     A.      I have a graduate degree.
25     Q.      And what is that in?  Where is it

**Page 13**

1  from?  And when did you get it?
2      A.      I have a master's in business
3  administration from the University of Chicago
4  Business School, which is presently called The
5  Booth, and that was in 2005.
6      Q.      Any others?
7      A.      No.
8      Q.      What year did you graduate high
9  school?
10     A.      1993.
11     Q.      So from --- you went to MIT from 1993
12 until you got a degree in 1996; is that correct?
13     A.      Yes.
14     Q.      And after 1996 when you got a degree
15 from MIT, did you work or go --- what did you do
16 then?
17     A.      I worked.
18     Q.      What did you do?
19     A.      I worked as a software developer for
20 different companies.  I did some entrepreneurial
21 work with a company that I helped to start, and
22 then I went to graduate school.
23     Q.      When did you --- did you form the
24 company --- one of the Athena entities or one of
25 the entities that ultimately became the Athena



Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

**Page 14**

1  companies?
2          Did you -- did you start Athena, I
3  guess? And when I say "Athena," let me just start
4  with Athena -- I know there are several Athena
5  entities here, but let's just start with Athena
6  Bitcoin, Inc.
7          Did you start that company?
8      A.    I'm not exactly sure what you mean
9  by "start." Could you be more specific?
10     Q.    Do you know when Athena Bitcoin,
11 Inc., was formed?
12     A.    It was formed in September of 2015.
13     Q.    When was Athena Bitcoin Global
14 formed?
15     A.    1991.
16     Q.    Did you form Athena Bitcoin Global?
17     A.    No.
18     Q.    When did you first become involved
19 with Athena Bitcoin Global?
20     A.    I believe on or around January of
21 2020.
22     Q.    And how -- what were the
23 circumstances of your becoming involved with
24 Athena Bitcoin Global?
25     A.    Athena Bitcoin, Inc., was purchased

**Page 15**

1  by Athena Bitcoin Global in a share exchange.
2      Q.    So what's the earliest -- I'm
3  getting confused by your dates, and that's my
4  fault, Mr. Gravengaard, not yours.
5          You said you became involved with
6  Global in January of 2020 and Inc. in September --
7  did you say you became involved with that in
8  September 2015, or is that the day -- is that when
9  it was formed?
10     A.    You asked when was it formed, and
11 the date of incorporation is September of 2015.
12     Q.    Okay. And Global was formed in
13 1991, correct?
14     A.    I believe that's true, yes.
15     Q.    But you didn't become involved with
16 Global until January 2020, right?
17     A.    That's what I said.
18     Q.    When did -- were you involved --
19 when did you become involved in any manner with
20 Inc.?
21     A.    In September of 2015.
22     Q.    Did you form -- were you responsible
23 for the formation of Inc.?
24     A.    I'm not clear on what you mean by
25 was "responsible for."

**Page 16**

1      Q.    Did you have any role in the
2  formation of Inc.?
3      A.    I would -- yes. I'm not clear
4  exactly which --
5      Q.    What was your role with respect to
6  the formation of Inc.? And just so --
7      A.    I --
8      Q.    Go on. Sorry.
9      A.    Attorneys in the state of Delaware
10 form company -- corporations, so I was not -- I'm
11 not that -- I'm not an attorney, and I did not do
12 that. I was directing the formation of Athena
13 Bitcoin, Inc., by those attorneys.
14     Q.    All right. And just for today's
15 purposes, if I use the term "Inc.," I'm referring
16 to Athena Bitcoin, Inc., and if I use the term
17 "Global," I'm referring to Athena Bitcoin Global.
18 Is that okay?
19         I'll try to use the full name, but
20 sometimes it's just easier to call one Global and
21 one Inc.
22         Is that -- you understand the
23 difference between those two companies, correct?
24     A.    I understand the difference between
25 those two companies.

**Page 17**

1      Q.    Inc. is a Delaware corporation,
2  right?
3      A.    Yes.
4      Q.    And where is its main office?
5      A.    In Chicago.
6      Q.    What's the -- what's the address of
7  its main office?
8      A.    1332 North Halsted, Chicago,
9  Illinois, County of Cook.
10     Q.    And Global is a Nevada corporation,
11 correct?
12     A.    Yes.
13     Q.    And where is its main office?
14     A.    At the same address, 1332 North
15 Halsted, Chicago, Illinois, County of Cook.
16     Q.    And, Mr. Gravengaard, if we were in
17 a conference room together for this deposition,
18 there would be a little less awkwardness with
19 respect to documents, but if there's some pauses
20 on my part today, it's because I'm trying to find
21 the electronic document to share it with you and
22 mark it as an exhibit. So there might be a little
23 bit of -- the technology is great, but there's a
24 little bit of awkwardness, I've noticed, with --
25 sometimes in these depositions just because of the



**Athena Bitcoin, Inc. (Eric Gravengaard)**
**August 17, 2022**

Page 18

```
1   delay in getting the electronic document to you.
2               Inc. is a wholly owned subsidiary of
3   Global at this point currently; is that right?
4       A.     Currently, yes.
5       Q.     And Inc. is the operating subsidiary
6   of Global; is that right?
7               MR. FOWLER:  Objection, form.
8       A.     What do you mean by "operating"?
9   BY MR. STEWART:
10      Q.     I'm going to share with you, to
11  answer that question -- I've lost my document.
12  I'm sorry.  I'm trying to find it.
13              MR. STEWART:  I'm going to have to
14          ask, Mike, I'm -- I want a document on my
15          exhibit list, but the share button is
16          grayed out.
17              TECH:  Just a second.  You've
18          already uploaded that document?
19              MR. STEWART:  Yes.
20  BY MR. STEWART:
21      Q.     While he's helping me on getting a
22  document opened up, Mr. Gravengaard, where are you
23  physically located today for this deposition?
24      A.     In Cook County, Illinois.
25      Q.     Are you at one of the Athena
```

Page 19

```
1   offices?
2       A.     I am at an office that I rent.
3       Q.     Is that at 1332 North Hall?
4       A.     No, it is not at 1332 North Hall.
5       Q.     Okay.  I'm sorry.  What was the
6   address you gave me?  1332 North -- was it --
7       A.     The street is named Halsted.
8       Q.     Halsted.  Are you at that address
9   today?
10      A.     I am not at that address.
11              TECH:  When you're looking at the
12          exhibit list --
13              MR. STEWART:  Yes.
14              TECH:  -- and you click on the
15          document, what does it say on the right
16          side for you?
17              MR. STEWART:  It says "Viewing
18          Privately."
19              TECH:  When you click Share, it's
20          not letting you do it?
21              MR. STEWART:  It's grayed out when
22          I'm just looking at the list.  I was able
23          to share the first one.
24  BY MR. STEWART:
25      Q.     Mr. Gravengaard, I apologize for the
```

Page 20

```
1   delay.  We're just -- usually the Share button
2   lets me share immediately and --
3               TECH:  Sorry about that.  I just
4           got booted out of the session.  Just a
5           sec.
6               Do you have access to your other
7           exhibits that are in there?
8               MR. STEWART:  Share button is
9           grayed out on everything, so we're going
10          to have to get that fixed.
11              TECH:  Okay.  Just a sec.
12              MR. STEWART:  Oh, do I need to --
13          okay.  I figured it out.  I needed to
14          close the first exhibit.  Sorry.  That's
15          what was going on.
16              TECH:  Sorry.  You can't share
17          more than one at once.
18              MR. STEWART:  Okay.  I'm going
19          to --
20  BY MR. STEWART:
21      Q.     I've shared with you what I marked
22  as Exhibit 2, which is excerpts from a US SEC
23  filing Form S-1 filed on February 10, 2022, by
24  Athena Bitcom Global.  And, again, it's just
25  excerpts of a very long document.
```

Page 21

```
1               Can you see the first page,
2   Mr. Gravengaard?
3       A.     I see a Form S-1 as filed by Athena
4   Bitcoin Global.  Again, I'm unfamiliar with this
5   company Athena Bitcom.
6       Q.     Okay.  Well, you know, I apologize
7   for my accent.  I mean Athena Bitcoin Global.
8   This is an Athena Bitcoin Global, February 10,
9   2022, SEC filing, correct?  At least the first
10  page shows that?
11              MR. FOWLER:  Objection, form.
12      A.     It does seem to show that.
13              MR. STEWART:  What's the
14          objection?
15              MR. FOWLER:  Authenticity.  If he
16          had -- if he doesn't have personal
17          knowledge of the document --
18              MR. STEWART:  Okay.
19              MR. FOWLER:  -- speculation on his
20          part.
21  BY MR. STEWART:
22      Q.     Mr. Gravengaard, did Athena Bitcoin
23  Global file a Form S-1 with the SEC on
24  February 10, 2022?
25      A.     I believe that it did.
```



**Athena Bitcoin, Inc. (Eric Gravengaard)**
**August 17, 2022**

Page 22

1    Q.    And (audio/technical malfunction)
2    appear (audio/technical malfunction) page of that
3    document?
4    A.    I'm sorry.  Your audio did not come
5    through on that.  Could you please repeat your
6    question.
7           THE REPORTER:  Looks like
8    Mr. Stewart is frozen.
9           MR. FOWLER:  You know, that's a
10   term we never thought we would hear when
11   we were practicing law, that one of the
12   lawyers is frozen.
13          TECH:  I'm just going to go off
14   the record until he comes back just a
15   sec.
16          MR. VALIENTE:  Record the time.
17          (Discussion off the record from
18   9:34 a.m. to 9:35 a.m.)
19   BY MR. STEWART:
20   Q.    Mr. Gravengaard, if you could scroll
21   down to a page that's got -- let's see.  It's got
22   an org chart on it, and I'm looking for the page
23   number now.  At the very bottom -- I don't know if
24   you can see it -- it says page 18 of 209, but it's
25   got at the top an org chart with "Athena Bitcoin

Page 23

1    Global" at the top.  There you go.
2           Do you see that?
3    A.    I see the organization chart that
4    you referred to.
5    Q.    All right.  And this is going back
6    to my question about an operating -- whether Inc.
7    is the operating company of Global.
8           If you'll look at that org chart, it
9    shows Athena Bitcoin Global Nevada at the top,
10   correct?
11   A.    Yes.  It shows Athena Bitcoin
12   Global, which is a corporation registered in
13   Nevada.
14   Q.    And underneath it, it says Athena
15   Bitcoin, Inc., correct?
16   A.    Yes.
17   Q.    And then underneath Inc. are several
18   other entities that have El Salvador, Columbia,
19   Argentina, and Mexico listed after them, right?
20   A.    Yes.
21   Q.    And is that a correct organizational
22   chart as of February of 2022?
23   A.    Yes.
24   Q.    Above that, it says -- the very top
25   line on that page:  The Company, Athena Bitcoin

Page 24

1    Global, is a Nevada corporation which owns
2    100 percent of our operating subsidiary, Athena
3    Bitcoin, Inc., comma, a Delaware corporation.
4           Is that right?
5    A.    Yes.
6    Q.    And that is referring to Inc. as the
7    operating subsidiary of Global, right?
8    A.    Yes.
9    Q.    That second sentence says:  Our
10   domestic business operations are conducted by
11   Athena Bitcoin, Inc.
12          Is that accurate?
13          MR. FOWLER:  Objection, form.
14          MR. STEWART:  What's the form?
15          MR. FOWLER:  Are you asking if
16   that's what the documented says, or are
17   you asking if that's factually accurate?
18          MR. STEWART:  Okay.  Good point,
19   Larry.
20   BY MR. STEWART:
21   Q.    Mr. Gravengaard, does the document
22   say that?
23   A.    The document reads:  Our domestic
24   business operations are conducted by Athena
25   Bitcoin, Inc.

Page 25

1    Q.    Is that substantively accurate?
2    A.    As of the date of that filing.
3    Q.    Has it changed?
4    A.    Athena Bitcoin Global does things
5    that are not related to Athena Bitcoin, Inc.
6    Q.    What does it do that is not related
7    to Inc.?
8    A.    It has entered into several
9    contracts subsequent to the filing of this Form
10   S-1 with the SEC.
11   Q.    Contracts related to what in
12   general?
13   A.    Cryptocurrency transactions and
14   services.
15   Q.    Do any of those relate to the
16   government of El Salvador?
17   A.    Some of them do.
18   Q.    And what has Global agreed to do for
19   the government of El Salvador since February of
20   2022?
21   A.    We have ongoing relationships to
22   manage a -- to manage Bitcoin ATMs on behalf of
23   the government of El Salvador.
24   Q.    Those ATMs are located where?
25   A.    On -- in El Salvador.



**Athena Bitcoin, Inc. (Eric Gravengaard)**
**August 17, 2022**

**Page 26**

1   Q.   Anyplace else?
2   A.   The consular offices of the
3   government of El Salvador.
4   Q.   And is that in -- those consular
5   offices, where are they located?
6   A.   I believe some of them are located
7   in the United States.
8   Q.   Are any in Texas?
9   A.   I am unsure of that answer.  I'm not
10  sure.
11  Q.   And, by the way, you are -- what is
12  your title with Inc.?
13  A.   I'm director of Athena Bitcoin, Inc.
14  Q.   Director.  What is your title with
15  Global?
16  A.   I have no title with Global as of
17  today.
18  Q.   What was your title with Global as
19  of February 2022?
20  A.   As stated in the S-1, I was its
21  chief executive officer.
22  Q.   What was your title of -- with Inc.
23  as of February of 2022?
24  A.   I had none.
25  Q.   You had no -- no title with Inc. as

**Page 27**

1   of February 2022?
2   A.   I don't believe so.
3   Q.   And, as you know, this lawsuit deals
4   with some issues that arose in approximately the
5   September-October time period of 2021.
6   Do you understand that?
7   A.   Yes.
8   Q.   What was your title with Inc. as of
9   September-October of '21?
10  A.   I don't believe I had a title with
11  Athena Bitcoin, Inc., during the time frame which
12  you just referenced.
13  Q.   What was your title with Global as
14  of the September-October '21 time period?
15  A.   I was its chief executive officer.
16  Q.   And the statements that we just
17  looked at, the statement that said:  Our domestic
18  business operations are conducted by Athena
19  Bitcoin, Inc., you told me that that was accurate
20  as of February of 2022, correct?
21  A.   Yes.
22  Q.   Would that have been accurate as of
23  September-October of 2021?
24  A.   Yes.
25  Q.   Okay.  I'm going to stop sharing

**Page 28**

1   that and go to . . .  Well, I'm attempting to
2   share -- now that disappears on me.
3   MR. STEWART:  Mike, I need your
4   help again.
5   TECH:  Are you trying to do the
6   term sheet, Exhibit 3?
7   MR. STEWART:  Yes.  Why is it not
8   sharing?
9   TECH:  Just a sec.  All right.
10  Just a moment.  Share.  It should be up
11  now.
12  MR. STEWART:  It's not showing up
13  on my live exhibit list.
14  TECH:  Can anyone else see the
15  exhibit?
16  MR. STEWART:  Should be a term
17  sheet.
18  MR. FOWLER:  It was listed a
19  minute ago.  It's not up there now.
20  MR. STEWART:  I just closed it.
21  Let me share it again.  It's still not
22  showing up --
23  TECH:  Yeah.  It should pop up
24  now.  Can you guys see it?
25  MR. FOWLER:  No.

**Page 29**

1   MR. STEWART:  Does refresh the
2   exhibit viewer help?
3   TECH:  Yeah.  Click there refresh
4   because I can see it.
5   MR. STEWART:  All right.  It's
6   showing up for me now.
7   BY MR. STEWART:
8   Q.   Mr. Gravengaard, I don't know if you
9   can see it yet.  If not, I had to -- there's a
10  refresh arrow in the upper right-hand corner.
11  A.   I don't see anything.  Are you
12  asking me a question if I -- or are you directing
13  me to press the refresh button?  I didn't
14  understand what you were asking.
15  Q.   If you can't see it, I would request
16  that you hit the refresh button.  That's what
17  works for me.
18  A.   I have pressed the refresh button,
19  and I now see a document.
20  Q.   All right.  I should have applied an
21  Exhibit 3 stamp to the first page.  This is a
22  three-page document.
23  Mr. Gravengaard, if you could -- you
24  can scroll through it.  I'm just going to ask you
25  what it is once you've had a chance to look at it



Page 30

1   or just at least scan it.
2        A.     This appears to be a term sheet
3   between Athena Bitcoin Global and Mr. Overton and
4   ROI Developers.
5        Q.     And is it dated on the first page
6   September 22, 2021?
7        A.     The document you have shown me is
8   dated September 22, 2021.
9        Q.     All right.  On the very last page,
10  the third page, is that your signature above your
11  typewritten name?
12       A.     That is my signature on the third
13  page of the document that you are showing me.
14       Q.     And above your signature, does it
15  say Purchaser Athena Bitcoin Global, Inc.?
16       A.     It does say Athena Bitcoin Global,
17  Inc.
18       Q.     Is there an entity that exists that
19  has the name Athena Bitcoin Global, Inc.?
20       A.     No, there is not.
21       Q.     Do you know why that was listed as
22  the purchaser on page 3 of Exhibit 3?
23       A.     It appears to be a typo because on
24  the first page, it identifies the purchaser as
25  Athena Bitcoin Global.

Page 31

1        Q.     What generally does Inc. do?  How
2   would you describe Inc.'s business?
3               And currently -- I guess currently
4   and whether that -- and the second part of my
5   question is going to be, has that changed since
6   September or October of 2021?
7               MR. FOWLER:  And, I'm sorry,
8        Kelly, I didn't hear the question.  What
9        does who do?
10              MR. STEWART:  Inc.
11       A.     You're referring to the company, not
12  the word?
13  BY MR. STEWART:
14       Q.     Yes, sir.  I'm referring to the
15  company.
16       A.     I misunderstood your initial
17  inquiry.
18              Athena Bitcoin, Inc., operates
19  Bitcoin ATMs in the United States.
20       Q.     Does it do anything else in general?
21       A.     That's its primary business.
22       Q.     So -- was that the same -- would
23  that description be accurate for September-October
24  of 2021?
25       A.     Yes.

Page 32

1        Q.     What does Global do or what did
2   Global do as of September-October of 2021?
3        A.     Global had purchased, in August of
4   2021, certain intellectual property that it was
5   licensing to the government of El Salvador.
6        Q.     Did that intellectual property deal
7   with the Chivo Wallet software?
8        A.     Yes.
9        Q.     And it's Global that owns that
10  license; is that right?
11       A.     Yes.
12       Q.     And does Global -- who has the
13  contract -- or who has the license with the
14  government of El Salvador?  Is it Global?  Inc.?
15  Or one of the other companies that's on the --
16  that were on that org chart we looked at or some
17  other company?
18       A.     Certain services are provided by
19  Athena Holdings of El Salvador, S.A. de C.V., and
20  some other services are provided to the government
21  by Athena Bitcoin Global.
22       Q.     Does the government of El Salvador
23  have a contract or a license with Global?
24       A.     Yes.
25       Q.     Does it have a contract or license

Page 33

1   with Athena Holdings El Salvador, S.A. de C.V.?
2        A.     Yes.
3        Q.     Does it have any contracts with
4   Inc.?
5        A.     No.
6        Q.     And you would agree with me that
7   Inc. is a wholly owned subsidiary of Global,
8   right?
9        A.     At the present time, Athena Bitcoin,
10  Inc., is a wholly owned subsidiary of Athena
11  Bitcoin Global.
12       Q.     And that was true as of
13  September-October of 2021, right?
14       A.     That was true in September of 2021.
15       Q.     And as of September-October 2021,
16  Athena Holdings El Salvador, S.A. de C.V., was a
17  wholly owned subsidiary of Athena Bitcoin, Inc.?
18       A.     No.
19       Q.     No?
20       A.     No.
21       Q.     When did Athena Holdings
22  El Salvador, S.A. de C.V., become a subsidiary of
23  Athena Bitcoin, Inc.?
24       A.     It has never been a wholly owned
25  subsidiary of Athena Bitcoin, Inc.  I would refer



Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

**Page 34**

1  you back to your Exhibit 2.
2      Q.    And you're saying that it's not
3  because it's owned by -- you own 95 percent of it,
4  and somebody named Matias Goldenhörn -- well, I'm
5  reading the wrong thing.
6             Why do you tell me that it's not a
7  wholly owned subsidiary of Inc.?
8      A.    Sir, I believe that you're reading a
9  document that explains why it is not a wholly
10  owned subsidiary.
11     Q.    Doesn't matter what I'm reading,
12  Mr. Gravengaard.  I'm asking you the question.
13            You told me that it wasn't a wholly
14  owned subsidiary of Inc., and I'm asking you why.
15     A.    Per the document that I believe that
16  you're reading, Athena Bitcoin, Inc., owns
17  99 percent of the entity you just asked about.
18     Q.    And you own the other 1 percent?
19     A.    That is correct.
20     Q.    Okay.  So it's not a wholly owned
21  subsidiary.  It's a 99 percent wholly --
22  99 percent owned subsidiary of Inc., correct?
23     A.    Could you restated your question?  I
24  don't know what a 99 percent wholly owned
25  subsidiary is.

**Page 35**

1      Q.    As of February of '22, Inc. owned
2  99 percent of Athena Holdings El Salvador,
3  S.A. de C.V., correct?
4      A.    Yes.
5      Q.    And that's accurate as of
6  September-October of 2021, correct?
7      A.    I believe it is, yes.
8      Q.    In September-October of 2021, did
9  you personally own 1 percent of Athena Holdings
10  El Salvador, S.A. de C.V.?
11     A.    I believe I did.
12     Q.    Do you currently own any interest in
13  Athena Holdings El Salvador, S.A. de C.V.?
14     A.    Yes.  I believe I still own
15  1 percent.
16     Q.    How much of Global do you own
17  currently?
18     A.    I believe it's approximately
19  28 percent.
20     Q.    Who are the officers of Global?
21     A.    Matias Goldenhörn.
22     Q.    What does he -- what's his role or
23  office?
24     A.    He is the chief executive officer of
25  Athena Bitcoin Global.

**Page 36**

1      Q.    Does Global have any other officers?
2      A.    Not at the present time.
3      Q.    Is Mr. Goldenhörn an officer of
4  Inc.?
5      A.    No.
6      Q.    Who are the officers of Inc.?
7      A.    I don't believe that Athena Bitcoin,
8  Inc., has any officers at the present time.
9      Q.    Did it have any as of February of
10  2022?
11     A.    I don't believe so.
12     Q.    Did it have any as of
13  September-October of '21?
14     A.    I don't believe so.
15     Q.    Is Inc. doing business in Texas
16  currently?
17     A.    I believe that Athena Bitcoin, Inc.,
18  operates some Bitcoin ATMs in the state of Texas.
19     Q.    I'm showing you -- or you should be
20  able to see a Texas Franchise Tax Information
21  Report -- actually four Texas Tax Public
22  Information Reports that I've marked as Exhibit 4.
23            Do you see those?
24     A.    I see a Texas Franchise Tax Public
25  Information Report.

**Page 37**

1      Q.    Okay.  And this is -- at least let's
2  look at the first page.
3            This says the taxpayer name is
4  Athena Bitcoin, Inc., correct?
5      A.    It is marked under the box Taxpayer
6  name, Athena Bitcoin, Inc.
7      Q.    And at the bottom of that first
8  page, it says sign here, and it's got your name
9  typed in, correct?
10     A.    Yes.
11     Q.    And it has the title of CEO, right?
12     A.    Yes.
13     Q.    And the date of May 7, 2018?
14     A.    The date is May 7, 2018.
15     Q.    The next page also lists as the
16  taxpayer name Athena Bitcoin, Inc., correct?
17     A.    I'm looking at page 2 of your
18  document, and it does say Athena Bitcoin, Inc.,
19  under the Taxpayer name heading.
20     Q.    All right.  And this page under
21  Section A in the middle lists you under the
22  section of officer, director, member, general
23  partner, manager, right?
24     A.    I'm sorry, yes, my name is referred
25  in Section A.



**Athena Bitcoin, Inc. (Eric Gravengaard)**
**August 17, 2022**

**Page 38**

1    Q.    And did you tell me that you -- and
2  this is -- I'm looking for a date on this page.
3  Toward the top, it says report year of 2019.
4         Do you see that?
5    A.    I believe that it says 2019 under
6  report year.
7    Q.    Thank you.  That's what I asked.
8         And were you an officer, director,
9  member, general partner, or manager in 2019?
10   A.    In 2019, I was an officer of Athena
11 Bitcoin, Inc.
12   Q.    When did you stop being an officer
13 of Inc.?
14   A.    After the acquisition in a share
15 exchange of Athena Bitcoin, Inc., by Athena
16 Bitcoin Global.
17   Q.    And what year was that?
18   A.    2020.
19   Q.    On the third page of this document,
20 it -- this also lists as the taxpayer name Athena
21 Bitcoin, Inc.
22         Do you see that?
23   A.    I do.
24   Q.    And the report year is 2020, right?
25   A.    Yes.

**Page 39**

1    Q.    And it lists -- also lists you as an
2  officer, director, member, general manager, or
3  partner?
4    A.    I was a director --
5    Q.    Okay.
6    A.    -- in -- and still am.
7    Q.    You're still a director of Inc.,
8  right?
9    A.    Of Athena Bitcoin, Inc., yes.
10   Q.    The fourth page of this document,
11 Mr. Gravengaard, is -- lists Athena Bitcoin, Inc.,
12 as the taxpayer, correct?
13   A.    On the fourth page of the document
14 you're showing me Athena Bitcoin, comma, Inc., is
15 listed as the taxpayer name.
16   Q.    Does the comma make a difference to
17 you?  You pointed it out this time.
18   A.    No.  But it is different than on the
19 third page of your document.
20   Q.    Well, let's -- no, it's not.  Let's
21 go to the first page.
22         The first page does not have a
23 comma, right?
24   A.    I'm sorry.  I misspoke.  On the
25 first page, there is no comma.

**Page 40**

1    Q.    The second, second page.
2    A.    And on the second, third, and fourth
3  page, there are commas.
4    Q.    Do you know if that makes a
5  difference one way or the other?  Are we talking
6  two different entities, or is it the same --
7    A.    I'm not an attorney, sir, and I
8  can't answer the question as to whether or not the
9  comma is important.
10   Q.    All right.  But is there, to your
11 knowledge, an entity -- are there two separate
12 entities, one called Athena Bitcoin Inc., with no
13 comma, and one Athena Bitcoin, Inc., with a comma?
14 In other --
15   A.    I'm --
16   Q.    Go on.
17   A.    I'm not sure.
18   Q.    All right.  Could there be two
19 different entities, or are you aware of only one
20 Athena Bitcoin entity that as an Inc. after its
21 name?
22   A.    There is one Delaware corporation
23 named Athena Bitcoin, Inc.  I don't know if in the
24 state of Delaware it is registered with or without
25 a comma.

**Page 41**

1    Q.    Well, let me show you that in a
2  second, but let's finish this document so we don't
3  have to come back.
4         On that fourth page, which is 2021,
5  are you listed an officer, director, member,
6  general manager -- general partner, or manager?
7    A.    On the fourth page my name is in
8  Section A as either a officer, director, member,
9  general partner, or manager.
10   Q.    And what was -- what were you in
11 2021 for Athena Bitcoin, Inc.?
12   A.    I was a director.
13   Q.    Mr. Gravengaard, I have marked
14 Exhibit 5.  And, again, I had to hit the refresh
15 button for the document to show up, so that's --
16 if you're seeing nothing, I would ask that you hit
17 that refresh button.
18         But can you see a document on
19 screen?
20   A.    I do not see a document on screen.
21   Q.    Would you please hit the refresh
22 button.
23   A.    I have pressed the refresh button.
24   Q.    Has it shown up yet?
25   A.    There is now a document showing.



Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

**Page 42**

1    Q.    Okay.  This is something I printed
2    off from the Delaware Division of Corporations
3    website on July 25 of this year.  And it shows an
4    entity named -- called Athena Bitcoin, comma, Inc.
5    Do you see that?
6    A.    I see that there's a document and I
7    see that the document says Athena Bitcoin, comma,
8    Inc.
9    Q.    Okay.  Are you aware of a separate
10   entity with the same name but without the comma?
11   A.    In Delaware, no.
12   Q.    Anywhere else?
13   A.    I don't know how the corporation has
14   been registered as a foreign corporation in the
15   state of Illinois or any other state in which we
16   might do business with or without the comma.
17   Q.    All right.  I am showing you what I
18   marked as Exhibit 6.  And I'm sure if I misnumber
19   something duplicate, the --- duplicate the number,
20   somebody will say something, but I'm trying to ---
21   trying not to do that.
22          But can you see a document on
23   screen?
24   A.    I see a document on screen.
25   Q.    All right.  This is a document I

**Page 43**

1    also printed out from the Illinois Secretary of
2    State on July 25 of 2022.
3          Do you see where it lists Athena
4    Bitcoin Inc.?
5    A.    I do.
6    Q.    And it doesn't have a comma here,
7    right?
8    A.    I do not see a comma.
9    Q.    All right.  And, look,
10   Mr. Gravengaard, my question is simple -- and I'm
11   just trying to determine whether there's two
12   different entities, one with a comma or one
13   without, if you know, as opposed to just one where
14   the comma might have been left out or
15   inadvertently put in.
16          Do you know one way or the other?
17   A.    It would appear that this is a -- I
18   don't know exactly what this document is.  I did
19   not print it out on the 25th of July.  But this
20   would appear to be a foreign corporate
21   registration of a Delaware corporation in the
22   state of Illinois, and the entity name is listed
23   as Athena Bitcoin Inc. with no comma.
24   Q.    All right.  And then on the second
25   page it lists you under President.

**Page 44**

1          Do you see that?
2    MR. FOWLER:  Where ---
3    A.    No, I do not.
4    MR. FOWLER:  Kelly, where are you
5    talking about?
6    MR. STEWART:  No, you know what
7    happened?  I've got pages -- my Exhibit 6
8    is pages 1 and 3 as opposed to -- looks
9    like it was a double-sided copy that
10   didn't print out.  So doesn't matter.
11   BY MR. STEWART:
12   Q.    Mr. Gravengaard, what I'm really
13   trying to find out is if there's a second entity
14   out there, and it sounds like -- I don't want to
15   put words in your mouth or misstate what you have
16   said, but it sounds like there's not two companies
17   that are called Athena Bitcoin, Inc.
18          It's one, and it may or may not have
19   a comma.  Is that a fair statement?
20   A.    I believe it is.  I'm not an expert
21   in corporate law or foreign corporate
22   registrations, and so I would direct your question
23   to someone who might be --- have better knowledge
24   of the Secretary of State's offices.
25   Q.    All right.  But as the

**Page 45**

1    representative of Athena Bitcoin, Inc., the
2    defendant in this lawsuit today, you're not aware
3    that there's two Athena Bitcoin, Inc., entities,
4    are you?
5    A.    I am not.
6    Q.    And would you agree with me that
7    Athena Bitcoin, Inc., is registered to do business
8    in Texas?
9    A.    I believe it is, but I don't have
10   any direct knowledge of whether or not it is or is
11   not registered to do business.
12   Q.    Are you aware of any DBAs, doing
13   business as, that would have been filed on behalf
14   of Athena Bitcoin, Inc.?
15   A.    Yes.
16   Q.    And what were those -- what was the
17   DBA that Inc. would have used or filed for?
18   A.    I believe that Athena Bitcoin, Inc.,
19   has filed DBAs to go by the name of Bitquick.
20   Q.    Okay.  And what does Bitquick do, if
21   anything?  Is it just a DBA, or does it have any
22   sort of operations that would be separate from
23   Inc.?
24   A.    There is no Bitquick service at the
25   present time.



GPS LLC
gpscalendar@gps.llc ~ 214.347.4781

Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

Page 46

1    Q.    Do you know who the directors of
2  Inc. are currently?
3    A.    Currently I'm the only director of
4  Athena Bitcoin, Inc.
5    Q.    Were you a director of Inc. as of
6  September-October of '21?
7    A.    Yes.
8    Q.    Were there any other directors as of
9  September-October of '21?
10    A.    Yes.
11    Q.    Who were the directors then?
12    A.    Edward Weinhaus and myself.
13    Q.    And Mr. Weinhaus is currently not a
14  director of Inc.; is that right?
15    A.    Yes.
16    Q.    How about Global?  Who are the
17  directors of Global now?
18    A.    Matias Goldenhörn, myself, Jason Lu,
19  and Steve Suarez.
20    Q.    And were those -- were all four of
21  those the directors in September-October of 2021?
22    A.    No.
23    Q.    Who were they in September-October
24  of 2021?
25    A.    I believe at that time that

Page 47

1  Mr. Weinhaus was a director and Mr. Goldenhörn was
2  not a director.
3    Q.    But Mr. Lu and Mr. -- was it
4  Steve --
5    A.    Suarez.
6    Q.    -- Suarez, were they directors?
7    A.    They were directors.
8    Q.    Does Inc. have any employees
9  currently?
10    A.    Inc. does have employees.
11    Q.    About how many?
12    A.    I couldn't say the exact number.
13    Q.    I mean, five?  Ten?  Twenty?  What's
14  your best estimate?
15    A.    I would say it's a number between
16  five and ten.
17    Q.    Did Inc. have any employees in
18  September-October of 2021?
19    A.    I believe it -- similar number,
20  between five and ten.
21    Q.    Does Global have any employees right
22  now?
23    A.    Yes.
24    Q.    How many?
25    A.    I believe between two or three.

Page 48

1    Q.    Did Global have any employees in
2  September-October of 2021?
3    A.    Yes.  It had two.  No.  I'm sorry.
4  I misspoke.  I believe it had three at that time.
5    Q.    Let's talk about, are any of those
6  employees that work for -- never mind.  Let me
7  strike that.
8          Do any of the employees of Inc. at
9  this point work in Texas?
10    A.    I --
11    Q.    Well, let me ask it a different way.
12  That's probably a bad question.
13          Do any of the employees of Inc.
14  currently live in Texas?
15    A.    I am not sure.
16    Q.    And I think you said you think
17  maybe -- maybe between five and ten employees of
18  Inc. currently, right?
19    A.    Yes.
20    Q.    Not sure how many work in Texas.
21          Do you know, does Bailey Jarret --
22  Jarrell?  Does Bailey Jarrell, do you know if she
23  is an Inc. employee?
24    A.    I'm not sure if she is or is not an
25  Inc. employee at the present time.

Page 49

1    Q.    Do you know if she lives in Texas?
2    A.    I don't.
3    Q.    Did Inc. have any employees that
4  lived in Texas in September-October of 2021?
5    A.    I don't believe we did, but I -- no,
6  I don't believe we did.
7    Q.    For whom does Noreen Pepino work?
8    A.    She works for Athena Bitcoin, Inc.,
9  I believe.
10    Q.    For whom does Gilbert Valentine or
11  Valentine work?
12    A.    I'm not sure.
13    Q.    Do you know of his title?
14    A.    He -- do I know his title with whom?
15    Q.    With Inc.
16    A.    I don't believe that he's an
17  employee of Athena Bitcoin, Inc.
18    Q.    Do you know his title with Global?
19    A.    He has no title with Athena Bitcoin
20  Global.
21    Q.    Okay.  Do you know whether he's the
22  executive vice president of compliance for Inc.?
23    A.    I do not believe that is true.
24    Q.    Has it ever been true?
25    A.    He was the chief compliance officer



Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

**Page 50**

1 for Athena Bitcoin, Inc., for many years.
2     Q.    Okay.  And the chief compliance
3 officer for Inc. for many years, do you know when
4 he stopped doing that, if he stopped?
5     A.    Yes.  When we hired a new chief
6 compliance officer.
7     Q.    What was the date on that?
8     A.    I don't know.
9     Q.    Was it sometime in 2022?
10     A.    It was either in late 2021 or early
11 in 2022, but I do not know the date.
12     Q.    Do you know if he was the chief
13 compliance officer for Inc. in September or
14 October of 2021?
15     A.    Yes.  He would have been the chief
16 compliance officer for Athena Bitcoin, Inc., in
17 the September and October time frame.
18     Q.    Do you know how many trips to Texas
19 he took in 2021?
20     A.    I do not.
21     Q.    Do you know one way or the other
22 whether he took trips to Texas -- made trips to
23 Texas for work in 2021?
24     A.    I do not believe he made any trips
25 to Texas for work in 2021.

**Page 51**

1     Q.    You said you don't believe.  Do you
2 know for sure?
3     A.    I'm not familiar with his travel
4 schedule.
5     Q.    Okay.  But so you don't know -- you
6 don't have any personal knowledge as to whether he
7 made any trips for work to Texas in 2021?
8     A.    I do not have any personal knowledge
9 of whether or not he traveled to Texas in 2021.
10     Q.    Do you know who Jeremy Brenner is?
11     A.    Yes.
12     Q.    Is he a former employee of Inc.?
13     A.    He is a former employee of Athena
14 Bitcoin, Inc.
15     Q.    Was he an employee of Athena
16 Bitcoin, Inc., in September-October of 2021?
17     A.    No, I do not believe he was.
18     Q.    Do you know when he left the
19 employment of Inc.?
20     A.    I believe that he left the
21 employment of Athena Bitcoin, Inc., at the end of
22 July 2022.
23     Q.    Was he --- did he serve as a
24 contractor or subcontractor of Inc. after that
25 time?

**Page 52**

1     A.    After which time?
2     Q.    After the end of '22 -- July of
3 20 -- I'm sorry.  I'm sorry, Mr. Gravengaard, I
4 misunderstood you.
5          You said he left Inc. at the end of
6 July of '22?
7     A.    Yes.
8     Q.    All right.  Was he ever a
9 subcontractor, to your knowledge, of Inc. at any
10 point?
11     A.    What do you mean by subcontractor?
12     Q.    Did he have any agreements to do any
13 sort of work for Inc., not as an employee, but in
14 any other capacity?
15     A.    Yes.  He may have had a contract
16 with Athena Bitcoin -- I'm sorry -- Athena
17 Holdings of El Salvador prior to his employment by
18 Athena Bitcoin, Inc.
19     Q.    Do you know the names of any of
20 Inc.'s current employees that you estimated may be
21 between five and ten?
22     A.    Yes.
23     Q.    What are the names you remember?
24     A.    Noreen Pepino.
25     Q.    Right.

**Page 53**

1     A.    Toby Cohen.  Sam Nazzaro.  Patrick
2 Patton.  And Eric Matson.
3     Q.    That's five people.  Do you -- could
4 be more?  That's all you remember; is that right?
5     A.    Those are the names that I
6 remembered off the top of my head.
7     Q.    All right.  If I didn't ask you --
8 if I already asked you this, I apologize, but I
9 want to make sure I got this right.
10          Noreen Pepino, she was working for
11 Inc. in September or October of '21; is that
12 correct?
13     A.    I believe that she was.
14     Q.    What's the e-mail address or the
15 e-mail domain for Inc. employees?
16     A.    We don't separate out domains by
17 which company a person is employed by.
18     Q.    That was my next question.
19          First question is, what's the e-mail
20 domain for Inc.?
21     A.    There is no domain specifically for
22 Inc.
23     Q.    All right.  Well --
24     A.    So I don't know how to answer your
25 question, sir.



Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

**Page 54**

1    Q.    It's the same e-mail domain address
2  for Inc. and Global, correct?
3         A.    There are many domains used by all
4  of the companies.
5         Q.    Okay.  Well, the @athenabitcoin.com,
6  that's an e-mail used for both Inc. and Global
7  currently, right?
8         A.    Yes.
9         Q.    That's the e-mail used for both Inc.
10 and Global in September of 2021, right?
11        A.    Yes.
12        Q.    And you said there are many others.
13             What are the others that are being
14 used?
15        A.    athena.sv --
16        Q.    Okay.  So --
17        A.    -- is quite popular with many
18 people.
19        Q.    So that's the -- that's the
20 El Salvador entity, is it?
21        A.    I don't know who owns the domain
22 name.
23        Q.    Okay.  And -- all right.  My
24 question was probably too broad.
25             For the US companies, are there

**Page 55**

1  any -- maybe that's what you were answering -- any
2  other domain names?
3         A.    I believe that the -- that Athena
4  Bitcoin Global owns approximately 25 to 35 domain
5  names.
6         Q.    But if somebody is sending an e-mail
7  to athenabitcoin.com, they're not going to know
8  whether that's going to Global or Inc.  It's the
9  same e-mail for both, right?
10             MR. FOWLER:  Objection, form.
11        A.    Yeah, I'm -- I'm not sure what your
12 question is, sir.
13 BY MR. STEWART:
14        Q.    Well, there's no distinct --
15        A.    I don't know how I could comment on
16 what someone else would believe.
17        Q.    Are you aware of any travel made
18 into Texas for work purposes by any of Inc.'s
19 officers, directors, and employees since January 1
20 of 2020?
21        A.    Am I aware of any?  I went to a
22 dinner with one of our investors in the state of
23 Texas approximately a month and a half ago.
24        Q.    Okay.  And let's continue with you.
25             Have you made any trips to Texas

**Page 56**

1  since January 1, 2020, related to work other than
2  this dinner that you just mentioned?
3             MR. FOWLER:  Objection.
4         A.    I believe I transited through --
5             MR. FOWLER:  Wait.  I'm going to
6         object to the question in that you are
7         not -- the question isn't specific on
8         what entity he is traveling for work for.
9         He's testified that he has a relationship
10        with more than one entity, and so the
11        question, as worded, is ambiguous and
12        can't be answered.
13             MR. STEWART:  Thank you for
14        instructing the witness, Mr. Fowler.
15 BY MR. STEWART:
16        Q.    Mr. Gravengaard, I didn't
17 distinguish between the entity.  I asked whether
18 you made any trips whatsoever for work purposes to
19 Texas since January 1 of 2020, and you told me
20 about a trip you made one and a half months ago.
21             Any other trips for any entity for
22 any purpose -- for work purposes?
23        A.    I believe I transited through DFW,
24 but I'm not sure on what work purpose I did that
25 transit in.

**Page 57**

1         Q.    Okay.  And any other trips to Texas
2  or through Texas for you personally?
3         A.    Not to my recollection.
4         Q.    Now, the dinner that you -- with the
5  investor one and a half months ago, was that for
6  Global or for Inc. or both or somebody else?
7         A.    No.  The individual with whom I had
8  dinner is a shareholder of Athena Bitcoin Global,
9  and I was meeting with him in that respect.
10        Q.    And at the time you met with him,
11 Global owned a hundred percent of Inc., correct?
12        A.    Yes.
13        Q.    All right.  That's you.
14             Any other Inc. employees or officers
15 or directors that you're aware of that have made
16 trips to Texas for work purposes since January 1
17 of 2020?
18        A.    Not that I'm aware of.
19        Q.    Do you know whether Mr. Weinhaus has
20 done any trips to Texas?
21        A.    He also attended the dinner that I
22 just mentioned.
23        Q.    And on whose behalf did he attend
24 the dinner?  Was that Global or Inc. or someone
25 else?



Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

Page 58

1    A.    That would have been Athena Bitcoin
2  Global at the time.  He was a director of Athena
3  Bitcoin Global.  And, as I said, we met with an
4  investor and a shareholder of Athena Bitcoin
5  Global.
6    Q.    And was that to discuss investing in
7  Global or any of its subsidiaries?
8    A.    It was to discuss his existing
9  investment and to solicit a follow-on investment
10  into Athena Bitcoin Global.
11    Q.    Other than you and Mr. Weinhaus, who
12  else from any Athena entity would have been at
13  that meeting?
14    A.    No one else.
15    Q.    What city in Texas was that in?
16    A.    It was north of Dallas.
17    Q.    Do you know if Mr. Valentine made
18  any trips to Texas on behalf of any Athena entity
19  since January 1, 2020?
20    A.    I have no knowledge of him traveling
21  to Texas since January 1 of 2020.
22    Q.    Did you do any work to prepare for
23  this deposition to find out whether any other Inc.
24  employees or officers or directors traveled to
25  Texas?

Page 59

1    A.    I did not do any work.
2    Q.    Does Inc. have any offices in Texas?
3    A.    No.
4    Q.    Does Global have any offices in
5  Texas?
6    A.    No.
7    Q.    Does Inc. employ any subcontractors
8  in Texas?
9    A.    I don't believe we do.
10    Q.    Did you do any work to determine
11  whether Inc. employed any subcontractors in Texas?
12    A.    No.
13    Q.    Does Inc. have any bank accounts,
14  investment or brokerage accounts, or any financial
15  accounts in Texas?
16    A.    No.
17    Q.    Does Global?
18    A.    No.
19    Q.    We talked about the e-mail address.
20  Let me ask you about the websites.
21         You know what, let me -- let's go
22  ahead and -- I was going to suggest, we've been
23  going a little over an hour.  Do you need a break,
24  or are you okay?
25    A.    I can continue.

Page 60

1    Q.    Okay.  The website for Inc. and
2  Global is the same; is that right?
3         MR. FOWLER:  Objection, form.
4  BY MR. STEWART:
5    Q.    Well, let me ask it this way:  Is
6  there a different website for Inc. than for
7  Global?
8    A.    I don't believe that there is.
9    Q.    Is it -- and that website is at
10  athenabitcoin.com, right?  That's the website for
11  both?
12    A.    That is the primary website for
13  Athena Bitcoin Global and Athena Bitcoin, Inc.
14    Q.    And it lists -- and I can show you
15  this.  This is not necessarily meant to be a
16  memory test.  But do you recall whether the
17  website lists Bitcoin ATM locations in Texas?
18    A.    I believe that the website shows the
19  locations of Athena Bitcoin, Inc.'s ATMs.
20    Q.    And some of those are located in
21  Texas, right?
22    A.    I believe that some of them are
23  located in Texas.
24    Q.    How many?
25    A.    I do not know.

Page 61

1    Q.    I've attached or submitted a
2  document that I marked as Exhibit 7.  Let me know
3  when you can see a document.
4    A.    I can see a document now.
5    Q.    Okay.  And I apologize for having to
6  ask you that every time, but it looks like
7  sometimes these documents aren't even showing up
8  on my end once I share them, so I have to -- I
9  don't want to start asking you questions without
10  making sure you can see it.
11         This is a print-off of -- from --
12  and it doesn't print off very well, but I'll
13  represent to you that this is a print-off from the
14  athenabitcoin.com website and I'm going to scroll
15  through -- or at least portions of it and -- when
16  you click on Texas or the locations -- and I want
17  to make sure, just see if you agree with what this
18  shows as being the ATM -- Bitcoin ATMs in Texas.
19         And so if you could scroll through
20  that, I can tell you my first -- you know, I'll
21  walk through with that, but I want you to have a
22  chance to look at it.
23    A.    This appears to be a list of Bitcoin
24  ATMs that are located in Texas.
25    Q.    And the first one, there's one in



Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

Page 62

1  Houston, the Greenway Commons.  Is that -- do you
2  see that?
3       A.    Yes.
4       Q.    Followed by another address in
5  Houston at Willowbrook Plaza, right?
6       A.    Yes.
7       Q.    Followed by a Best Royal Liquor.
8  I'm not sure if that address got cut off, but that
9  looks like that's one in Houston, right?
10      A.    I don't know where the Best Royal
11 Liquor store is.
12      Q.    All right.
13      A.    And your document does not show an
14 address.
15      Q.    And then following that is one in
16 Dallas-Fort Worth at East Food Mart, correct?  One
17 in Fort Worth, I should say.
18      A.    East Food Mart is listed below Best
19 Royal Liquor, yes.
20      Q.    Below that, is a Zoom Food Mart in
21 Fort Worth, correct?
22      A.    Below that is Zoom Food Mart of Fort
23 Worth.
24      Q.    The bottom of that -- and, again, it
25 looks like the printing just cut it off, but

Page 63

1  there's one listed or described as Sugar Land.
2            Do you see that?
3       A.    I see the word "Sugar Land" on the
4  piece of paper that you're showing me.
5       Q.    All right.  The next page there's
6  one listed as Nancy's Liquor Express in Fort
7  Worth, right?
8       A.    I see the words "Nancy's Liquor
9  Express," and the address appears to be in Fort
10 Worth.
11      Q.    The last one listed is in Kemah,
12 Firehouse Vapors in Kemah, Texas, right?
13      A.    That does appear to be the last one
14 in your list.
15      Q.    Do these locations reflect Bitcoin
16 ATMs in Texas that are owned by Inc.?
17      A.    I believe so, yes.
18      Q.    Are there any others, to your
19 knowledge?
20      A.    No.
21            MR. FOWLER:  And, Kelly, I'm
22 assuming you mean in Texas?
23            MR. STEWART:  Yes.  Yes.
24 BY MR. STEWART:
25      Q.    And those ATMs -- those Bitcoin ATMs

Page 64

1  can be used by Texas residents, correct?
2       A.    I believe that the machines can be
3  used by Texas residents.
4       Q.    And they can be used by anybody
5  who's physically present at the ATM, whether
6  they're a Texas resident or not, correct?
7       A.    No.  That is definitely not correct.
8       Q.    You have to be a Texas resident to
9  use those ATMs?
10      A.    No, you do not.
11      Q.    Okay.  So an Oklahoma resident could
12 use those ATMs if they are at the ATM perhaps,
13 right?
14      A.    Perhaps they could.
15      Q.    Okay.  Well, why are you hesitant?
16 Why could somebody who's not a Texas resident --
17      A.    I'm not at all hesitant, sir.
18      Q.    Well, then why could somebody who's
19 not a Texas resident not use them?  Is that what
20 you're saying or --
21      A.    That is not what I'm saying.
22      Q.    All right.  And my question is:  You
23 don't have to be a Texas resident to use these
24 ATMs, right?
25      A.    You do not -- it's not a requirement

Page 65

1  to be a Texas resident to use these ATMs.
2       Q.    But these ATMs are physically
3  located in Texas, correct?
4       A.    These ATMs are located in the state
5  of Texas.
6       Q.    And to use them, you would have to
7  physically be in the state of Texas, correct?
8       A.    To use an ATM, you have to be
9  physically present in the state of Texas -- to use
10 one of these ATMs --
11      Q.    Right.
12      A.    -- you have to be physically present
13 at the ATM.
14      Q.    By the way, back on -- while we're
15 talking about the website, can somebody
16 communicate with Inc. through the website?
17      A.    I'm unclear what you mean by
18 communicate through the website.
19      Q.    Well, is there any way to interact
20 with Inc. through the website?
21      A.    I'm not sure.
22      Q.    Okay.  Do you know if somebody can
23 send a message to Inc. or make an inquiry to Inc.
24 through the website?
25      A.    I'm not sure.



Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

Page 66

1      Q.      Do you know if somebody can transact
2   business with Inc. through the website?
3      A.      No, I don't believe that you can
4   transact any business through the website.
5          MR. STEWART:  Let's take a
6      five-minute break.  Is that okay?  I need
7      to run down the hall.
8          MR. FOWLER:  Sure.
9          MR. STEWART:  Can we go off the
10     record?
11         THE REPORTER:  We're off.
12         (Recess from 10:34 a.m. to
13     10:46 a.m.)
14         THE REPORTER:  Go ahead.
15   BY MR. STEWART:
16     Q.      Mr. Gravengaard, I asked you about
17   contractors that Inc. may have had that work in
18   Texas, and I just want to make sure I didn't ask
19   you -- I used the right term.  Let me ask you that
20   question again.
21         Does Inc. have any contractors or
22   subcontractors or entities that have -- that are
23   nonemployees that work in Texas?
24     A.      Not to my knowledge.
25     Q.      And of the five Inc. employees that

Page 67

1   you listed earlier that you remember, do any of
2   those also work for Global?
3      A.      No, I don't believe they do.
4      Q.      Do you know if Global and Inc. have
5   any common employees?
6      A.      At the present time I don't believe
7   they do.
8      Q.      Do you know if they have in the
9   past?
10     A.      Rick Suri, who was formerly the CFO,
11   may have been an employee of both -- I'm not
12   entirely sure -- if I remember.
13     Q.      Did you say CEO or CFO?
14     A.      Chief financial officer.
15     Q.      CFO.  All right.  Any others other
16   than Mr. Suri?
17     A.      No.
18     Q.      Did Jeremy Brenner work on the Chivo
19   Wallet project?
20     A.      Yes.
21     Q.      Does Inc. own any other property in
22   Texas other than the Bitcoin ATMs?
23     A.      No.
24     Q.      Does Global?
25     A.      No.

Page 68

1      Q.      Does Inc. do any other work in Texas
2   other than anything related to the Bitcoin ATMs?
3      A.      No.
4      Q.      You would agree with me that Inc.
5   has a registered agent in Texas?
6      A.      I believe at the current time Athena
7   Bitcoin, Inc., has a registered agent in Texas.
8      Q.      And you agree with me it's
9   registered to do business in Texas, Inc.?
10     A.      I believe it is also registered to
11   do business in Texas.
12     Q.      I've put back on the screen
13   Exhibit 4.  I believe I marked it 4.  It's hard to
14   see on line, at least from my view.  Let me blow
15   it up or try to blow it up.
16         Anyway, and these are the Texas
17   Franchise Tax Public Information Reports,
18   Mr. Gravengaard, and these were all, as we walk
19   through, for Athena Bitcoin -- Athena Bitcoin,
20   Inc., some with a comma and some without.
21         Do you recall that?
22     A.      I do recall our conversation
23   earlier.
24     Q.      All right.  And on Section B --
25   let's just look at the first page.  It says to

Page 69

1   enter information for each corporation, et cetera,
2   in which this entity owns a 10 percent interest or
3   more.
4          Do you see that?
5      A.      I do see a section labeled B.
6      Q.      And on the first page of Exhibit 4
7   is blank, right?
8      A.      Is blank on the first page of
9   Exhibit 4.
10     Q.      And under that Section B, there's a
11   Section C that says:  Enter information for each
12   corporation, et cetera, that owns an interest of
13   10 percent or more in this entity.
14         And that's blank, right?
15     A.      It is also blank under the first
16   page.
17     Q.      This first page is 2018.  Were
18   those -- was there any entity in 2018 that owned
19   10 percent or more of Inc.?
20     A.      I don't believe that there was a
21   corporation, LLC, LP, or -- I'm not sure exactly
22   what LP or PA stands for -- that owned more than
23   10 percent in the 2018 year.
24     Q.      Limited partnership or professional
25   association?



Page 70

1    A.    Yeah, I don't believe that there
2  were any such entities.
3    Q.    All right.  Back on Section B, was
4  there -- did Inc. own any of those entities --- own
5  10 percent or more of any of those entities in
6  2018?
7    A.    It might have.
8    Q.    The next page is 2019.  Do you see
9  the same two sections on page 2?
10   A.    Yes.
11   Q.    And those are also blank, right?
12   A.    They are also blank.
13   Q.    And did any entity own 10 percent or
14  more of Inc. in 2019?
15   A.    I don't believe it did.
16   Q.    Did Inc. own 10 percent or more of
17  any of those listed -- of any of those kinds of
18  listed entities in 2019?
19   A.    It would have had foreign
20  subsidiaries that are not listed in Section B.
21   Q.    On page 3, 3 is the 2020 report.
22  Those two sections are likewise blank again,
23  correct?
24   A.    Yes.
25   Q.    In 2020 did any entity own

Page 71

1  10 percent or more of Inc.?
2    A.    Yes.
3    Q.    And that was Global, correct?
4    A.    Athena Bitcoin Global, correct.
5    Q.    And it's not listed there, right?
6    A.    It is not listed there.
7    Q.    In 2020 did Inc. own 10 percent or
8  more of any of those types of entities listed?
9    A.    It would have had foreign
10  corporations.  I'm not sure that those are within
11  the scope of the listed entities or the types of
12  entities that are being asked in Section B of this
13  form.
14   Q.    And that's blank on 2020, correct?
15   A.    The section is blank on the form
16  listed with report year 2020.
17   Q.    And on 2021, the fourth and final
18  page -- and, for the record, my Exhibit 4 is
19  Athena 6, 7, 9, and 14.
20       My question on the fourth page,
21  Mr. Gravengaard, is on Sections B and C.  Those
22  are blank there too, correct?
23   A.    They are blank on the fourth page of
24  your exhibit.
25   Q.    And as of 2021, Global owned more

Page 72

1  than 10 percent of Inc., right?
2    A.    That is correct.
3    Q.    And did any -- did Inc. own
4  10 percent or more of those listed entities in
5  2021?
6    A.    The foreign subsidiaries, which
7  again I do not know if they would or would not
8  qualify under the list of entities provided in
9  Section B.  I'm unfamiliar with this form and the
10  guidance on how to fill out Section B.
11   Q.    Okay.  Did you sign any of these
12  forms?
13   A.    It appears that I signed the first
14  one ---
15   Q.    All right.
16   A.    -- where my name is listed under
17  sign here.
18   Q.    And that's the 2018 form?
19   A.    That's correct.
20   Q.    And then the 2019, 2020, and 2021
21  forms have the title CEO but don't have your name
22  listed, right?
23   A.    That is correct.  They do not have
24  anything listed in the sign here box.
25   Q.    Were you the CEO of Inc. in '19,

Page 73

1  '20, and '21?
2    A.    I was the CEO of Inc. for the '19
3  year, but I don't believe we had a CEO in the '20
4  and '21 years.
5    Q.    Did Inc. obtain revenue related to
6  the Bitcoin ATMs in Texas?
7         MR. FOWLER:  Objection, form.
8  BY MR. STEWART:
9    Q.    You can answer.
10   A.    I believe that the ATMs in Texas
11  produced revenue.
12   Q.    And that revenue was obtained by
13  Inc., correct?
14   A.    Yes.
15   Q.    Let's talk, Mr. Gravengaard, about
16  Accruvia's work for what we believe is Inc. and
17  which your attorneys have said is really Global,
18  but the work that forms the basis of this lawsuit.
19  Let's jump to that and talk about that.
20       I'm going to show you -- let me call
21  it up just a second -- an invoice -- a couple
22  invoices.  Let me get this on here.  I believe I'm
23  at Exhibit 8.  Well, I'm marking as Exhibit 8 an
24  invoice that is dated October 4, 2021.  Again, I
25  had to hit refresh to get it to show up.  Let me



Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

Page 74

1  know, please, when you can see it.
2      A.    I can see a document that's marked
3  Invoice.
4      Q.    All right.  And I marked that as
5  Exhibit 8 at the bottom.
6            This is an invoice that says Bill To
7  1332 North Halsted Street.
8            Do you see that?
9      A.    I see where it is marked Bill to
10 1332 North Halsted Street.
11     Q.    That's the address, the physical
12 address, for both Inc. and Global, right?
13     A.    That is the address for Athena
14 Bitcoin Global and Athena Bitcoin, Inc.
15     Q.    All right.  And this invoice -- the
16 amounts on this invoice which total 11,686.69
17 were, in fact, paid by an Athena entity, correct?
18     A.    They were paid.
19     Q.    All right.  And the -- this has
20 got -- what was your understanding of what type of
21 work Shaun Overton was doing personally that shows
22 up in this invoice?
23     A.    I believe that he was overseeing the
24 development of Athena Bitcoin Global's product,
25 intellectual property, including the --

Page 75

1  specifically the software used by the government
2  of El Salvador for their Chivo Wallet.
3      Q.    So he was doing work related to
4  Chivo Wallet for an Athena entity, correct?
5      A.    He was doing work for Athena Bitcoin
6  Global for the Chivo Wallet.
7      Q.    And that was -- he was doing that in
8  conjunction with you, right?
9      A.    I don't understand what you mean by
10 "in conjunction."
11     Q.    All right.  Well, were you working
12 with Shaun on his work for Chivo Wallet?
13     A.    I was working with Shaun, yes.
14     Q.    And you knew what Shaun was doing
15 for the work on Chivo Wallet, correct?
16     A.    At some points I knew what he was
17 working on, and at other points I'm sure I did not
18 know what he was working on.
19     Q.    The other programming hours listed
20 here with Franklin Grassals and the other people
21 listed, those folks were doing work for Chivo
22 Wallet, correct?
23     A.    I believe that they were doing work
24 for Chivo Wallet, yes.
25     Q.    And that was being done certainly in

Page 76

1  coordination with you; is that right?
2      A.    Some of it was in coordination with
3  me.
4      Q.    I've marked as Exhibit 9 an invoice
5  for $8,428.34.
6            Can you tell me when that shows up
7  on your screen?
8      A.    I see an invoice marked as
9  Exhibit 9.
10     Q.    All right.  And is that -- would you
11 agree with me that no Athena entity has paid for
12 that invoice -- or paid the number -- the amount
13 in that invoice?
14     A.    I do not believe an Athena entity
15 has paid this invoice.
16     Q.    Do you see toward the bottom it says
17 programming hours for Bailey Jarrell?
18            Do you see that?
19     A.    I see where it's marked Bailey
20 Jarrell.
21     Q.    Okay.  Do you know what Bailey
22 Jarrell was doing?
23            And this would have been at the
24 bottom left-hand corner.  It says Invoice for
25 labor November 1 through 3 of 2021.

Page 77

1      A.    I was not familiar with what
2  Ms. Jarrell's work was during the time period of
3  November 1 through 3rd of 2021.
4      Q.    Do you know one way or the other
5  whether she was doing marketing work for an Athena
6  entity?
7      A.    I don't know one way or the other if
8  she was doing marketing work for Athena Bitcoin
9  Global during that time period.
10     Q.    Do you know if she was doing
11 marketing work for Inc.?
12     A.    She was definitely not doing
13 marketing work for Athena Bitcoin, Inc.  There
14 would be no purpose for that.
15     Q.    Do you know who she was taking
16 direction from for the marketing work?
17     A.    I don't.
18     Q.    Okay.  But you know she's doing work
19 for Global, but you don't know who she was working
20 for?
21     A.    Actually, I don't know that she was
22 doing work for Global.  I see that -- I see that
23 there is a bill for her time, but I'm unfamiliar
24 with what work she was doing.  But she definitely
25 was -- there's no reason for her to have been



Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

**Page 78**

1  doing work for Inc.  There's nothing that Inc.
2  was ---
3        Q.      Even though Inc. is described in
4  your SEC filing as the operating entity, Our
5  domestic operations are conducted by Athena
6  Bitcoin, Inc., there's no reason for her to have
7  done any marketing for Inc. is your testimony?
8        A.      Right.  Because, I mean, I don't
9  know what she was doing during that time period.
10  I'm seeing that she was billed to us, so I assume
11  that she was doing work during that time period.
12  But whether that work was directed towards the
13  marketing efforts of Athena Bitcoin --- or Athena
14  Holdings of El Salvador or Athena Bitcoin Global,
15  I'm not sure.
16        Q.      So you have no personal knowledge of
17  what work Ms. Jarrell was doing that's reflected
18  in this invoice?
19        A.      That's -- that is correct.  I have
20  no knowledge of what work she was doing during
21  that time period.
22        Q.      For the same time period, you do
23  know what Shaun Overton was doing, correct?
24        A.      Yes.
25        Q.      And the other programmers listed,

**Page 79**

1  Lance Moore on down, you know they were all
2  working on Chivo Wallet, correct?
3        A.      They were all working on the Athena
4  Bitcoin Global product, which was going by the
5  street name of Chivo Wallet, yes.
6        Q.      Okay.  And --- but the work was done
7  for Chivo Wallet, both Shaun Overton and the other
8  programmers, right?
9        A.      Yes.
10        Q.      I've put on the screen a $75,250.57
11  invoice, and I've marked it as Exhibit 9.
12              Can you see an invoice marked
13  Exhibit 9?
14        A.      I see an exhibit marked Exhibit 9.
15        Q.      Okay.  I apologize for the
16  awkwardness about asking you if you see something,
17  but, nonetheless, you'll have to do it.
18              On this it has a Bailey Jarrell,
19  like fourth from the bottom, Bailey Jarrell listed
20  with a cost, and this at the bottom left-hand
21  corner, it says Invoice for labor October 1
22  through the 31st.
23              Do you see that?
24        A.      I do see that.
25        Q.      Do you have any personal knowledge

**Page 80**

1  of what work Ms. Jarrell was doing that's
2  reflected in this invoice?
3        A.      No, I do not.
4        Q.      And then Shaun Overton and the other
5  people listed, Lance Moore on down, were they
6  doing work for Chivo Wallet that's reflected in
7  this invoice?
8        A.      They were doing work for Athena
9  Bitcoin Global to further its intellectual
10  property that was being used by Chivo as part of
11  the Chivo Wallet product, yes.
12              MR. STEWART:  Object to the
13  nonresponsive portion of that question
14  [sic].
15  BY MR. STEWART:
16        Q.      My question is, was there work being
17  done for Chivo Wallet?
18              MR. FOWLER:  Objection, form.
19        A.      I'm not sure how you can work for
20  Chivo Wallet.
21  BY MR. STEWART:
22        Q.      Was their work being used for the
23  Chivo Wallet project?
24        A.      Their work was being used by Athena
25  Bitcoin Global in -- to enhance the intellectual

**Page 81**

1  property that Athena Bitcoin Global had licensed
2  and contracted to the government of El Salvador.
3              MR. STEWART:  Object to the
4  nonresponsiveness.
5  BY MR. STEWART:
6        Q.      Mr. Gravengaard, I understand you're
7  trying to insert the word "Global" in every one of
8  your answers, but my question is not that
9  detailed.
10              It's was the work that's reflected
11  in Exhibit 9 -- other than Ms. Jarrell which you
12  said you don't have personal knowledge about, was
13  the other work related to the Chivo Wallet
14  project?
15              I'm not asking you who it was for,
16  just was the work related to ---
17        A.      Was it related, yes.
18        Q.      And, likewise, back on the prior
19  exhibit, was the work, other than Ms. Jarrell,
20  related to the Chivo Wallet project?
21        A.      It was related.
22        Q.      And, again, both the $8,400 invoice
23  we looked at -- and I might have labeled these the
24  same number --- and the $7,500 invoice -- $75,000
25  invoice we've got on the screen, no Athena entity



**Athena Bitcoin, Inc. (Eric Gravengaard)**
**August 17, 2022**

**Page 82**

1  has paid for those invoices -- has paid those
2  invoices, correct?
3      A.    I believe that is correct.
4      Q.    And why is that?
5      A.    They have not been paid.
6      Q.    Why have they not been paid?
7      A.    We believe that Mr. Overton has
8  interfered with our ability to continue working in
9  El Salvador, and we have a commercial dispute with
10 him as to his behavior in El Salvador immediately
11 subsequent to submitting these invoices.
12     Q.    Do you have any contracts with
13 either Mr. Overton or Accruvia that says you have
14 the right to offset against these invoices for any
15 sort of commercial dispute that you just
16 described?
17     A.    I don't believe that we have a
18 contractual -- a contract that has such terms.
19     Q.    But so the reason these two invoices
20 have not been paid is because whatever Athena
21 entity believes that Mr. Overton has taken some
22 bad actions that impacted --- negatively impacted
23 Athena in El Salvador?
24     A.    Yeah.  We specifically believe
25 they're illegal under El Salvador law.

**Page 83**

1      Q.    The invoices?
2      A.    No, I'm sorry, his actions.
3      Q.    All right.  Any other reason why
4  these invoices were not paid?
5      A.    No.
6      Q.    Did Inc. attempt to either hire any
7  of these folks listed on these invoices or obtain
8  their services as a subcontractor or a contractor?
9      A.    Athena Bitcoin Global and/or Athena
10 Bitcoin -- Athena Holdings of El Salvador has
11 contracted with one or more of these people listed
12 on this invoice.
13     Q.    Do you know who either of those two
14 entities has contracted with?
15     A.    I'm sorry.  Can you repeat your
16 question?
17     Q.    Yeah.
18     Do you know who from these two
19 invoices any Athena entity has contracted with?
20     A.    Yeah.  So let's see, Panos, who I
21 don't see on your Exhibit 9, has contracted with
22 Athena Holdings of El Salvador.  And I believe
23 Ms. Jarrell, who we previously discussed, accepted
24 a position with Athena Bitcoin, Inc.
25     Q.    Have any of the others been

**Page 84**

1  approached by any Athena entity to work for them
2  in any sort of manner, whether it be an employee
3  or a contractor or a subcontractor?
4      A.    I think we made a blanket statement
5  to everyone that if they wanted to continue
6  working on the Chivo Wallet project that we would
7  be open to having a discussion with them.
8      Q.    And Mr. Panos is the only one, to
9  your knowledge, that has said yes?
10     A.    Yes.
11     Q.    Are you paying him the same or
12 equivalent to what he was getting paid for by
13 Accruvia?
14     A.    I believe that we were.
15     Q.    And the blanket statement or offer
16 to all the others, was that the same or equivalent
17 to what Accruvia was paying them?
18     A.    I believe that was what we
19 communicated.  I don't remember specifically.
20     Q.    Do you know when those offers were
21 made?
22     A.    The early part of November of 2021.
23     Q.    When did you first believe
24 Mr. Overton did something untoward toward any of
25 the Athena entities?

**Page 85**

1      A.    When the government of El Salvador
2  called us and explained to us his actions.
3      Q.    When was that?
4      A.    Again, in the first week of November
5  of 2021.
6      Q.    Is that before or after you made
7  offers to all of these folks?
8      A.    I don't remember.
9      Q.    Who at the government -- from the
10 government of El Salvador called any Athena entity
11 about Mr. Overton?
12     A.    I don't remember exactly who called
13 us to alert us that Mr. Overton had spoken to
14 them.
15     Q.    And when you say "us," who is the
16 "us"?
17     A.    Either Matias Goldenhörn or myself.
18     Q.    Do you remember personally any
19 communications from the government of El Salvador
20 about these so-called untoward actions by
21 Mr. Overton?
22     A.    I remember a meeting that I was
23 called to where I was present and Sara Hanna of
24 the government of El Salvador were present.
25     Q.    Do you know when that was?



Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

**Page 86**

1  A.     Again, it was the first week of
2  November 2021.
3       Q.     What did they tell you about
4  Mr. Overton or Accruvia?
5       A.     They said that Mr. Overton had come
6  to them and said that he knew all of the problems
7  that Athena had and that he had spent the previous
8  month figuring out what those problems were and
9  that only he could solve all of their problems if
10 he paid them -- if the government of El Salvador
11 paid him to fix those problems.
12      Q.     Did they tell you anything else?
13      A.     Not that I remember.
14      Q.     Was Athena having any problems with
15 the Chivo Wallet project?
16      A.     I don't understand your question.
17 Can you be more specific?
18      Q.     Well, you said that the government
19 of El Salvador said that Mr. Overton had told them
20 that there were problems with the project.  That
21 was the --- the Chivo Wallet project, correct?
22      A.     That's correct.  It was the Chivo
23 Wallet project that I was referring to when I said
24 there were problems.
25      Q.     Did Athena have any problems with

**Page 87**

1  the Chivo Wallet project?
2       A.     There were several bugs that came to
3  light between the launch in September and that
4  first week of November.
5       Q.     So would telling the government of
6  El Salvador that there were bugs, would that -- in
7  the Chivo Wallet software, that would be accurate,
8  correct?
9       A.     At the time I'm not sure if there
10 were outstanding bugs or not.
11      Q.     But there were bugs.  You just said
12 that, right?  There were bugs.
13      A.     There were bugs that --
14      Q.     So --
15              {Simultaneous/overlapping
16              indiscernible voices.}
17      A.     -- come to light that were fixed.  I
18 don't know if there were any outstanding issues ---
19 BY MR. STEWART:
20      Q.     Okay.
21      A.     -- at the time of that meeting.
22              MR. STEWART:  Object to the
23      responsiveness.
24 BY MR. STEWART:
25      Q.     Mr. Gravengaard, I'm not asking you

**Page 88**

1  whether the bugs were fixed.  I'm asking you
2  whether it would be a truthful statement to tell
3  the government of El Salvador that there were bugs
4  or there had been bugs in the Chivo Wallet
5  software.
6              MR. FOWLER:  Objection, form,
7      compound.
8       A.     Yeah.
9  BY MR. STEWART:
10      Q.     Are you answering my question?
11      A.     I think I answered your question,
12 Counselor.  There were bugs.
13      Q.     And that is my question.  Would
14 telling the government of El Salvador that there
15 were bugs in that software be accurate?
16              MR. FOWLER:  Objection, form.
17      A.     Again, were they bugs that were
18 unsolved or were they solved bugs?
19 BY MR. STEWART:
20      Q.     I didn't ask that.
21      A.     Well, I'm asking you to clarify
22 because I'm not sure how to answer your question
23 without knowing that.
24      Q.     Mr. Gravengaard, you just told me --
25 you just agreed that there were bugs in the

**Page 89**

1  software, one, right?  And you did say they were
2  fixed, two.
3       A.     I did say they were -- there were
4  fixed bugs.
5       Q.     But there were bugs at least at some
6  point, correct?
7       A.     At some point there were bugs.
8       Q.     Okay.  So it's a truthful statement
9  to tell the government of El Salvador that there
10 were at some point bugs in the software?
11              MR. FOWLER:  Objection, form.
12              Kelly, this is way beyond the
13      scope of the deposition.  The deposition
14      relates to, as you know, jurisdiction.
15      This is outside the scope of
16      jurisdiction.
17              MR. STEWART:  Well, you went
18      outside the scope of jurisdiction
19      yesterday.  I don't think so.  It goes to
20      the work, and it all relates to which
21      entity the Chivo Wallet software was done
22      for.
23              So I think I'm going to move on,
24      nonetheless, even though I don't agree
25      that it was outside the scope, but I will



Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

**Page 90**

```
1    move on.
2  BY MR. STEWART:
3       Q.    Let's go back to these invoices and
4  let's talk about how they got paid or how at least
5  the first one got paid.  Let me call up a
6  document.
7              MR. STEWART:  I don't know if the
8         court reporter is keeping track.  I think
9         I might have marked the last two exhibits
10        9.
11            (Clarification requested by the
12        stenographer.)
13            MR. STEWART:  Let's call one 9A
14        and one 9B.  We can fix that after the
15        depo.  I'm going to mark this then 10.
16  BY MR. STEWART:
17       Q.    Do you see a document on your
18  screen?
19       A.    I see a document on my screen.
20       Q.    Okay.  Do you know how the one
21  invoice for 8,000 -- or the $8,400 invoice was
22  paid, mechanically?
23             What -- was it a check?  Was it
24  bill.com?  Do you know?
25       A.    I believe that it was paid through
```

**Page 91**

```
1  bill.com.
2       Q.    All right.  And do you understand
3  that Mr. Overton would submit his invoices to
4  Noreen Pepino for payment?
5       A.    I believe that he was supposed to
6  submit them to our billing system that globally
7  handles all of our payables.
8       Q.    All right.  And do you see -- I
9  don't know that you've ever seen what I marked as
10  Exhibit 10, which is Accruvia 4 and 5.
11             Have you seen this before?
12       A.    I have never seen your Exhibit 10
13  before.
14       Q.    All right.  Do you see that it -- it
15  looks like it's an e-mail at the top to
16  soverton@roidevs.com?
17             Do you see that?
18       A.    I see it appears to be an e-mail to
19  the e-mail address you just referenced.
20       Q.    Okay.  It does say:  Track your
21  payment from Athena Bitcoin Inc.
22             Would you agree with me that's what
23  this document says?
24       A.    I agree with you the document says
25  that.
```

**Page 92**

```
1              MR. STEWART:  Is the last one 10
2         or 11?
3  BY MR. STEWART:
4       Q.    I'm trying to mark this next one 11.
5  You see a document that's a pretty dark document.
6  Can you see that?
7       A.    I see what appears to be an e-mail
8  directed at me through my athena.sv e-mail
9  address.
10       Q.    Okay.  And is this -- at the bottom
11  this says it's -- it says:  Eric, please advise on
12  the timing of payments on the invoices.  Shaun.
13             Do you see that?
14       A.    I do see that.
15       Q.    This looks like it was sent
16  November 5 of 2021.
17       A.    I don't know if it was sent or
18  received, but I do see that the date on this piece
19  of paper or whatever is November 5 of 2021.
20       Q.    All right.  And it was sent to
21  Noreen Pepino at noreen@athenabitcoin.com, right,
22  one of the recipients?
23       A.    She is one of the recipients.
24       Q.    Your e-mail on this is
25  eric@athena.sv, right?
```

**Page 93**

```
1       A.    Yes.
2       Q.    That's not Global's e-mail address,
3  is it?
4       A.    It's one of -- as I testified
5  earlier, it is one of the domains that is owned
6  globally by Athena Bitcoin Global.
7       Q.    All right.  But it doesn't say on --
8  athena.sv doesn't say Inc. or Global?  Doesn't say
9  either, right?
10       A.    It appears to say athena.sv.
11       Q.    So is the answer to my question,
12  yes, it doesn't say either?
13       A.    I'm sorry.  What was your question?
14  Does it say the word "Global"?
15       Q.    Or Inc.
16       A.    It does not say the word "Global" or
17  "Inc."
18       Q.    It's not hard.
19             I marked as Exhibit 12 a e-mail that
20  has on the front October 4, 2021, to Noreen
21  Pepino.
22             Do you see that?
23       A.    I do.
24       Q.    Looks like it was cc'd to you?
25       A.    It does appear to have my name on
```



Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

Page 94

1   the cc list of this printout of an e-mail.
2       Q.    And the subject is Accruvia Labor
3   Invoice, right?
4       A.    That is what is written next to the
5   word "Subject."
6       Q.    And it's coming from
7   quickbooks@notification.intuit.com.  It's got the
8   word "Accruvia" in front of it, right?
9       A.    I'm sorry.  Can you repeat your
10  question?
11      Q.    What does the "From" line say?
12      A.    The "From" line says "Accruvia," and
13  then in angled brackets it reads
14  "quickbooks@notification.intuit.com."
15      Q.    All right.  Do you recall receiving
16  this e-mail?
17      A.    I don't recall receiving this
18  e-mail.
19      Q.    All right.  Next page is a
20  November -- let me just -- I'll skip this
21  document.  Go back to another one.
22            All right.  I marked Exhibit 13.
23  Can you see a document on your screen?
24      A.    I see an Exhibit 13 on my screen.
25      Q.    Have you seen this at all before?

Page 95

1       A.    I have not seen this before.
2       Q.    Nonetheless, do you recognize it as
3   text from bill.com?
4       A.    I do not recognize it as text from
5   bill.com.
6       Q.    Okay.  Do you see that in the
7   third -- the third section that says 10/12/21, it
8   says "Athena Bitcoin I Bill.com"?  Do you see
9   that?
10      A.    I am not sure what it says, but it
11  does say "Athena Bitcoin" and then there's a
12  vertical line and then it says "Bill.com."
13      Q.    Okay.  So you don't think that
14  vertical line is an I.  You think it's a vertical
15  line?
16      A.    I don't know.
17      Q.    You don't know, do you?
18      A.    I don't.
19      Q.    Okay.  And you don't know what
20  bill.com was communicating to Accruvia or to
21  Ms. Pepino about the payment or nonpayment of
22  Accruvia's invoices, do you?
23      A.    No, I couldn't know what bill.com
24  was communicating with Ms. Pepino or Mr. Overton.
25      Q.    Who paid -- which entity paid the

Page 96

1   $11,000 invoice from Accruvia that was actually
2   paid?
3       A.    I believe Athena Bitcoin, Inc., paid
4   it on behalf of Athena Bitcoin Global.
5       Q.    Does Inc. have a bank account at
6   Citizen's National Bank?
7       A.    Yes.
8       Q.    Does Global have an account there
9   too?
10      A.    It does now.
11      Q.    Did it?
12      A.    It did not previously.
13      Q.    Okay.  I've marked Exhibit 14.  Do
14  you know if this is -- or can you tell whether
15  this is a report from Citizen's National Bank?
16      A.    I don't see an Exhibit 14, sir.
17      Q.    Can you refresh, please.
18      A.    There's nothing to refresh, sir.
19      Q.    You know what, sorry, I need to
20  share it with you first.  I hit the wrong button.
21  All right.  And I can't tell -- let me blow it up.
22  That probably is part of my problem.  Need to -- I
23  marked this as Exhibit 14.
24            Can you see Exhibit 14 now?
25      A.    I see a document marked Exhibit 14.

Page 97

1       Q.    All right.  Can you tell in the
2   middle that -- the first page that this has a --
3   it says it's paid from Citizen's National Bank
4   with a partial bank account number?
5       A.    I see that it says it is paid from
6   Citizen's National Bank, and there is a partial
7   account number.
8       Q.    And do you see the process date of
9   October 10, 2021?
10      A.    Yes, I see the process date.
11      Q.    As of October of 2021, Inc. was the
12  only Athena entity that had an account at
13  Citizen's National Bank, correct?
14      A.    I believe that is correct.
15            MR. FOWLER:  Kelly, you said it
16  shows a process date of October 10.  Am I
17  looking at the wrong document?
18            MR. STEWART:  October -- I
19  misspoke then.  October 12, 2021.
20            MR. FOWLER:  Okay.  Okay.
21  BY MR. STEWART:
22      Q.    Tell me when you can see what I
23  marked as Exhibit 15.
24      A.    I see your Exhibit 15.
25      Q.    All right.  Have you seen Exhibit 15



**Athena Bitcoin, Inc. (Eric Gravengaard)**
**August 17, 2022**

Page 98

1  before?
2      A.      No, I have not.
3      Q.      All right.  Do you know -- and I
4  guess I think you've answered this question, but
5  if it's from -- it's an e-mail from bill.com to
6  Shaun Overton.
7              Do you see where that says that on
8  the top on the first page?
9      A.      I see where that's indicated on the
10 first page.
11     Q.      It says in the middle Track your
12 payment from Athena Bitcoin Inc.
13             Do you see that?
14     A.      I see that.
15     Q.      Likewise, let me know, please, when
16 you can see my Exhibit 16.
17     A.      I see your Exhibit 16.
18     Q.      All right.  And this again at the
19 top -- or let me just ask you this:  Have you seen
20 Exhibit 16 before?
21     A.      I have not seen Exhibit 16 before.
22     Q.      Do you see, though, nonetheless, at
23 the top it appears to be an e-mail from bill.com
24 to Shaun Overton?
25     A.      It appears to be an e-mail from

Page 99

1  bill.com to Mr. Overton.
2      Q.      It says:  Hi Accruvia, You've
3  received money in your bank account from Athena
4  Bitcoin for these invoices.
5              Do you see that?
6      A.      I see that.
7      Q.      All right.  That's on page 1.  It
8  also says the same thing on page 2.
9              Do you see that?
10     A.      I see that on page 2.
11     Q.      Please tell me when you can see my
12 Exhibit 17.
13     A.      I see your Exhibit 17.
14     Q.      And do you see on the front that
15 this says Defendant's Supplemental Responses to
16 Plaintiff's First Set of Personal Jurisdiction
17 Discovery?
18     A.      I see where it says the words you
19 just spoke.
20     Q.      Have you seen this document before?
21 And you may want to page through it, just . . .
22     A.      I believe I've seen this document
23 before.  My signature appears -- appears on
24 page 10.
25     Q.      If you could turn to page 10 --

Page 100

1  actually, page 9 of -- the last page, on your
2  signature page, the last page, page 10 of 10.  Are
3  you there?
4      A.      Yes.
5      Q.      And I want to read you -- this is
6  Number 19 at the top of the page is asking for
7  request for admission from Inc. that Athena paid
8  Accruvia for work Accruvia performed.
9              And there's some legal objections,
10 but the last sentence says specifically:  Athena
11 denies it paid Accruvia for work Accruvia
12 performed for Athena.
13             Did you not just tell me that Inc.
14 paid Accruvia for the work?
15     A.      There appears to be two parts to the
16 sentence you just wrote.
17     Q.      Yeah.
18     A.      Specifically -- I believe to quote
19 this document, it says:  Specifically, Athena
20 denies that it paid Accruvia for work Accruvia
21 performed for Athena.
22     Q.      And so the reason that's denied is
23 because of the phrase "performed for Athena"?
24     A.      That's correct.
25     Q.      All right.  And it's Athena's --

Page 101

1  it's Inc.'s position in this lawsuit that none of
2  the work that Accruvia did was for Inc.  It was
3  either for Global or one of the -- or the
4  El Salvador subsidiary?
5      A.      That's correct.  And, further,
6  Athena Bitcoin Global did not at the time have a
7  bank account and couldn't make payments.  So
8  Athena Bitcoin Global used its consolidated
9  balance sheet and requested Athena Bitcoin, Inc.,
10 make the payment on its behalf and, as you've
11 already shown, Mr. Overton was communicating with
12 me on an athena.sv e-mail address, which the sv
13 country code is El Salvador.
14             MR. STEWART:  Okay.  I'll object
15 to the nonresponsive portion of that
16 question [sic].
17 BY MR. STEWART:
18     Q.      While we're on this page, to save
19 from coming back to it, the next request for
20 admission, Mr. Overton, is Number 20 that asks for
21 admission or denial on Accruvia performed work in
22 Texas -- you know what, I now see the problem with
23 that.  I should have said Accruvia performed work
24 in Texas for Athena.
25             If Athena -- if that request were



Page 102

1  stated, it says: Accruvia performed work in Texas
2  for Athena, would you agree with it or disagree
3  with it?
4          MR. FOWLER:  Objection, form.
5  BY MR. STEWART:
6      Q.    Well, let me just ask it this way:
7  Did Athena -- excuse me.
8          Did Accruvia do work while in Texas
9  for any Athena entity?
10     A.    I don't know.
11     Q.    Do you know where Mr. Overton lives?
12 What state?
13     A.    I believe that he works in Texas
14 because you've mentioned that, but I've never been
15 to his home.  I don't know anything about where he
16 lives.
17     Q.    Did he ever tell you that he lived
18 in Texas?
19     A.    He may have.
20     Q.    In fact, did you not encourage him
21 to fly home to Texas at one point during the
22 middle of this work?
23     A.    I believe that I did not encourage
24 him to fly home.  I believe that he did come to me
25 and ask that he go home to his family.

Page 103

1      Q.    And you knew that was in Texas,
2  right?
3      A.    I may have at the time known it was
4  in Texas.
5      Q.    You're denying you knew it was in
6  Texas?
7      A.    I don't remember where he lives.
8      Q.    Okay.  Do you know where Accruvia
9  was located physically, where its home address
10 was?
11     A.    I don't know if Accruvia has an
12 office.  I don't know.  I've never visited its
13 offices.
14     Q.    At the time in September-October of
15 2021, did you know where Shaun Overton lived?
16     A.    In September of 2021, I believe -- I
17 believe that I remember he lived in Texas at that
18 time.
19     Q.    And did you know during that time
20 period that Accruvia was located in Texas?
21     A.    I don't know if I knew that Accruvia
22 existed as a Texas entity or not.  I was also
23 unaware that Accruvia has any offices.
24     Q.    You'd entered into a term sheet --
25 "you" being what you're contending is Athena

Page 104

1  Bitcoin Global, entered into a term sheet with
2  Mr. Overton that we looked at, I believe, as
3  Exhibit 3, and that was to discuss or continue the
4  process of possibly buying his company and
5  Mr. Overton working for -- working for Global,
6  correct?
7      A.    Yes.
8      Q.    And yet you didn't know where he
9  lived at the time you entered into that term
10 sheet?
11     A.    Is there an address for Accruvia on
12 that term sheet?  I'm --
13     Q.    I didn't ask you whether there's an
14 address.
15     A.    I'm trying to remember.  If there
16 was an address on that term sheet, then I would
17 have known at the time.
18     Q.    That's not my question,
19 Mr. Gravengaard.  My question is:  Did you know at
20 the time where Mr. Overton lived?
21     A.    I think I did, but, again, I
22 don't . . .
23     Q.    Would you have offered somebody a
24 job as the CTO for Global without knowing where
25 they live?

Page 105

1      A.    We're in a fully remote workforce,
2  sir, and so --
3      Q.    So that's --
4      A.    At the time we had to verify his
5  employment, you know, his eligibility for
6  employment, we would have checked such a thing.
7      Q.    Would you have to pay taxes on his
8  employment if he did become an employee?
9      A.    I believe that is the way tax law
10 works.
11        (Simultaneous/overlapping
12     indiscernible voices.)
13 BY MR. STEWART:
14     Q.    And you'd need to know what state he
15 lived in or resided in, correct?
16     A.    I believe that we would at the time
17 that he would have become an employee, yes.
18     Q.    And I'm just trying to nail down, as
19 of the September 22, 2021, date of the term sheet,
20 did you know where Mr. Overton lived?
21     A.    And I'm answering your question that
22 I believe that at the time I knew that he was in
23 Texas, but, again, I don't know -- never been to
24 his house and I didn't know that there was an
25 office for Accruvia.  I only met with Mr. Overton



Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

**Page 106**

```
1   in El Salvador.
2         Q.    Thank you.
3               Did you know as of September 22,
4   2021, where Accruvia was physically located?
5               MR. FOWLER:  Objection, form,
6         asked and answered.
7   BY MR. STEWART:
8         Q.    You can answer.
9               MR. FOWLER:  No, he can't answer.
10  He's already answered the question,
11  Kelly, twice.
12              MR. STEWART:  I'm not -- no.  It's
13  unclear.  I'm not sure what he's saying.
14        A.    I don't know, as of the 22nd of
15  September, if I knew where Accruvia had its
16  offices.
17  BY MR. STEWART:
18        Q.    Okay.  Thank you.  Now you've
19  answered it.
20              At some point in your working
21  relationship with Mr. Overton, you had discussions
22  with him about going home -- right? -- for some
23  brief period of time?
24        A.    I believe that we did have
25  discussions about him going home.
```

**Page 107**

```
1         Q.    Did you know during those
2   discussions where he lived?
3         A.    Broadly that he lived in Texas, I
4   believe.  I believe that I knew at the time that
5   he lived in Texas.
6         Q.    Did you know that he ---
7         A.    He was returning to Texas.  I
8   shouldn't say I knew that he lived there.  I
9   take -- I want to amend that comment.  I believe
10  he was returning to his family, and he was going
11  to see them in Texas.
12        Q.    Okay.  But you didn't know he lived
13  there.  You just knew he was going to see his
14  family in Texas?
15        A.    That's what he stated to me.  I
16  don't know if that was true.
17        Q.    Did you know that Mr. Overton was
18  doing work for you when he was at home?
19        A.    I don't know that he was doing that.
20  He said he needed to go see his family.
21        Q.    Okay.  Did you keep in touch with
22  him while he was seeing his family?
23        A.    I may have had a phone call with
24  him.
25        Q.    Do you know where he was located
```

**Page 108**

```
1   when you had a phone call with him?
2         A.    No, I do not.
3         Q.    And your phone call was not about
4   his family.  It was about the work on Chivo
5   Wallet?
6         A.    That is probably true.
7         Q.    Did you ever have Microsoft Teams
8   communications, video calls, Zoom calls, or any
9   calls with Mr. Overton while he was in Texas?
10        A.    There might have been one call.
11        Q.    And I think I know the answer to
12  this, but did you ever have any communications
13  with Ms. Jarrell while she was in Texas, you
14  personally?
15        A.    No, I don't believe I did.  I don't
16  believe that I met Ms. Jarrell at all, really,
17  until January of '22.  That's my first
18  recollection of meeting Ms. Jarrell.
19        Q.    With respect to the work that was
20  invoiced for -- that we've looked at the three
21  invoices, Mr. Gravengaard, we looked at an $11,000
22  invoice that was paid and then an $8,400 and a
23  $75,000 invoice that weren't paid.
24              Do you agree with me generally?  I'm
25  not asking about the details, but we've looked at
```

**Page 109**

```
1   three invoices, one of which was paid and two of
2   which weren't, right?
3         A.    Yes.  We've looked at three
4   invoices.
5         Q.    And did -- for that work that
6   Accruvia contends that it did, did you ever tell
7   Mr. Overton, You're doing this work for Global?
8         A.    Yes, I believe that's what the
9   letter of intent said, that we're interested in
10  having Mr. Overton and the rest of Accruvia join
11  with Athena Bitcoin Global and to work on the
12  intellectual property that's owned by Athena
13  Bitcoin Global and to help Athena Bitcoin Global
14  to fulfill its requirements with the contract it
15  has with the government of El Salvador.
16        Q.    And when you say "letter of intent,"
17  do you mean the term sheet?
18        A.    I'm sorry, I meant the term sheet.
19        Q.    Okay.  There's not a separate letter
20  of intent, right?
21        A.    I misspoke.  I was referring to the
22  term sheet which you marked as Exhibit ---
23        Q.    Yeah.  Not a problem.  I just -- I
24  want to make sure I didn't overlook a document.
25              Now, the term sheet, as we
```



Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

Page 110

1  discussed, was an offer to Shaun Overton to --
2  well, it was an offer.  It was -- the goal of that
3  was to purchase Accruvia and to have Mr. Overton
4  work as, I believe, the chief technology officer;
5  is that right?
6      A.     I believe that was the primary goals
7  of that document, yes.
8      Q.     Were the -- any of the work that was
9  in the invoices listed as coming out of that term
10 sheet?
11             MR. FOWLER:  Objection, form.
12     A.     Yeah, I don't fully understand your
13 question.  Could you repeat that?
14 BY MR. STEWART:
15     Q.     Yeah.
16             Did the term sheet specifically
17 address the work that is showing in the invoices?
18             MR. FOWLER:  Objection, form.
19     A.     The work . . .  The invoices seemed
20 to be for work that was done subsequent to the
21 term sheet with the understanding that Athena
22 Bitcoin Global was going to acquire Accruvia and
23 its relationships with its developers and hire
24 Mr. Overton.
25             ///

Page 111

1  BY MR. STEWART:
2      Q.     Did you ever tell Mr. Overton that
3  that subsequent work was for Global?
4      A.     I believe I did because it's for
5  Athena Bitcoin Global.
6      Q.     Okay.  When did you tell him that
7  that work was for Global?
8      A.     I'm sure when we began our working
9  relationship and I showed him the source code for
10 the Chivo Wallet, which is the possession -- which
11 is owned by Athena Bitcoin Global.
12     Q.     You say you're sure that you did.
13             Do you recall a specific
14 conversation where you said, Shaun, the work
15 that's going to occur post-September 22, '21,
16 pursuant to that term sheet -- the work that's
17 going to occur after that term sheet was entered
18 into is going to be for Global?
19             Do you recall a specific
20 conversation --
21     A.     I do not recall a specific
22 conversation.
23     Q.     Did you ever tell him the work was
24 for Inc.?
25     A.     No.

Page 112

1      Q.     Did you ever tell him the work was
2  for Athena Holdings El Salvador, S.A. de C.V.?
3      A.     No, because I don't think that he
4  worked on any -- anything that would have directly
5  been for that entity.
6      Q.     Was that entity -- and that's the
7  El Salvador entity.  Was that doing any work for
8  Chivo Wallet?
9      A.     It -- that entity has the contract
10 to operate the Bitcoin ATMs in the government of
11 El -- I'm sorry -- in the country of El Salvador.
12 That entity may also have other contracts with the
13 government regarding point-of-sale systems.
14     Q.     And I missed the word you said.  You
15 said it has a contract to operate the what kind of
16 ATMs?
17     A.     The Chivo ATMs, the Chivo-branded
18 ATMs that we use.
19     Q.     Sorry.  I just couldn't hear.
20             That's the Athena Holdings
21 El Salvador, S.A. de C.V.?
22     A.     Right.
23     Q.     Mr. Overton signed a nondisclosure
24 agreement also with the Athena Holdings
25 El Salvador entity, correct?

Page 113

1      A.     Yes.
2      Q.     And I'm looking at it, and I can
3  show it to you, but I think it says Athena
4  Holdings El Salvador Variable Capital Limited
5  Company.  That's the -- that should be the same as
6  Athena Holdings El Salvador, S.A. de C.V.,
7  correct?
8      A.     Yes.  I believe what you're reading
9  is a translation of the abbreviation S.A. de C.V.
10     Q.     All right.  And did any of the work
11 that was invoiced, none of that work was for the
12 S.A. de C.V. entity, correct?  Is that your
13 testimony?
14     A.     Yeah, I don't believe that it was.
15 Yeah, I don't believe that it was.
16     Q.     Has Inc. filed any lawsuits in Texas
17 before?
18     A.     I don't believe that Inc. has filed
19 any lawsuits in Texas.
20     Q.     Other than this lawsuit, has Inc.
21 ever been sued in Texas?
22     A.     I don't believe that Inc. has ever
23 been sued in Texas.
24     Q.     Has Global either filed or been sued
25 in Texas?



Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

Page 114

1      A.      My history with Global would only go
2  back to 2020, so I can't speak about anything
3  Global may or may not have done prior to that.
4  But Global has not been sued in any lawsuit since
5  2020 in Texas.
6      Q.      Did any Athena entity pay for
7  Mr. Overton's flight back to Texas when he went
8  home?
9      A.      I'm not sure how Mr. Overton paid
10 for his flight to return -- to go to Texas.
11     Q.      Do you have any personal knowledge,
12 one way or the other, as to whether Inc. paid it,
13 Global paid it, Mr. Overton paid it, or anybody
14 else paid it?
15     A.      No, I have no -- I have no knowledge
16 of that.
17     Q.      Do you know who Sophia Martinez is?
18     A.      Ms. Martinez was our executive
19 assistant in El Salvador.
20     Q.      Who was her -- was her employer
21 S.A. de C.V.?
22     A.      I'm sure that it was.
23     Q.      She's not a Global or an Inc.
24 employee -- is she a Global or an Inc. employee,
25 to your knowledge?

Page 115

1      A.      No, to my knowledge she was not.
2      Q.      Do you know whether she arranged for
3  S.A. de C.V. to pay for Mr. Overton's flights?
4      A.      She may have.  She arranged for
5  other people to travel in and out of El Salvador,
6  but I have no direct knowledge as to whether or
7  not she did the travel planning for Mr. Overton.
8      Q.      I guess I've got to . . .  I think
9  I'm on Exhibit --- could the court reporter tell me
10 which exhibit I'm on, please.
11          THE REPORTER:  Let me look at the
12     list real quick.  I think 18 is next.
13 BY MR. STEWART:
14     Q.      When you can see Exhibit 18, please
15 let me know.
16     A.      I can see Exhibit 18.
17     Q.      That says Defendant's Responses to
18 Plaintiff's First Set of Merits Discovery?
19     A.      I see where it says that.
20          MR. STEWART:  Larry, don't worry,
21     I'm going to ask him personal
22     jurisdiction issues, not --
23 BY MR. STEWART:
24     Q.      In fact, you --- last page you
25 signed, you verified the interrogatory responses?

Page 116

1      A.      My signature appears on page 5 of
2  this document.
3      Q.      Looks like you verified everything.
4  Okay.  I'm going to ask you about
5  Interrogatories 2 and 3, which are on page 4, I
6  believe.
7          MR. FOWLER:  What are we supposed
8      to be looking at?
9          MR. STEWART:  You mean what page
10     number?
11          MR. FOWLER:  Yeah, please.
12          MR. STEWART:  Yeah.
13     Interrogatories 2 and 3 which should be
14     on page -- showing up on my page 4.
15          MR. FOWLER:  Okay.  All right.
16     Thanks.
17 BY MR. STEWART:
18     Q.      Are you there, Mr. Gravengaard?
19     A.      I believe I am.
20     Q.      Okay.  Interrogatory 2 asks whether
21 Athena has used in any manner any work or services
22 performed by Accruvia, including, but not limited
23 to, any use of such work or services in or for
24 ATMs owned by Athena, and the answer is no.
25          Do you see that?

Page 117

1      A.      Yes.
2      Q.      It says:  The work done by Accruvia
3  was for another entity in El Salvador and the ATMs
4  in that country are not owned by Athena.
5          What is the other entity in
6  El Salvador to which you're referring?
7      A.      I see what the question is.  Okay.
8  I assume that we're referring to --- my
9  interpretation of your interrogatory was did
10 Accruvia do work for ATMs, and my response was
11 Accruvia did not do work for ATMs, and any ATMs
12 that are in El Salvador are owned by an entity
13 that's not Athena.
14     Q.      My question is, your response to
15 Number 2 says:  The work done by Accruvia was for
16 another entity in El Salvador.  That's the first
17 part.
18          What entity in El Salvador was the
19 work done by Accruvia done for?
20     A.      Oh, right.  No.  Athena --- the
21 answer then would be incorrect.  The work done by
22 Accruvia was done for Athena Bitcoin Global.
23     Q.      Okay.  Because I thought you just
24 told me a minute ago -- I'm agreeing with you
25 because I --



**GPS LLC**
gpscalendar@gps.llc ~ 214.347.4781

Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

**Page 118**

1    A.    Yeah.  I agree that I think this
2  interrogatory was confusing and we're trying to
3  weave a lot of things together, and so I think
4  perhaps the answer is more specific, that Accruvia
5  was working for Athena Bitcoin Global on its
6  intellectual property that Athena Bitcoin Global
7  owns.  But this notion of the ATMs in Texas and/or
8  wherever, those ATMs are owned by Athena Bitcoin,
9  Inc.
10    Q.    Because you had just told me earlier
11  that Accruvia did not do any work for Athena
12  Holdings El Salvador, S.A. de C.V., correct?
13    A.    Right.  Because the work was really
14  on the Chivo Wallet, and that software is owned by
15  Athena Bitcoin Global.
16    Q.    I want to talk about Chivo Wallet in
17  a second because it impacts here.
18          Okay.  So the answer to Number 2 is
19  incorrect.  At least that first phrase of that
20  second sentence is incorrect, right?
21    A.    Right.
22    Q.    And the ATMs in that country, you're
23  talking about El Salvador.  Those ATMs are not
24  owned by Athena, right, Inc.?
25    A.    Right.

**Page 119**

1    Q.    They are owned by Athena Holdings
2  El Salvador, S.A. de C.V.?
3    A.    Yes.
4    Q.    Okay.  And then on Interrogatory 3
5  right beneath it, my client asks:  Has Athena
6  benefitted from in any manner from the work or
7  services performed by Accruvia, including, but not
8  limited to, et cetera.
9          And the answer is:  No.  The work
10  performed by Accruvia involved the operations of a
11  third party in a different country.
12          Is that correct?
13    A.    The -- the work performed by
14  Accruvia was for Athena Bitcoin Global and its
15  contract with the government of El Salvador in a
16  different country.
17    Q.    All right.  And that's Global's
18  contract to set up the software to run Chivo
19  Wallet, right?
20    A.    Yes.  Probably.
21          MR. STEWART:  Let's talk about --
22  it's noon.  We can take a short lunch
23  break.  I'm not guaranteeing I have less
24  than an hour, but it could be less than
25  an hour.  So I'm happy to work through,

**Page 120**

1    but --
2          MR. FOWLER:  Well, I'll tell you,
3  my preference would be to keep going.
4          MR. STEWART:  Okay.  Let's keep
5  going, and at 12:30 I'll revisit.  We may
6  or may not be done by 12:30.
7          MR. FOWLER:  Mr. Gravengaard, are
8  you okay going, or do you need a lunch
9  break?
10          THE WITNESS:  No, that's fine.
11          MR. STEWART:  Okay.
12          MR. FOWLER:  Eric, what about you?
13  Are you okay to keep going?
14          THE WITNESS:  Yeah, we can keep
15  going.
16  BY MR. STEWART:
17    Q.    All right.  Let's talk about Chivo
18  Wallet in general.
19          It's the official Bitcoin platform
20  of El Salvador that supports the use of Bitcoin as
21  a legal tender in that country; is that right?
22    A.    I'm sorry, you're asking me about --
23    Q.    Chivo Wallet.
24    A.    -- whether or not I know that to be
25  a fact?  I believe that's a fact, but --

**Page 121**

1    Q.    Okay.  And it's used in -- it's a
2  software that's used, at least in part, to help
3  connect Bitcoin ATMs in the US with Bitcoin ATMs
4  in El Salvador, correct?
5    A.    No.  I wouldn't characterize it that
6  way at all.
7    Q.    It doesn't help them connect?
8    A.    I mean, no, not specifically.
9    Q.    Okay.  Is it used -- it's used for,
10  at least in part, ATMs in El Salvador, correct?
11    A.    I'm sorry.  Could you be more
12  specific about it's used in ---
13    Q. ,  You can tell I'm not a tech
14  attorney, so that's why my questions are rough.
15  But I'm just trying to get a -- just so I can
16  understand it.
17    A.    And I'm just trying to answer
18  truthfully, sir.
19    Q.    Well, I didn't say you weren't.  I'm
20  just trying to answer [sic] intelligent questions.
21          It's a software that's used to help
22  facilitate remittances -- right? --- between two
23  ATMs?
24    A.    Are you asking if it's used to
25  facilitate remittances between two ATMs?  That



Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

Page 122

1  would be incorrect.
2      Q.     Okay.  Is it used to facilitate
3  remittances or payments in any manner?
4      A.     It can be used to facilitate
5  payments or remittances, yes.
6      Q.     Okay.  How do you -- rather than me
7  stumbling through some awkward questions, maybe
8  this will help.  We talked about Chivo Wallet.
9             Tell the judge what Chivo Wallet is,
10  in your words.
11      A.     I believe that the Chivo Wallet is
12  an app that the citizens of El Salvador can use to
13  transact in the two currencies that are legal in
14  El Salvador.
15      Q.     And those would be Bitcoin and what?
16      A.     I believe that their second currency
17  is called the US dollar.
18      Q.     Now, does Chivo Wallet have any use
19  for Bitcoin -- use in Bitcoin ATMs in the United
20  States?
21      A.     Not to my knowledge because I don't
22  know that you can have the Chivo Wallet in the
23  United States.
24      Q.     You don't have to have access to --
25  if you want to -- if you want to take US dollars

Page 123

1  in the United States and get them to somebody in
2  El Salvador using Bitcoin, if you're standing in a
3  US Bitcoin ATM, you're not going to utilize the
4  Chivo Wallet technology or software in any manner?
5      A.     No, because I think you would have
6  to be in El Salvador to have a Chivo Wallet app on
7  your phone.
8      Q.     You can't have a Chivo Wallet app on
9  your phone in the United States?
10      A.     No.  It's geofenced to prevent that.
11      Q.     Okay.
12      A.     You probably can't load it on your
13  phone right now.
14      Q.     Can you check your Chivo Wallet
15  balance at an ATM in the United States?
16      A.     No, you cannot check your Chivo
17  Wallet balance at an ATM in the United States.
18      Q.     Could you transfer US dollars from
19  the United States to El Salvador using a Bitcoin
20  ATM without Chivo Wallet being in place?
21      A.     There's many parts to that question.
22  You cannot transmit US dollars from a Bitcoin ATM
23  in the United States.
24      Q.     You can't deposit US dollars in a
25  Bitcoin ATM and have somebody in El Salvador

Page 124

1  obtain either US dollars or Bitcoin for that --
2  for what you put in in the United States?
3      A.     That's a different question, sir.
4      Q.     Okay.
5      A.     You could use a Bitcoin ATM to
6  purchase Bitcoin in the United States.
7      Q.     Okay.  And then somebody in
8  El Salvador, they -- that Bitcoin can be
9  transferred to somebody in El Salvador, right?
10      A.     Yes.
11      Q.     And then they can get it either in
12  Bitcoin or US dollars?
13      A.     Well, they would receive Bitcoin.
14      Q.     Okay.  Can you send Bitcoin from the
15  USA to El Salvador?  You can, right?
16      A.     I believe that's legal to do.
17      Q.     In fact, that's what the Bitcoin
18  ATMs of Athena do, right?  One of the things they
19  do, correct?
20      A.     No.  The Athena Bitcoin ATMs sell
21  Bitcoin to people that are using the ATMs.
22      Q.     Right.
23      A.     So long as they comply with both our
24  terms of service as well as, you know, normal
25  anti-money laundering.

Page 125

1      Q.     Okay.  So if I've got $100 and I
2  want to transfer that to Bitcoin for whatever
3  reason, I can go to a Bitcoin ATM owned by Athena
4  in Texas and I could put in $100 in cash and get
5  the equivalent value of Bitcoins, right?
6      A.     Very specifically, to not
7  accidentally step across a line, you would be
8  purchasing Bitcoin --
9      Q.     I could --
10      A.     -- using the ATM.
11      Q.     Okay.  So I could take $100 and
12  purchase $100 worth of Bitcoin at an Athena ATM in
13  Texas.  I could do that, correct?
14      A.     Less whatever fees may have been
15  charged to you.
16      Q.     But I could do that, correct?
17      A.     I'm not saying you would receive
18  $100 of Bitcoin --
19      Q.     All right.
20      A.     -- in response for your purchase.
21      Q.     Okay.  I could go to an Athena ATM
22  Bitcoin in Texas, put in $100 and I would get some
23  amount of Bitcoin purchased?
24      A.     Yes.  Assuming you passed all the
25  OFAC and other regulatory checks.



Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

Page 126

1    Q.    And then I could send that Bitcoin,
2  if I chose to, to somebody in El Salvador, right?
3    A.    I couldn't stop you.  That would be
4  a sovereign transaction on your behalf.
5    Q.    And to do that, though, those
6  persons in El Salvador, to get that -- I think
7  what I heard you say is those persons in
8  El Salvador, to get the Bitcoin, however much I
9  purchased, they would have to be -- have the app,
10  the Chivo Wallet app, right?
11    A.    No, they would not have to have the
12  Chivo Wallet app.
13    Q.    But they can have the Chivo Wallet
14  app, right?
15    A.    They could have the Chivo Wallet
16  app.
17    Q.    Okay.  So what's the benefit of the
18  Chivo Wallet app if people don't need it?  If they
19  don't have to have it in El Salvador to get
20  Bitcoin that was transferred to them, why would
21  you want to -- what do you tell people about why
22  you need the Chivo Wallet?
23    A.    I don't.  We're not the operators of
24  the Chivo Wallet.  It's not our -- it's not
25  Athena's position to market the Chivo Wallet app.

Page 127

1    Q.    Okay.  Marketing aside, what's the
2  benefit of Chivo Wallet to somebody in El Salvador
3  that has it?  Is there a benefit?
4    A.    I'm not sure how I could explain
5  that in an answer to your question.
6    Q.    Well, you're telling me that Global
7  has a contract with the government of El Salvador
8  to develop Chivo Wallet technology or software,
9  right?
10    A.    Had, yes.
11    Q.    And you can't tell me what any
12  benefit to that Chivo Wallet would be?
13    A.    Well, how do I presume what someone
14  in El Salvador believes are the benefits of using
15  the Chivo Wallet?
16    Q.    I'm not asking somebody in
17  El Salvador.  I'm asking you.
18         What would be the benefit of using
19  the software that your company is getting paid for
20  or has gotten paid for by the government of
21  El Salvador to develop?
22    A.    What would be the benefits to me?
23    Q.    What would be the benefits to a
24  user?
25    A.    Benefits over what?  Compared to

Page 128

1  what?
2    Q.    Why would somebody get a Chivo
3  Wallet app in El Salvador?  What's the purpose?
4    A.    Oh.  Well, the purpose would be to
5  hold dollars in Bitcoin in an account on their
6  mobile phone.
7    Q.    Okay.  And one way that somebody in
8  El Salvador who has Chivo Wallet could get that
9  Bitcoin could be a transfer from the United
10  States, right?  That's one way?
11    A.    Of the millions of possible ways, I
12  guess that is one of the ways.
13    Q.    All right.  And an ATM, a Bitcoin
14  ATM, in the United States to transfer to somebody
15  who's using Chivo Wallet in El Salvador, there has
16  to be some connection -- they have to work
17  together at some level, right?
18         You're -- the technology in the
19  United States versus Chivo Wallet software in
20  El Salvador, they have to work together to make a
21  transfer, right?
22    A.    Well, it's an open -- it's an open,
23  decentralized platform.  Bitcoin works on a
24  peer-to-peer basis.  Anyone can operate and make
25  Bitcoin transactions regardless of what software

Page 129

1  they're running.  That's what makes it a
2  beautiful, decentralized, open system.
3    Q.    Okay.  But still I think -- maybe
4  you're answering my question.  Maybe I'm just
5  misunderstanding it.
6         But in order for somebody in the
7  United States to purchase Bitcoin and transfer
8  that Bitcoin to somebody in El Salvador that would
9  be using the Chivo Wallet, there has to be a
10  connection between that Chivo Wallet software and
11  the US Bitcoin ATM that was used, right?
12    A.    No.  Other than they're both part of
13  the Bitcoin network.  And, in fact, the ATM
14  wouldn't even know that they -- that it was going
15  to a Chivo Bitcoin address.
16    Q.    Mr. Gravengaard, why would you
17  develop Chivo Wallet if -- if a person in
18  El Salvador could use any sort of program to
19  transfer Bitcoin or receive it?  What's the
20  benefit of Chivo Wallet?
21    A.    Again, compared to what other
22  wallet?  There's many wallets that the citizens of
23  El Salvador could use.
24    Q.    I'm not asking you to compare it.
25  I'm just saying why would somebody want Chivo



**GPS LLC**
gpscalendar@gps.llc ~ 214.347.4781

**Athena Bitcoin, Inc. (Eric Gravengaard)**
**August 17, 2022**

**Page 130**

1  Wallet? What is its purpose?
2      A.     Its purpose is to hold dollars in
3  Bitcoin.
4      Q.     Okay. And is it any different than
5  any other wallet that somebody in El Salvador can
6  access?
7      A.     I mean, I think that it has, you
8  know, a very unique look and feel compared to
9  other wallets that are available to the citizens
10  of El Salvador, as available in the App Store, or
11  the Google Play, or the Huawei Store.
12      Q.     What did the government of
13  El Salvador tell you as to why they wanted you to
14  do this?
15      A.     What did the government of
16  El Salvador tell us about why -- could you repeat
17  that question?
18      Q.     Yeah. You said Global has a
19  contract with the government of El Salvador to
20  develop the Chivo app -- Chivo Wallet. Sorry.
21      A.     Right.
22      Q.     What did they tell you? Did they
23  just say develop it, or did they say develop it
24  because we need X, Y, and Z?
25          What were the reasons for developing

**Page 131**

1  the Chivo Wallet?
2      A.     You'd have to go ask the government
3  for the reasons for why they wanted to have a
4  Chivo Wallet.
5      Q.     What did they tell you?
6      A.     I don't know that they did tell us.
7      Q.     So you filed -- "you" being Global
8  filed a Form S-1 with the SEC on February 10 of
9  2022 and touted the contracts that you have with
10  the government of El Salvador and all of the Chivo
11  Wallet work, Mr. Gravengaard, and you're unable to
12  tell me any benefits to that Chivo Wallet sitting
13  here today?
14      A.     Well, I mean, I'm unclear exactly to
15  whom it's supposed to be a benefit and exactly how
16  I'm supposed to answer your question.
17      Q.     I'm just asking for any answer. I
18  mean --
19      A.     I think I've given you an answer,
20  like you can hold dollars in Bitcoin --
21      Q.     Okay.
22      A.     -- in the wallet, and that's an
23  amazing thing.
24      Q.     All right. But there's other --
25  there's other wallets out there that do the same

**Page 132**

1  thing, correct?
2      A.     There are -- I believe there are
3  other wallets out there that offer similar
4  functionality. I think the Chivo Wallet is really
5  beautiful.
6      Q.     Okay. How is it different than the
7  other wallets out there?
8      A.     Oh, well, it's a custodial wallet.
9  Its look and feel is different. There are
10  noncustodial wallets. There are wallets that hold
11  more currencies than just dollars and Bitcoin.
12  Some wallets only hold Bitcoin. Some wallets
13  allow you to do transactions on other blockchains.
14  I have a wallet on my phone that I believe has
15  Dogecoin.
16      Q.     Was the government trying -- was the
17  government of El Salvador in developing getting
18  you to -- "you" being Global -- to develop Chivo
19  Wallet trying to reduce commissions in the
20  intro -- in the remittance industry?
21      A.     I believe a goal of the government
22  of El Salvador is to reduce the total cost of
23  remittances.
24      Q.     Chivo Wallet does that, if somebody
25  uses it, right?

**Page 133**

1      A.     You would have to specify like by
2  what mechanism you think that it would reduce the
3  cost of remittances.
4      Q.     If somebody is getting -- if
5  somebody in El Salvador is using Chivo Wallet to
6  receive Bitcoin that was purchased in a US Bitcoin
7  ATM, that reduces the commissions, right?
8      A.     Oh, no. Not in any way.
9      Q.     No?
10      A.     No.
11      Q.     There's no benefit -- I thought you
12  said there was a benefit commission-wise to using
13  Chivo Wallet.
14      A.     Oh, to using the Chivo Wallet versus
15  some other wallet? Perhaps.
16      Q.     Yeah. That was my question. Yes.
17      A.     The Athena Bitcoin ATMs in the
18  United States generally charge a markup on the
19  price of Bitcoin anywhere between 12 and
20  20 percent, which would far outstrip the costs of
21  a traditional remittance.
22      Q.     Okay. But --
23      A.     So it would make no economic sense
24  for someone to use an Athena Bitcoin, Inc., ATM to
25  send their hundred dollars to their relative or



**Athena Bitcoin, Inc. (Eric Gravengaard)**
**August 17, 2022**

Page 134

1  friend or whomever in El Salvador regardless of
2  whether they are using the Chivo Wallet or any
3  other Bitcoin wallet in El Salvador.
4          Our commissions are just simply much
5  higher than what I believe to be the costs of
6  Western Union.
7      Q.    So if -- your testimony is that if
8  somebody purchases Bitcoin on an Athena ATM --
9  Bitcoin ATM in the United States and transferred
10  that to somebody in El Salvador using Chivo
11  Wallet, that they're still going to have a pretty
12  huge commission, 10 to 20 percent commission?
13      A.    There's a 20 -- there's a 10 to
14  20 percent markup -- I don't like to use the word
15  "commission" -- charged to the person who
16  purchased the Bitcoin in the United States.
17      Q.    So where would the savings in
18  markups or commissions or whatever you want to
19  call them come into play by using Chivo Wallet?
20      A.    Oh, for someone in El Salvador, they
21  can use a Chivo-branded ATM and either buy or sell
22  Bitcoin with zero markups.
23      Q.    Okay.  They have to have a
24  Chivo-branded ATM in El Salvador?
25      A.    Yes.

Page 135

1      Q.    And do they need the Chivo Wallet,
2  the Chivo Wallet app to use that?
3      A.    No.
4      Q.    No?  Okay.
5          So they need to use a Chivo-branded
6  ATM in El Salvador, and that there would lower
7  their commissions --
8      A.    Yes.
9      Q.    -- or markup?
10      A.    There's a beautiful one in the
11  airport in San Salvador right near the exit gate
12  as you walk towards customs.  And many people use
13  it.  Many people that are making a pilgrimage to
14  El Salvador to see how Bitcoin is being used use
15  it there.  And they pay zero commission on
16  their -- or fees or markups on their purchase or
17  sale of Bitcoin.
18      Q.    And it doesn't matter where they're
19  purchasing or selling Bitcoin -- I mean, what if
20  they're transferring Bitcoin?  Does that --
21      A.    I'm not sure what you mean by
22  "transferring."  Let me be more specific.
23          They can use any wallet they choose.
24  They can -- if they are lucky enough to have a
25  Chivo Wallet, they could use the Chivo Wallet.

Page 136

1  But they could use any wallet that's interoperable
2  with all wallets that can make or receive Bitcoin
3  on the Bitcoin network, and then they would
4  receive their Bitcoin without any markup.
5      Q.    Are those ATMs -- is there just one
6  in the airport, or are they at the consulates
7  or --
8      A.    I believe there's about 200 such
9  machines throughout the country of El Salvador.
10      Q.    Are there any Chivo-branded ATMs in
11  the United States?
12      A.    There are some at the consulates.
13      Q.    And are those ATMs that are being
14  installed or owned by or run by any Athena entity?
15      A.    Yes.  Those are owned by Athena
16  Bitcoin Global.
17      Q.    Were those in existence in September
18  or October of 2021?
19      A.    Some of them were, but we were still
20  rolling out the installations of those.
21      Q.    Do the Chivo-branded ATMs use Chivo
22  Wallet technology in any manner?
23      A.    No.
24      Q.    So your testimony is that the Chivo
25  Wallet software has absolutely no connection or

Page 137

1  role with Athena's US Bitcoin ATMs?
2      A.    That's correct.
3      Q.    There's just no --
4      A.    There's no relationship.  There's no
5  relationship between those two.
6      Q.    Did Chivo Wallet have any
7  relationship with the Chivo-branded ATMs in the
8  consulates in the United States?
9      A.    Can you repeat your question?  Does
10  the Chivo Wallet talk to the ATMs in the
11  consulates?  Is that what your question --
12      Q.    No, I didn't say talk to.  I said
13  does the Chivo Wallet technology or software have
14  any relationship to the US consulate Chivo-branded
15  ATMs?
16      A.    No.  Those are all completely
17  different platforms that have no communications
18  between those platforms.
19          MR. STEWART:  Let me take just a
20      couple-minute break.  Just a second.
21          (Recess from 12:20 p.m. to
22      12:36 p.m.)
23          THE REPORTER:  Ready.  Go ahead.
24          MR. STEWART:  Back on the record?
25          THE REPORTER:  Yes.



Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

Page 138

```
1   BY MR. STEWART:
2        Q.    Mr. Gravengaard, I just had a short
3   discussion with your lawyer during the break about
4   some of the scope of some of the topics, and are
5   you -- some of the questions I have been asking
6   you have been about the software, the Chivo Wallet
7   software and its relationship, if any, with Texas
8   Bitcoin ATMs or US Bitcoin ATMs.
9             Are you up to speed today to answer
10  fully and accurately all the questions that I've
11  asked you so far about the software, Chivo Wallet?
12       A.    I believe that I have been able to
13  answer all of your questions about the software.
14       Q.    Who is operating the US consulate
15  Chivo-branded ATMs?  Which entity?
16       A.    I believe it's Athena Bitcoin Global
17  has that contract.
18       Q.    Not Inc., correct?
19       A.    I believe that is true.  It's
20  Global.
21       Q.    And was that the same in
22  September-October of 2021?
23       A.    I believe it was.
24       Q.    I believe you mentioned that Global
25  didn't have a bank account and that's why Inc.
```

Page 139

```
1   paid Accruvia for the one invoice.
2             Do you recall that testimony?
3        A.    Yes.
4        Q.    Does Global and Inc. have any sort
5   of intercompany agreement for Global to -- for
6   Inc. to do that?
7        A.    There's no written agreement that
8   I'm aware of between those two entities to do
9   that.
10       Q.    Has Global repaid Inc. for the one
11  invoice that was actually paid to Accruvia?
12       A.    Yes.
13       Q.    Is it Mr. Panos?  Do you recall --
14  I'm jumping back a little bit.
15            Mr. Panos, do you know which entity
16  he worked for?  Was it the El Salvadoran entity,
17  Inc., or Global?  Do you recall?
18       A.    It wouldn't have been Inc., but I
19  would have to check our employment records as to
20  which entity he signed an agreement with.
21       Q.    Do you know the dates which he
22  worked for any entity?
23       A.    No, I do not.
24       Q.    Okay.  And by "worked," I mean
25  either employed or was a contractor.  Does that
```

Page 140

```
1   change your answer?
2        A.    No.  Broadly, I remember speaking
3   with him in October of last year, and I believe
4   that he began working with us again sometime in
5   the spring of this year through the end of July of
6   this year.
7        Q.    Okay.  Do you recall speaking in
8   November of 2021 at a conference called IABITCONF?
9        A.    I do remember speaking at such a
10  conference.
11       Q.    Is everything that you stated --
12  well, in speaking, you got up and publicly spoke
13  to a group of people at that conference, right?
14       A.    I spoke to a group of people at that
15  conference.
16       Q.    With respect to what you said during
17  your speech, if you want to call it that -- can I
18  call it a speech?
19            With respect to that speech, is
20  everything you said true and accurate?
21            MR. FOWLER:  Object to form.
22       A.    I -- I don't know.  I don't remember
23  everything that I said, and I don't know if
24  everything is at this current time true and
25  accurate to what I said.
```

Page 141

```
1   BY MR. STEWART:
2        Q.    At the time was everything you said
3   true and accurate?
4        A.    I believe it was, but I don't -- I
5   have no reason to believe it's not.
6        Q.    Do you recall speaking in April of
7   '22 to a Miami Bitcoin conference?
8        A.    Yes.
9        Q.    Did you also give a public speech at
10  that?
11       A.    I think I spoke on a panel.
12       Q.    Okay.  Is everything you said
13  publicly on that panel in April of 2022, was it
14  true and accurate at the time?
15            MR. FOWLER:  Objection, form.
16       A.    I believe that it was.
17  BY MR. STEWART:
18       Q.    And I believe you told me -- as you
19  can tell, Mr. Gravengaard, I'm just doing some
20  cleanup questions which is usually a good sign
21  we're close to the end.
22            I believe you told me that Global
23  did not pay the two Accruvia invoices because of
24  their belief that Mr. Overton had taken some bad
25  actions with respect to them in El Salvador; is
```



Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

Page 142

1  that right?
2      A.      Caused us great harm by doing -- by
3  taking such actions.
4      Q.      And so in response to that supposed
5  great harm that you say Mr. Overton did, Global
6  refused to pay the invoices for the work that was
7  done?
8      A.      Yes.  That's correct.
9      Q.      Who is -- who is -- and I apologize
10 if I've asked this, but I'm not sure I have.
11             But just to close the loop, on the
12 Chivo-branded ATMs in consulates in the US, who
13 is -- is there an entity doing maintenance work or
14 watching those, making sure they operate fine?
15     A.      A subcontractor that monitors those
16 machines?
17     Q.      Okay.
18     A.      I'm not sure.
19     Q.      Who hires that subcontractor is
20 really where I'm going.
21     A.      Yeah, I'm not sure.  Like who
22 changes the paper out?  I'm not sure.
23     Q.      Not who the subcontractor is, but
24 who hired the subcontractor, Global, Inc., or some
25 other entity?

Page 143

1      A.      I'm not sure.
2      Q.      Could be Inc.?
3      A.      It could be, or it could be Global.
4  I'm -- I don't know who has that contract or who
5  hired them.
6             MR. STEWART:  Can the court
7      reporter tell me, am I on Exhibit 19?
8             (Clarification requested by the
9      stenographer.)
10 BY MR. STEWART:
11     Q.      I just marked Exhibit 19,
12 Mr. Gravengaard.  And feel free to scroll through
13 this.
14             And my question -- my first question
15 for you on it is whether you have seen this
16 document before.
17     A.      I have never seen this document
18 before.  At least I don't remember seeing this
19 document before.
20     Q.      So do you know what it is?
21     A.      I'm not familiar with what it is.
22     Q.      Okay.  Was Chivo Wallet ever called
23 Chivo Core?
24     A.      There is a piece of the Chivo
25 software that we call the Chivo Core.

Page 144

1      Q.      And that piece of software is in
2  Chivo Wallet, correct?
3      A.      It would have been the -- you might
4  think of it as the back end to a system that
5  enables the Chivo Wallet to operate.
6      Q.      I see on the website something
7  called Athena Ruru.  Or Rura.  Is it Ruru or Rura?
8  Ruru.
9      A.      I'm sorry.  Are you asking me how to
10 pronounce Maori?  To the best of my knowledge,
11 it's Ruru.
12     Q.      Okay.  And is that different than
13 Chivo Wallet?  Or what is Ruru?
14     A.      Yes, it's different.  Chivo Wallet
15 is a product and is owned by the government of
16 El Salvador and operated by Chivo, S.A. de C.V. in
17 El Salvador.  And Chivo -- and Athena Ruru is the
18 brand name we have given to an Athena product,
19 which is also a wallet.
20     Q.      What's the name of that wallet?
21     A.      I just said it was Athena Ruru.
22     Q.      Okay.  And that Ruru wallet is owned
23 by Global?
24     A.      Yes.
25     Q.      Does the Ruru wallet, is it -- does

Page 145

1  it use any of the software or technology that went
2  into Chivo Wallet?
3      A.      It is based on similar concepts and
4  some of the same intellectual property.
5      Q.      When was it developed?
6      A.      Largely started in January of 2022
7  and onward.
8      Q.      And is Athena Ruru a wallet that is
9  used in Athena's Texas ATM Bitcoins -- or Bitcoin
10 ATMs?
11     A.      No.
12     Q.      It's not used at all in your -- in
13 the US --
14     A.      No.
15     Q.      Is it used at all in the US Bitcoin
16 ATMs?
17     A.      No.
18     Q.      How much of the code from Chivo
19 Wallet is used in Chivo -- Chivo --
20             MR. FOWLER:  Objection, form.
21     Kelly, we're way beyond the scope of your
22     deposition notice here.
23             MR. STEWART:  Well, Larry, with
24     all due respect, we're not because the
25     tie of the work done in question on Chivo



Athena Bitcoin, Inc. (Eric Gravengaard)
August 17, 2022

**Page 146**

1    Wallet, to the extent that's used in
2    Ruru, that's personal --- that goes to
3    personal jurisdiction.
4            So if Mr. Gravengaard can't answer
5    my question, then he can tell me that.
6    And I understand that software was not a
7    topic, but it is part of the whole tie to
8    the use of the work that -- one of the
9    topics was the use of the work done by
10   Accruvia, and I'm trying to find out
11   whether Global used that work. And
12   that's where we get into these details.
13           MR. FOWLER: Well, actually,
14   that's not true. You're not asking
15   whether Global used the work. You're
16   asking whether Bitcoin Inc. used the
17   work, and that is a completely different
18   topic.
19           MR. STEWART: Okay.
20   BY MR. STEWART:
21   Q.      Well, Ruru is owned by Global --
22   right? -- or done by Global? Mr. Graengaard,
23   right?
24   A.      May I make a separate statement,
25   which is we haven't released the Athena Ruru

**Page 147**

1    Wallet, so there are no users of it.
2    Q.      Okay.
3    A.      So, therefore, it can't be -- it
4    can't be used in an Athena Bitcoin, Inc., manner
5    because it's not used by anyone.
6    Q.      All right. And so is the work done
7    for Chivo Wallet by Accruvia, is that work in any
8    way a part of the software or any way part of
9    Ruru?
10   A.      I'm not sure that any of the work
11   that was done by Accruvia has survived to be a
12   part of the Ruru software at the present time.
13   Q.      Do any of the Inc. subcontractors or
14   employees work on Ruru?
15   A.      Do any of the Inc. . . No, not -- I
16   don't believe they do.
17   Q.      Have they ever worked on Ruru?
18   A.      I believe Ms. Jarrell has worked on
19   some of the marketing in preparation for launching
20   of Ruru.
21   Q.      Okay. But as far as --
22   A.      The software development is not done
23   in the United States by Athena Bitcoin, Inc.,
24   employees.
25   Q.      Is it done by any Inc. contractors

**Page 148**

1    or subcontractors wherever they're located?
2    A.      Yeah, no. It's -- it's not.
3    Q.      Advertising is one of my topics.
4            Does Inc. do any advertising or
5    marketing in Texas?
6    A.      No, I don't believe we do. Like
7    billboards and things like that, no.
8    Q.      Well, other than website, you're not
9    aware of any marketing or advertising, then, that
10   Inc. might be doing in Texas?
11   A.      No.
12           MR. STEWART: Okay. I pass the
13   witness.
14           MR. FOWLER: We'll reserve all
15   questions.
16           MR. STEWART: All right.
17           THE REPORTER: We're off the
18   record.
19           (Proceedings concluded at
20   12:51 p.m.)
21           (Signature of the witness was not
22   requested pursuant to FRCP 30(e)(1).)
23
24
25

**Page 149**

1            CERTIFICATE
2    I, RONALD R. COPE, Registered Professional
     Reporter and Certified Realtime Reporter, do
3    hereby certify that prior to the commencement of
     the examination, ERIC GRAVENGAARD (PERSONAL
4    JURISDICTION) was duly sworn by me to testify to
     the truth, the whole truth and nothing but the
5    truth.
     I DO FURTHER CERTIFY that the foregoing is a
6    verbatim transcript of the testimony as taken
     stenographically by and before me at the time,
7    place and on the date hereinbefore set forth, to
     the best of my ability.
8    I DO FURTHER CERTIFY that signature of the
     witness was not requested pursuant to FRCP
9    30(e)(1).
     I DO FURTHER CERTIFY that I am neither a
10   relative nor employee nor attorney nor counsel of
     any of the parties to this action, and that I am
11   neither a relative nor employee of such attorney
     or counsel, and that I am not financially
12   interested in the action.
     I DO FURTHER CERTIFY that the amount of time
13   used by each party at the deposition is as
     follows:
14           Kelly Stewart - 3:09:19
             Larry L. Fowler, Jr. - 0:00:00
15
16
17           RONALD R. COPE, CSR, RPR, CRR,
18           Notary Public
             My commission expires October 17, 2025
19           GOUCHER PARKER SPIVEY, LLC
             Texas Court Reporting Firm Reg. 11446
20           9243 Dove Meadow Drive
             Dallas, Texas 75243
21           214.347.4781
22           gpscalendar@gps.llc
23   Dated: 31st day of August, 2022
24
25



**GPS LLC**
gpscalendar@gps.llc ~ 214.347.4781

# BLOCK & MCNEILL, LLP

Sterling Plaza
5949 Sherry Lane, Suite 900
Dallas, Texas 75225

Telephone
214 866-0990

Facsimile
214 866-0991

Web Site
www.bmcounsel.com

**By Email and Certified Mail, Return Receipt Requested**

December 14, 2021

Mr. Zachary Soto
PAG.law PLLC
600 Brickwell Avenue, Suite 1725
Miami, Florida 33131
Email: zac@pag.law

      Re:    Demand for Payment on behalf of ROI Developers Inc. d/b/a Accruvia

Dear Mr. Soto:

      This law firm represents ROI Developers Inc. d/b/a Accruvia ("Accruvia"), which has retained us to assist it in collection of the outstanding amounts owed to it by Athena Bitcoin Global ("Athena"). Enclosed with this letter are two invoices previously submitted by Accruvia to Athena, no. 1050 dated November 3, 2021 in the amount of $75,250.57 and no. 1052 dated November 4, 2021 in the amount of $8,428.34, both of which remain outstanding as of the date of this letter. I also enclose invoice no. 1049 dated October 4, 2021 in the amount of $11,686.69, which reflects the parties' agreement and course of conduct regarding the invoicing and payment for services provided by Accruvia and its personnel to Athena.

      On behalf of Accruvia, demand is hereby made that Athena, by no later than 5:00 p.m. (Dallas, Texas time) on December 21, 2021, remit payment to Accruvia of readily available funds in the amount of $83,678.91. Please be advised that Accruvia expressly reserves all of its legal rights and remedies against Athena, including but not limited to its rights to pursue all of its lawful remedies against Athena in a legal action for damages for breach of contract, quantum meruit and theft of services under the Texas Theft Liability Act. If Accruvia prevails in any such legal action it reserves the right to seek not only to its actual damages for the outstanding balance owed, but also its additional damages, exemplary damages, attorney's fees, court costs and pre- and post-judgment interest to the maximum lawful extent.

      Please immediately advise to me in writing whether or not Athena agrees to comply with the foregoing demand. If you have any questions concerning the contents of this letter, please contact me in writing. Oral communications will not serve to protect whatever rights Athena may have.

**Exhibit 5**

BLOCK & McNEILL, LLP

Mr. Zachary Soto
December 14, 2021
Page 2

Very truly yours,

Christopher M. McNeill

cc:    Accruvia

Enclosures



**Accruvia**
615 W Harwood Rd Ste B2
Hurst, TX  76054 US
soverton@roidevs.com

# INVOICE

**BILL TO**
Athena Bitcoin
1332 North Halsted Street
Chicago, IL 60642

**INVOICE #** IB1050
**DATE** 11/03/2021
**DUE DATE** 11/03/2021
**TERMS** Due on receipt

| ACTIVITY | AMOUNT |
|---|---|
| **Programming Hours:Programming Hour** Lance Moore | 6,513.00 |
| **Programming Hours:Programming Hour** Mariano Andres | 5,010.00 |
| **Programming Hours:Programming Hour** Yordano Morel | 1,904.09 |
| **Programming Hours:Programming Hour** Williams Mendez | 10,016.00 |
| **Programming Hours:Programming Hour** Franklin Grassals | 10,016.00 |
| **Programming Hours:Programming Hour** Panos Angeloupolos | 10,000.00 |
| **Programming Hours:Programming Hour** Mario Grullon | 5,011.63 |
| **Programming Hours:Programming Hour** Leonidas Panagiotou | 1,517.04 |
| **Programming Hours:Programming Hour** Shaun Overton | 16,666.67 |
| **Programming Hours:Programming Hour** Bailey Jarrell | 5,871.05 |
| **Programming Hours:Programming Hour** Burak Hamzao lu | 1,258.06 |
| **Programming Hours:Programming Hour** Overhead expenses - 1.5% | 1,132.03 |
| **Programming Hours:Programming Hour** Gustavo Rodriguez | 335.00 |

Invoice for labor October 1-31

**BALANCE DUE**

**$75,250.57**



**Accruvia**
615 W Harwood Rd Ste B2
Hurst, TX  76054 US
soverton@roidevs.com

# INVOICE

**BILL TO**
Athena Bitcoin
1332 North Halsted Street
Chicago, IL 60642

**INVOICE #** IB1052
**DATE** 11/04/2021
**DUE DATE** 11/04/2021
**TERMS** Due on receipt

| ACTIVITY | AMOUNT |
|---|---|
| **Programming Hours:Programming Hour**<br>Lance Moore | 1,000.00 |
| **Programming Hours:Programming Hour**<br>Mariano Andres | 500.00 |
| **Programming Hours:Programming Hour**<br>Yordano Morel | 700.00 |
| **Programming Hours:Programming Hour**<br>WIlliams Mendez | 1,000.00 |
| **Programming Hours:Programming Hour**<br>Franklin Grassals | 1,000.00 |
| **Programming Hours:Programming Hour**<br>Panos Angeloupolos | 1,000.00 |
| **Programming Hours:Programming Hour**<br>Mario Grullon | 500.00 |
| **Programming Hours:Programming Hour**<br>Leonidas Panagiotou | 350.00 |
| **Programming Hours:Programming Hour**<br>Shaun Overton | 1,666.67 |
| **Programming Hours:Programming Hour**<br>Bailey Jarrell | 587.11 |
| **Programming Hours:Programming Hour**<br>Overhead expenses - 1.5% | 124.56 |

Invoice for labor November 1-3, 2021. Final payment

**BALANCE DUE**                 **$8,428.34**



**Accruvia**
615 W Harwood Rd Ste B2
Hurst, TX  76054 US
soverton@roidevs.com

# INVOICE

**BILL TO**
1332 North Halsted Street,
Chicago, IL, 60642

**INVOICE #** IB1049
**DATE** 10/04/2021
**DUE DATE** 10/11/2021
**TERMS** Net 30

| ACTIVITY | AMOUNT |
|---|---|
| **Programming Hours:Programming Hour** Franklin Grassals | 666.66 |
| **Programming Hours:Programming Hour** Williams Mendez | 1,999.98 |
| **Programming Hours:Programming Hour** Panos Angelopoulos | 1,999.98 |
| **Programming Hours:Programming Hour** Burak Hamzaoglu | 630.00 |
| **Programming Hours:Programming Hour** Mariano Andres | 1,200.00 |
| **Programming Hours:Programming Hour** Mario Grullon | 1,200.00 |
| **Programming Hours:Programming Hour** Gustavo Rodriguez | 484.00 |
| **Programming Hours:Programming Hour** Shaun Overton | 3,333.36 |
| **Programming Hours:Programming Hour** Overhead expenses - 1.5% | 172.71 |

PAID

| | |
|---|---|
| PAYMENT | 11,686.69 |
| BALANCE DUE | **$0.00** |

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**(FORT WORTH DIVISION)**

| | | |
|---|---|---|
| **ROI   DEVELOPERS,   INC.   d/b/a** § | | **Case No. 4:22-cv-00073-O** |
| **ACCRUVIA** § | | |
| § | | (Formerly in the 96th District Court of Tarrant |
| *Plaintiff* § | | County, Texas |
| § | | Cause No. 096-331099-21 |
| **VS.** § | | |
| § | | |
| **ATHENA   BITCOIN,   INC.   d/b/a** § | | |
| **ATHENA BITCOIN GLOBAL** § | | |
| § | | |
| *Defendant* § | | |

## AFFIDAVIT OF LARRY L. FOWLER, JR.

| | |
|---|---|
| **STATE OF TEXAS** § | |
| § | |
| **COUNTY OF TARRANT** § | |

Before me, the undersigned Notary Public on this day personally appeared LARRY L.

FOWLER, JR., who upon his oath stated:

1.  "My name is Larry L. Fowler, Jr.  I am over 18 years of age and I am competent to make and give this affidavit.  The facts stated in this affidavit are within my personal knowledge and are all true and correct.  I am an attorney of record for the Defendant in this proceeding.

2.  The document that is attached as *Exhibit 2* to the Appendix to the Defendant's Motion for Summary Judgment and Brief in Support is a certified copy of the translated Non-Disclosure Agreement signed and entered into by Shaun Overton for the benefit of Athena Holdings El Salvador, S.A. de C.V. which was discussed with Mr. Gravengaard at his deposition.  *See* Oral Deposition of Eric Gravengaard at pages 112-113, lines 23-25 and 1-9, respectively.

3.  The document that is attached as *Exhibit 5* to the Appendix to the Defendant's Motion for Summary Judgment and Brief in Support is a copy of the December 14, 2021 demand letter on behalf of Accruvia sent to Athena Bitcoin Global which was discussed with Mr. Overton at his deposition.  *See* Oral Deposition of Shaun Overton at pages 97-99, lines 4-25, 1-25, 1-19, respectively.

**Exhibit 6**         101

**4.** Attached hereto as ***Exhibit 1*** are the Plaintiff's Responses to Defendant's First Set of Personal Jurisdiction Discovery, Requests for Admissions which were served in response to the Defendant's discovery requests by the Plaintiff ROI Developers, Inc. d/b/a Accruvia in the above-referenced case.

**5.** Further affiant sayeth naught."

_____
Larry L. Fowler, Jr.

**SWORN** to and **SUBSCRIBED** before me, the undersigned authority, on this the 4th day of October, 2022 by Larry L. Fowler, Jr.

_____
Notary Public, State of Texas

MELISSA ROMAN
Notary Public, State of Texas
Comm. Expires 09-25-2026
Notary ID 129971930

---

**AFFIDAVIT OF LARRY L. FOWLER, JR.** **PAGE 2**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **ROI DEVELOPERS, INC.,** | § | |
| **d/b/a ACCRUVIA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:22-cv-00073-O** |
| | § | |
| **ATHENA BITCOIN, INC.,** | § | |
| | § | |
| **Defendant.** | § | |

**PLAINTIFF'S RESPONSES TO DEFENDANT'S**
**FIRST SET OF PERSONAL JURISDICTION DISCOVERY**

Plaintiff ROI Developers, Inc., d/b/a/ Accruvia ("Accruvia") responds to Defendant's

First Set of Personal Jurisdiction Discovery as follows:

**OBJECTIONS TO ALL REQUESTS**

1.      Accruvia objects to the definition of Accruvia because it includes independent

contractors, over whom it does not exercise control.  Accruvia also objects to this definition

because it includes "other related parties retained or otherwise controlled by Accruvia."  As

written, in includes Accruvia's attorneys, making it seek privileged information, and it is unclear

what "otherwise controlled by Accruvia" means.  Accruvia will respond to the discovery

requests on behalf of itself and in accordance with the Federal Rules of Civil Procedure.

2.      Accruvia objects to the instruction regarding identifying or describing a person

because, by requiring the person's present or last-known office address, work-related telephone

number, occupation, job title, employer, and employer's contact information, it is overly broad

and imposes a burden on Accruvia not required by the Federal Rules of Civil Procedure.

Accruvia, to the extent necessary to respond to the discovery requests by identifying a person,

will provide the person's name and last-known phone number/email.

1

EXHIBIT
1

**REQUEST FOR PRODUCTION NO. 8:** Any documents evidencing that Athena made contact with Accruvia within the State of Texas, including phone records, notes from phone calls, logs of connections to wireless networks, or WLAN report.

**RESPONSE:** Accruvia will produce responsive documents, if any, at a mutually convenient time and location.

**REQUEST FOR PRODUCTION NO. 9:** All documents including but not limited to the employment or independent contractor agreement or the like, identifying the location or residence of any employee or subcontractor of Accruvia who performed work for Athena.

**RESPONSE:** Accruvia objects to this request because it is overly broad and seeks irrelevant information because the actual residency of the independent contractors, if they are not Texas residents, is not at issue. Accruvia has provided in response to Interrogatory No. 10 the names of independent contractors and has stated that only Overton and Jarrell are or were Texas residents. With respect to Jarrell, who was a Texas resident when she was an Accruvia employee, she now works for Athena (or one of its related companies). Accruvia further objects to this request because, by seeking "all documents . . . identifying the location or residence," it is further overly broad, vague and ambiguous.

**REQUEST FOR PRODUCTION NO. 10:** All documents evidencing a request for Accruvia to perform any work for Athena within or from the State of Texas.

**RESPONSE:** Accruvia will produce responsive documents, if any, at a mutually convenient time and location.

**REQUEST FOR PRODUCTION NO. 11:** All documents evidencing a "valid and existing agreement between Accruvia and Athena that provides that Athena will pay Accruvia for the software development and support services work it performed for Athena."

**RESPONSE:** Accruvia will produce responsive documents, if any, at a mutually convenient time and location.

### Requests for Admission

**REQUEST FOR ADMISSION NO. 1:** Admit that the work you allege was performed for Athena did not have to be performed in Texas.

**RESPONSE:** Admitted.

**REQUEST FOR ADMISSION NO. 2:** Admit that the work you allege was performed for Athena was not work related to the ATMs owned and/or operated by Athena in Texas.

**RESPONSE:** Denied.

**REQUEST FOR ADMISSION NO. 3:** Admit that Athena's actions in breach of the terms of the alleged agreement that you described in your answer to Interrogatory No. 6 were not performed within the State of Texas.

**RESPONSE:** Denied.

**REQUEST FOR ADMISSION NO. 4:** Admit that no in-person meeting between Accruvia and Athena ever took place in Texas.

**RESPONSE:** Admitted.

**REQUEST FOR ADMISSION NO. 5:** Admit that a majority of Accruvia's business takes place in El Salvador.

**RESPONSE:** Accruvia objects to this request because it seeks an admission on a fact that is not relevant—i.e., where Accruvia's "business takes place." The issue for personal jurisdiction is *Athena's* contacts with Texas, not Accruvia's contacts elsewhere. Where Accruvia's "business takes place" is also undefined, vague and ambiguous, and Accruvia objects to this request on that ground too. Regardless of its irrelevance, based on Accruvia's understanding of the phase "where business takes place," Accruvia denies this request.

**REQUEST FOR ADMISSION NO. 6:** Admit that your familiarity with Athena arose from work you were conducting in El Salvador.

**RESPONSE:** Admitted.

**REQUEST FOR ADMISSION NO. 7:** Admit that the only employee of Accruvia who was a Texas resident between August and November 2021 was Shaun Overton and admit that Shaun Overton worked mostly if not entirely from El Salvador.

8

**RESPONSE:**  This request constitutes two requests for admission, making it improper.  With respect to "the only employee of Accruvia who was a Texas resident between August and November 2021," Accruvia denies that request.  With respect to whether "Shaun Overton worked mostly if not entirely from El Salvador," Accruvia objects because the phrase "mostly if not entirely" is vague and ambiguous.  Regardless, based on Accruvia's understanding of "mostly if not entirely," Accruvia denies that request.

**REQUEST FOR ADMISSION NO. 8:** Admit that Athena never sent any payment, correspondence or used any courier services for delivery of any communications to Accruvia in Texas.

**RESPONSE:** Denied.

**REQUEST FOR ADMISSION NO. 9:** Admit that Accruvia did not enter into a Term Sheet Agreement with Athena on September 22, 2021. Term Sheet Agreement is defined as the document produced to Accruvia Bates labeled 000003-000005.

**RESPONSE:**  Accruvia admits that the Term Sheet is between Accruvia and "Athena Bitcoin Global Inc."  Accruvia otherwise denies this request.

Dated this 13th day of June, 2022.

Respectfully submitted,

/s/ Kelly Stewart
Kelly Stewart
Texas Bar No. 19221600
K STEWART LAW, P.C.
5949 Sherry Lane, Suite 900
Dallas, Texas 75225
972.308.6168
kelly@kstewartlaw.com

**ATTORNEY FOR PLAINTIFF**

9

## **CERTIFICATE OF SERVICE**

This certifies that copy of this document was served on counsel for Defendant on June

13, 2022, via email.

/s/ Kelly Stewart

10

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| ROI DEVELOPERS, INC.,<br>d/b/a ACCRUVIA,<br><br>Plaintiff,<br><br>v.<br><br>ATHENA BITCOIN, INC.,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 4:22-cv-00073-O |

## VERIFICATION

STATE OF TEXAS          §

COUNTY OF Tarrant §

BEFORE ME, the undersigned authority, on this day personally appeared Shaun Overton, known to me to be the person whose signature appears below, and upon his oath duly deposed and said:

My name is Shaun Overton. I am the President of ROI Developers, Inc. d/b/a Accruvia ("Accruvia"). As such, I have personal knowledge of the facts in this Verification. I hereby verify that Accruvia's factual responses to the interrogatories in Defendant's First Set of Personal Jurisdiction Discovery are true and correct.

Shaun Overton

This instrument was personally acknowledged, subscribed, and sworn to before me on the 2 day of June, 2022, by Shaun Overton.

DENE LANEASE CARTER
My Notary ID # 13323695
Expires July 28, 2025

NOTARY PUBLIC, in and for the State of Texas

My Commission Expires: July 28, 2025